FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA** 2011 MAR -9  PM 2: 47
**SAVANNAH DIVISION**

CLERK_____
SO. DIST. OF GA.

| | |
|---|---|
| UNITED STATES   ex rel.<br>PHILLIP S. SCHAENGOLD,<br><br>    Plaintiff - Relator<br><br>v.<br><br>MEMORIAL HEALTH, INC.,<br>MEMORIAL HEALTH UNIVERSITY<br>MEDICAL CENTER, PROVIDENT<br>HEALTH SERVICES, INC., MPPG<br>INC., d/b/a MEMORIAL HEALTH<br>UNIVERSITY PHYSICIANS<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.    C V 4 1 1 - 0 5 8

FILED *IN CAMERA* AND
UNDER SEAL

## FALSE CLAIMS ACT / QUI TAM COMPLAINT

1.  This is a *qui tam* complaint brought by Plaintiff-Relator Phillip S. Schaengold on behalf

of the United States of America to recover damages and civil penalties arising from the

Defendants' actions in violating the False Claims Act, 31 U.S.C. § 3729, *et seq*.  Defendants

knowingly presented, or caused to be presented, numerous false or fraudulent claims for payment

or approval to the United States in connection with the operation of their health care facilities in

Savannah, Georgia.  These false claims were the tainted product of prohibited patient referrals to

the Defendants from physician practices and individual physicians in violation of the Fraud and

Abuse Anti-Kickback and prohibited referral provisions of 42 U.S.C. § 1320a – 7b(b) and the

Stark Laws.  In addition, Relator's employment was unlawfully terminated and he seeks redress

under 31 U.S.C. § 3730(h).   In support of the Complaint, Relator avers as follows:

## JURISDICTION AND VENUE

2.   This Court has jurisdiction over this action under 28 U.S.C. § 1331 in that the claims arise under the laws of the United States, specifically the False Claims Act, 31 U.S.C. § 3729-33, the Fraud and Abuse Anti-Kickback and prohibited referral provisions of 42 U.S.C. § 1320a – 7b(b), and the Stark Laws.  In addition, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is a party to the action.

3.   Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because the Defendants reside in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

4.   Relator Phillip S. Schaengold is a resident of the State of Georgia.  Relator served as President and Chief Executive Officer of Defendant Memorial Health, Inc. and Defendant Memorial Health University Medical Center, Inc. from June 1, 2009 until his retaliatory discharge on January 5, 2011.

5.   Defendant Memorial Health, Inc. ("the Holding Company") is a non-profit corporation organized under the laws of the State of Georgia and maintains a principal office address of 4700 Waters Avenue, Savannah, Georgia 31404.  The Holding Company was created to own and operate a comprehensive health care system consisting of outpatient and inpatient medical facilities, physician practices, residency teaching programs, medical transportation and other related and ancillary components.  The Holding Company owns and operates Defendant Memorial University Medical Center, Inc.

6.   Defendant Memorial University Medical Center, Inc. ("Memorial") is a non-profit corporation organized under the laws of the State of Georgia and maintains a principal office address of 4700 Waters Avenue, Savannah, Georgia 31404.  Memorial operates a 530 bed medical center serving multiple counties in southeastern Georgia and southern South Carolina.

- 2 -

7.  Defendant Provident Health Services, Inc. ("Provident") is a for-profit corporation organized under the laws of the State of Georgia and maintains a principal office address of 4700 Waters Avenue, Savannah, Georgia 31404.  Provident is a holding company for many of the ancillary service providers operating in connection with the Hospital including ambulance transport, medical office buildings, and physicians employed by Defendant MPPG, Inc. Memorial is the sole member of Provident.

8.  MPPG Inc. ("MHUP") is a for-profit corporation organized under the laws of the State of Georgia and maintains a principal office address of 4700 Waters Avenue, Savannah, Georgia 31304. MHUP conducts business under the trade name Memorial Health University Physicians. MPPGis the holder of the physician contracts for those physicians working at the Hospital and is the legal entity that employs the physicians.

## LEGAL AND REGULATORY BACKGROUND

9.  **The Anti-Kickback Statute**, 42 U.S.C. § 1320a-7b(b) ("AKS"), arose out of Congressional concern that if those who influence healthcare decisions were allowed to have a financial stake in selection of healthcare goods and services, their judgment might be tainted, resulting in goods and services being provided that are medically unnecessary, of poor quality, or even harmful.

10.  To protect the integrity of government programs, in 1972 Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care, strengthening that statute in 1977 and again in 1987. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

11.     Among other provisions, the AKS makes criminal certain types of remunerative arrangements:

> (b) Illegal remunerations.
>     (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $ 25,000 or imprisoned for not more than five years, or both.
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $ 25,000 or imprisoned for not more than five years, or both.

42 U.S.C.S. § 1320a-7b.

12.     Violation of the AKS subjects the perpetrator to exclusion from federal health care programs, civil money penalties of $50,000 per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7(b)(7) and (a)(7).

13.     **The Stark Laws** are made up three separate provisions which govern physician self-referral for Medicare and Medicaid patients. Under the Stark Laws, physicians are prohibited from referring a patient to a medical facility in which they have a financial interest. Given the physician's position to benefit from the referral there is both an inherent conflict of interest, and potential for over-utilization of services. In addition, such referrals could limit competition. Stark regulations may be found at 42 C.F.R. § 411.350 through § 411.389.

14.     Stark I was included as a provision in the Omnibus Budget Reconciliation Act of 1989 and barred self-referrals for clinical laboratory services under the Medicare program, effective January 1, 1992. Stark I also included a series of exceptions to accommodate legitimate business arrangements. Stark II, contained in the Omnibus Budget Reconciliation Act of 1993 (OBRA 1993), expanded the restriction to a range of additional health services and applied it to both Medicare and Medicaid.

15.     The Designated Health Services ("DHS") covered by the Stark Laws include clinical laboratory services; physical therapy; occupational therapy; radiology and imaging services; radiation therapy and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics and prosthetic devices; home health care and supplies; outpatient prescription drugs; and inpatient and outpatient hospital care.

16.     Stark broadly defines "referral" to include a request by a physician for an item or service payable under Medicare or Medicaid (including the request by a physician for consultation with another physician as well as any test/procedure ordered/performed by such other physician), or a request by a physician for the establishment of a care plan to include provision of a DHS.

17.     CMS has provided certain exceptions to the AKS and Stark laws, in order to permit legitimate relationships between physicians and related professionals and institutions. Defendants, however, have failed to avail themselves of any of the exceptions.

18.     FMV is defined statutorily to mean "the value in arm's length transactions, consistent with the general market value". 42 U.S.C. § 1395nn(h)(3).

19.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the **Medicare program**. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

20.     **Medicare Part A** provides basic insurance for the costs of hospitalization and post-hospitalization care.  42 U.S.C. § 1395c-1395i-2 (1992). **Medicare Part B** is a federally subsidized, voluntary insurance program that covers the fee schedule amount for laboratory services. 42 U.S.C. §§ 1395(k), 1395(i), 1395(s).

21.     Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund.  42 U.S.C. § 1395(u).  In this capacity, the carriers act on behalf of CMS.  42 C.F.R. § 421.5(b).  Most hospitals, including Defendants, derive a substantial portion of their revenue from the Medicare program.

22.     In order to receive Medicare funds, enrolled suppliers, including Defendants, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

23.     Among the rules and regulations which enrolled suppliers, including Defendants, agree to follow are to: (a) bill Medicare Carriers for only those covered services which are medically necessary; (b) not bill Medicare Carriers for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over-utilization of services; (d) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (e) comply with state and federal statutes, policies and regulations applicable to the Medicare Program; and (f) not engage in any illegal activities related to the furnishing of services to recipients.

24.     Under the Medicare Program, CMS makes payments retrospectively (after they are rendered) to hospitals for inpatient services.  In order to establish a hospital's eligibility to participate in the program, Medicare enters into provider agreements with a given hospital. However, the contract between Medicare and the hospital is not to provide particular services for particular patients.  Any benefit from those services is derived solely by the patients and not by the U.S. or the Medicare program.

25.     **Resource-Based Relative Value Scale (RBRVS)** has been used since the Ominibus Budget Reconciliation Act of 1989 to determine how much money medical providers should be paid. It is currently used by CMS and by nearly all Health maintenance organizations (HMOs).  The RBRVS assigns procedures performed by a physician or other medical provider relative value units ("RVUs").  Total RVUs for a given procedure/CPT code is composed of three separate factors: physician work (52%), practice expense (44%), and malpractice expense (4%). The RVUs assigned to CPT codes change from year to year.

26.     RVUs are then adjusted by geographic region. This value is then multiplied by a fixed conversion factor, which changes annually, to determine the amount of payment.

27.     To assist with the administration of Medicare Part A, CMS contracts with fiscal intermediaries ("FIs") pursuant to 42 U.S.C. § 1395h.   These FIs are typically insurance companies, and are responsible for processing and paying claims and for audits of a provider's cost reports.  Upon discharging a Medicare beneficiary, the hospital submits claims for interim reimbursement for items and services provided during the beneficiary's stay.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals use CMS Form UB-92 (formerly HCFA Form UB-82) to submit these interim claims.

28.     In order to receive payment from Medicare, CMS requires hospitals to annually submit CMS-2552, known as a Hospital Cost Report.  Cost Reports are the final claim made to a FI for payment for services provided to Medicare beneficiaries.

29.     The **Cost Report**, which is filed with the FI, states the total amount that the hospital believes it is due for the year from CMS.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20.  *See also* 42 C.F.R. § 405.1801(b)(1).  CMS relies on the Cost Report to determine whether it owes the hospital more than has been paid through interim payments, or whether the hospital has been overpaid and must reimburse the Medicare program.  42 C.F.R. §§ 405.1803, 413.60, and 413.64(f)(1).

30.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s/UB-82's) during the course of the fiscal year. On the Cost Report, this liability for inpatient services is then totaled with any other Medicare liabilities owed to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

31.     Medicare has the right to audit the Cost Reports and financial representations made by all of the Defendants hospitals to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

32.     Every hospital's Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator. Prior to September 30, 1994, the responsible provider official was required to certify, in pertinent part:

> [T]o the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

(Form CMS-2552-81).

33.     Thus, the provider was required to certify that the filed Hospital Cost Report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; and (3) complete, i.e., that the Hospital Cost Report is based upon all known information.

34.     The "applicable instructions" contained in the pre-September 1994 certification included the requirement that services described in the Cost Report complied with Medicare program requirements, including provision outlawing kickbacks, codified in 42 U.S.C. § 1320a-7b(b). The pre-September 1994 Hospital Cost Report (CMS-2552-81) reminded providers that "intentional misrepresentation or falsification of any information contained in this cost report may be punishable by law fine and/or imprisonment under federal law."

35.     On September 30, 1994, Medicare revised the certification provision of the Hospital Cost Report to add the following:

*I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.* (Form CMS-2552-92).

96.     Subsequently, in or about 1996, the Hospital Cost Report was revised again to include the following notice:

*Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.*

97.     Under all versions of the CMS Form 2552 certification, the provider certified that services provided in the cost report were not infected by a kickback.

98.     A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

*Whoever...having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment...conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...shall in the case of such a...concealment or failure...be guilty of a felony.*

99.     Each year, Defendants submitted Hospital Cost Reports that falsely represented compliance with Medicare laws/regulations, including the Anti-Kickback Statute. These misrepresentations were material to the Government's decision to pay for services. In light of the foregoing, each CMS Form UB-92/UB-82 submitted by Defendants under Medicare was a false claim.

100.    In addition to the hospital fees billed by hospitals, physicians also bill for their services provided to Medicare patients. Physicians and physician groups submit form CMS-1500 (formerly HCFA-1500) for this purpose. The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from

Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

101.  By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicare program, and that they have complied with all applicable regulations and laws governing the program, including the Anti-Kickback Statute.

102.  At all times relevant to this complaint, Defendants was enrolled in, and sought reimbursement from, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), now known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS"). TRICARE/CHAMPUS is a federally-funded program that provides medical benefits, including hospital services to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer (b) the unmarried spouses and children of deceased service members; and (c) retirees. Hospital services at non-military facilities are sometimes provided for active duty members of the armed forces as well. 10 U.S.C. § 1971-1104; 32 C.F.R. § 199.4(a).

103.  In addition to individual patient costs, providers are required to submit a TRICARE/CHAMPUS form, "Requests for reimbursement of CHAMPUS Capital and Direct Medical Education Costs," ("Requests for Reimbursement") in which the provider sets forth its number of TRICARE/CHAMPUS patient days and financial information which relates to these two cost areas and which is derived from the facility's Medicare cost report. This Request for Reimbursement requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report".

104.  Upon receipt of a hospital's Request for Reimbursement and its financial data, TRICARE/CHAMPUS or its FI applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of

- 11 -

TRICARE/CHAMPUS patients in the facility. Defendants submitted Requests for Reimbursements to TRICARE/CHAMPUS that were based on its Medicare cost reports.

105.     Whenever Defendants' Medicare cost reports contained falsely inflated or incorrect data or information from which Defendant derived their Requests for Reimbursement submitted to TRICARE/CHAMPUS, those Requests for Reimbursement were also false.

106.     Whenever Defendants' Requests for Reimbursement were false due to falsity in their Medicare cost reports, Defendants falsely certified that the information contained in their Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report" (emphasis added).

107.     Each year, Defendants submitted Hospital Cost Reports that falsely represented compliance with Medicare regulations and laws, including the Anti-Kickback Statute.

108.     In addition to the hospital fees billed by hospitals, physicians also bill for their services provided to TRICARE/CHAMPUS patients. Physicians and physician groups submit form CMS-1500 for this purpose. The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

109.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in TRICARE/CHAMPUS program, and that they have complied with all applicable regulations and laws governing the program, including the Anti-Kickback Statute.

## FACTUAL BACKGROUND

110.     The claims in this case center on the Defendants' unlawful plan to overcompensate certain physicians well above fair market value for their services in return for the promise of patient referrals from those physicians to the Defendants' health care facilities and for ancillary services.  Once the plan was implemented, the Defendant's continued to overcompensate certain physicians well above fair market value for their services in return for the promise of patient referrals from those physicians to the Defendants' health care facilities and for ancillary services knowing the unlawful nature of the compensation.  The excessive compensation constitutes an unlawful "kickback" that is expressly prohibited by the federal Anti-Kickback Statute and the Stark Laws and therefore results in tainted claims for Medicare and Medicaid payments in violation of the False Claims Act.

111.      In addition to violating the Anti-Kickback Statute, the Stark Laws and the False Claims Act, Defendants' conduct also represents an independent violation of the terms of a Certification of Compliance Agreement (CCA) between Memorial and the Inspector General's Office of the United States Department of Health and Human Services ("HHS-OIG") which mandates compliance and specific self-reporting at even a higher level than required by existing law.

112.     The Defendants' had ample opportunity to come into compliance with the Anti-Kickback Statutem the Stark Laws, and the CCA but chose not to do so because members of the Board of Directors determined that compliance would be contrary to the Defendants' own financial self-interests.  As a member of the Memorial Board of Directors wrote in an e-mail dated October 3, 2010 in reference to physician contracts and management's effort to reduce compensation, "we all recognize we cannot continue to pay the salaries at the same level. However, we cannot afford to lose paying patient referrals to the hospital."

## The Certification of Compliance Agreement (CCA)

113.     On or about February 7, 2008 The Holding Company and Memorial entered into a Certification of Compliance Agreement ("CCA") with HHS-OIG.

114.     The CCA mandates the continuation of the implementation and operation of an internal compliance program.  The CCA also imposes annual and incident related reporting requirements upon Memorial.

115.     Section II.E. of the CCA requires Memorial to report on an annual basis to HHS in a number of categories including "a summary of all internal or external reviews, audits, or analyses related to Memorial's arrangements and transactions that implicate the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) and the Stark Law (42 U.S.C. § 1395nn) . . . ."

## Acquisition of Eisenhower Medical Associates

116.     In 2008, soon after entering into the CCA, Memorial entered into negotiations with Dr. Paul Bradley, the principal owner of Eisenhower Medical Associates ("EMA"). Memorial pursued a contractual relationship with EMA for the purpose of shifting patient admissions and referrals from St. Joseph's/Candler health system to Memorial's health care system.

117.     As a result of the negotiations, the EMA practice ended its association with the St. Joseph's/Candler Health System and executed contracts to join Memorial.

118.     The financial arrangements associated with the acquisition by Memorial of EMA violated the Anti-Kickback Statute and Stark Laws inasmuch as the physician compensation agreed to by EMA and Memorial exceeded fair market value and was entered into for the purpose of obtaining patient referrals from the physicians in the EMA practice.

119.     Memorial knew or should have known that the practice had not and would not support the agreed-upon physician compensation.

- 14 -

120.    Memorial knew or should have known that the physician compensation agreement would exceed fair market value because the proposed practice acquisition pro forma projected approximately a $670,000 financial loss for each of the five (5) years post acquisition.

121.    Memorial knew or should have known that the physicians' compensation formula itself encouraged over-utilization of ancillary services resulting in increased reimbursement from Medicare, Medicaid, Tricare and commercial payers because the physicians' compensation formula granted a 50% cash collection guarantee regardless of the cost to perform the ancillary service.

122.    As an example, a practice-based laboratory test costs approximately 80% of the cash collected for the test; an imaging exam costs approximately 60% of the cash collected for the exam.  In both cases, the EMA physicians were guaranteed a collection rate of 50%, thereby guaranteeing a financial loss to the employer, Memorial.

123.    After Relator Schaengold, became CEO on June 1, 2009 he became aware of the complexity of the EMA arrangement and possible compliance issues.  He commissioned a review of compensation for EMA in order to determine its relationship with fair market value ("FMV"), and determined   that EMA physicians were being compensated significantly above FMV.

124.    In response to his investigation, Relator Schaengold began negotiations with EMA.  His intention was to modify the contracts to a Net Income model that would eliminate the FMV and ancillary revenue issues.

125.    EMA would not agree to modify their arrangement with Memorial.  In July, 2010, Mr. Schaengold requested that the employing subsidiary, MPPG, terminate EMA's employment agreement, as permitted by the contract between EMA and Memorial and a180-day

termination notice was issued on July 23, 2010.  EMA was to cease to be employed by Memorial on January 23, 2011.

126.        On information and belief, in 2009 the EMA practice generated $9.33 million in gross patient charges, of which approximately $3.3 million was billed to Medicare.  In addition, EMA's patient admissions to Memorial and referrals for outpatient services at Memorial generated approximately $15.4 million in gross patient charges, of which approximately $5.4 million was billed to Medicare.

127.        On information and belief, in year 2010 the EMA practice generated approximately $9.3 million in charges, of which approximately $3.3 million was billed to Medicare.

128.        Relator estimates that in 2010 EMA's admissions and referrals to Memorial generated approximately $15 million in charges, of which approximately $5.3 million was billed to Medicare.

129.        On information and belief, as a result of employing the three (3) EMA physicians, Memorial incurred a financial loss of approximately $3 million over a 30-month period.   Te EMA physicians received compensation above FMV estimated at $1.5 million over the same 30 months.

## Inflated Bonus Payments

130.        In 2008, Memorial paid out approximately $4.2 million in bonuses to its employed physicians as per the contracts in place at that time.   The Community-based physicians received approximately $3.0 million in bonuses.  The cash collection data upon which many of the Community-based physicians' bonus payments were calculated was in fact erroneous.  The erroneous collection data caused the payment of inflated bonuses.

131.     Despite the fact that the underlying cash collection data was in error, paid out bonuses were not adjusted downward by Memorial management for fear of antagonizing the physicians and adversely impacting their admission and referral patterns.

132.     Relator became aware of the excessive bonus payments in October/November 2010 while conducting a review of the physicians' billing and collection service which was outsourced to a third party prior to his employment.  Mr. Schaengold brought this matter to the attention of Mr. William Daniel, Chairman, Mr. Curtis Lewis, Chairman-elect, and Mary Ann Beil, Vice President for Compliance sometime in the November/December 2010 timeframe.

133.     To Relator's knowledge no action was taken in regards to the overpayment of these bonuses prior to January 5, 2011, the date his employment with Memorial was terminated.

### MHUP Fair Market Value Issues

134.     Memorial Health University Physicians (MHUP) is the trade name for 100 physicians who are employed by Memorial Health, through Provident Health Services (PHS), a for-profit subsidiary, and MPPG, Inc, a PHS for-profit subsidiary.  Forty five (45) physicians are employed in hospital-based functions such as trauma surgeons, critical care specialists, pediatric surgeons and academic residency-related clinics.  Approximately fifty five (55) physicians are employed in community based practice settings.

135.     In 2008, soon after entering into the CCA, Memorial entered into negotiations with MHUP to develop a new compensation plan in an effort to stem the mounting losses at the physician practices.  In January 2009 the new compensation plan, developed with considerable input from the affected physicians, was implemented by Memorial's then management team.  The new compensation plan paid Community-based physicians on the basis of a formula of 60% productivity and 40% cash collections.

136.     Memorial knew or should have known that the Community-based practices had not and would not support the agreed upon physician compensation.

137.     Memorial knew or should have known that the physician compensation agreement would exceed fair market value.

138.     Memorial knew or should have known that the physicians' compensation formula itself encouraged over utilization of ancillary services, resulting in increased reimbursement from Medicare, Medicaid, Tricare and commercial payers because the physicians' compensation formula granted a 40% cash collection guarantee regardless of the cost to perform the ancillary service.

139.     In 2009, the Community-based practices generated approximately $65 million in gross charges, of which approximately $16.25 million was billed to Medicare and approximately $5.2 million billed to Medicaid.  In 2010, the community based practices generated approximately $70 million in gross charges, of which approximately $17.5 million was billed to Medicare and approximately $5.8 million billed to Medicaid.

140.     Based on preliminary 2009 financial results, Relator became concerned that the compensation formulas were faulty and MHUP's Community-based practices benefitted unfairly, resulting in a significant increase in physician compensation and, subsequently, substantial financial losses for Memorial Health.  The 2009 audited financials were released in April 2010 and reported an $18.6 million loss from operations for MHUP and its physician practices, of which $8.5 million loss was attributed to the Community-based practices.

141.     In the spring of 2010, Mr. Schaengold requested that a Fair Market Value physician compensation review be conducted.

142.     Relator believes that in 2009 and 2010, several physicians were compensated in a manner inconsistent with FMV guidelines.  On information and belief, these physicians received

approximately $1.8 million each year in excess compensation when compared to the 75th percentile of total compensation as calculated by the Medical Group Management Association (MGMA).

143.     The compensation paid was not consistent with FMV guidelines on the basis of other business judgment factors such as strategic importance, quality outcomes, clinical skills, professional accomplishments, business development skills or recruitment difficulties.

144.     Mr. Schaengold was sufficiently concerned about MHUP's growing financial losses, estimated to reach $18.0 million in 2010, and the Community-based physicians' FMV issues, to ask the board of MPPG, Inc. to issue Non-Renewal six-month notices as permitted by the employed physicians' contracts so that a new Net Income compensation model could be implemented.  The non-renewal notices were sent on June 28, 2010.

145.     Management then engaged a representative group of physicians and included a Memorial Board member, Michael Kaigler, Director of Human Resources for Chatham County, GA and the Memorial Board's Chairman of the Personnel and Compensation Committee, to negotiate a new Net Income compensation model that would eliminate the FMV issues and reduce Memorial's financial losses.

146.     After three months of negotiation and deliberation, a new compensation model was presented to the Board's Personnel and Compensation Committee and Finance Committee in September 2010, followed by  a revised version a month later in October 2010.  The proposed Net Income model proposed to reduce compensation for Community-based physicians by $2.9 million and projected to reduce MHUP's financial loss in 2011 to approximately $13.8 million. Management's recommendations received preliminary approval by both committees subject to final review by the Memorial Board.

147.     At its October 27, 2010 meeting, however, the Board, under pressure from the Community-based employed physicians, , rejected management's new Net Income compensation model and instead extended the existing contracts until June 30, 2011.

148.     On information and belief, the current compensation arrangement is in place and at least sixteen physicians are being paid well in excess of fair market value, and this will continue until at least June 30, 2011.

**Board Interference Demonstrating Knowledge of Unlawful Acts**

149.     During the negotiation process for a new Net Income compensation model, two of the largest employed internal medicine groups (Chatham Medical Associates with six physicians and Memorial Medical Associates with five physicians) engaged in a campaign to have the Board overturn management's recommendations.

150.     These two groups threatened to leave Memorial's employment and join Southeast Orthopedics Center, Savannah's largest orthopedic practice. The implied threat was that referrals to Memorial specialists and admissions to Memorial Health University Medical Center would be adversely impacted. Several of these physicians were receiving compensation inconsistent with FMV guidelines.

151.     Contrary to Relator's admonition that "downstream" income and patient referrals should not be included in determining physician compensation and that to do so is, in fact, a violation of Anti Kickback and Stark Laws and related regulations, the Board demanded that downstream income and patient referrals from Chatham Medical Associates and Memorial Medical Associates (and even the soon-to-be-terminated Eisenhower Medical Associates) be calculated and included in the FY2011 budget process.

152.     A number of Board members further insisted that downstream income and patient referrals be considered in negotiating a new compensation model for the community-based physicians.

153.     Management had no choice but to include in the FY2011 budget a downstream volume and revenue negative impact of $80 million in charges, which translated to a projected additional income loss of $0.8 million per physician or an additional total loss to Memorial of

$12 million, if the three physician groups went through with their threats to join Southeastern Orthopedic Center.

154.    On October 27, 2010, the Board, in consideration of possible losses from downstream income and patient referrals, voted to reject management's Net Income compensation proposal. Instead, the Board voted to extend the existing contracts till June 30, 2011, thus maintaining in place those contracts with compensation in excess of FMV.

155.    Furthermore, the Board removed Relator and his senior management team from future physician contract negotiations.

156.    In December 2010, a new model was presented to the Board's Personnel and Compensation Committee, and the Finance Committee, where it received approval.

157.    This new model permits many of the Community-based physicians to retain current compensation levels, does not resolve many of the FMV issues, and was significantly more generous in its terms than the contracts proposed by management.

158.    Relator advised the Board that in his opinion, the new model did not solve the FMV risks inherent in the older, extended model.

159.    Despite these reservations, the full Board approved the new model on December 15, 2010.

**Retaliation**

160.    At several meetings of the Board, Personnel and Compensation Committee, and Finance Committee of the Board, Mr. Schaengold advised Board members that Memorial had FMV issues associated with its employed physicians. Relator Schaengold also raised concerns about the EMA acquisition and the compensation of its physicians, inappropriate consideration of downstream revenue from admissions and referrals when developing compensation models. He also warned of possible conflicts of interest on the part of Board members who were related

to or married to physicians affected by the arrangements, or who were themselves affected physicians.

161.      In addition to Mr. Schaengold's reports and concern about FMV and legal counsel's conflict of interest, Memorial's Corporate Officer, Mary Ann Beil, submitted a formal complaint to Mr. Schaengold and to the Chairman of the Board about possible conflicts of interest.

162.      For example, both Relator and Beil were concerned about the actions of Dr. Robert Brown, the leader of Chatham Medical Associates. Dr. Brown pressured the Board to reject Management's proposal, was a very vocal and active participant in committee and board discussions in regards to the proposed compensation changes, yet never submitted a conflict of interest statement.

163.      On or about October 3, 2010 Kay Ford, a Board Member and Chairman of the Board's Strategic Committee, writing to other Board Members in regard to management's proposed Net Income compensation model and the fair market compensation issues, said "[t]his is a difficult decision and we all recognize we cannot continue to pay the salaries at the same level. However, we cannot afford to lose paying patient referrals to the hospital."

164.      The Board interfered in the remedial process by rejecting management's proposed compensation plan that would have eliminated all FMV issues, effective January 1, 2011. Instead, the Board chose to extend the existing problematic compensation model to June 30, 2011 in order to not risk the loss of patient admissions and referrals.

165.      On January 3, 2011, Mr. Schaengold communicated to William Daniel, Chairman of the Board, a set of recommendations including a request that management be permitted to regain control over the physician contract negotiation process and cease implementation the proposed plan. Also, Mr. Schaengold requested that those with conflicts of interest be excluded

from any future physician contract negotiations, and that an outside legal advisor be retained to ensure an appropriate and accurate submission of the last CCA Annual Report due February 7, 2011.

166.     In retaliation for Mr. Schaengold's efforts to rectify the compensation structure that was resulting in compensation in excess of FMV, the Memorial Board terminated Mr. Schaengold's employment without prior notice or cause on the evening of January 5, 2011, effective immediately.

167.     Despite the retaliatory nature of the discharge, Memorial Health, Inc. subsequently characterized the discharge as "without cause" under Mr. Schaengold's Employment Agreement.

168.     Pursuant to the terms of his Employment Agreement, Mr. Schaengold is entitled to certain compensation in the event of a termination without cause, including compensation in lieu of thirty (30) days' notice and 18 months of severance pay.

169.     Defendant Memorial Health, Inc. has failed and refused to pay compensation and severance owed under the Employment Agreement and has unlawfully conditioned the payment of benefits upon Mr. Schaengold executing a written severance agreement containing a release of all legal claims including "the federal and state False Claims Acts (including the qui tam provisions thereof), the Stark Law, the federal Anti Kickback Statute, the IRS Whistleblower Statute…..".

## COUNT I – FALSE CLAIMS ACT, TAINTED CLAIMS
(Eisenhower Medical Associates)

170.　　　Plaintiff realleges each and every allegation above as if fully set forth herein.

171.　　　Relator believes that, prior to his employment, Defendants induced EMA to leave St. Joseph's/Candler Health System by paying excessive remuneration as financial inducements to physicians of the practice who became employees of the Defendants.

172.　　　The above fair market value of physician compensation levels constitute unlawful kickbacks designed by the Defendants to fraudulently induce illegal referrals of patients to the Defendants' health care facilities and caused use of ancillary services.  The unlawful kickbacks in fact did induce illegal referrals to the Defendants' health care facilities and did in fact cause the use of ancillary services.

173.　　　Consequently, the Defendants knowingly engaged in systematic filing of Medicare and Medicaid claims with the United States which were derived from the illegal referrals thereby creating undeserved profits for the Defendants at the expense of the United States.

174.　　　The United States government, unaware of the falsity of the claims and in reliance on the accuracy and representations thereof, paid the claims for prohibited referrals.

175.　　　As a direct and proximate result of the Defendants' unlawful scheme, Medicare and Medicaid has been caused to pay monies to the Defendants which the Defendants would not otherwise be entitled to receive.

176.　　　The Defendants' fraudulent scheme violates the Fraud and Abuse Anti-Kickback and Prohibited Referral provisions of 42 U.S.C. § 1320 7b(b) and the Stark Law, 42 U.S.C. § 1395nn(a)(1) and each of Defendants' "tainted" claims that were filed with the agencies of the United States government, including Medicare and Medicaid, constitute separate violations of the Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*

## COUNT II – FALSE CLAIMS ACT, TAINTED CLAIMS
(Not Less than 16 Individual Physicians)

177.     Plaintiff realleges each and every allegation above as if fully set forth herein.

178.     Relator has information and belief that prior to his employment the Defendants engaged in a pattern and practice of paying more than fair market value to physicians who became and remained employees of the Defendants.

179.     The above fair market value physician compensation levels constitute unlawful kickbacks designed by the Defendants to fraudulently induce illegal referrals of patients to the Defendants' health care facilities.  The unlawful kickbacks in fact did induce illegal referrals to the Defendants' health care facilities.

180.     Consequently, the Defendants knowingly engaged in systematic filing of Medicare and Medicaid claims with the United States which were derived from the illegal referrals thereby creating undeserved profits for the Defendants at the expense of the United States.

181.     The United States government, unaware of the falsity of the claims and in reliance on the accuracy and representations thereof, paid the claims for prohibited referrals.

182.     As a direct and proximate result of the Defendants' unlawful scheme, Medicare and Medicaid has been caused to pay monies to the Defendants which the Defendants would not otherwise be entitled to receive.

183.     The Defendants' fraudulent scheme violates the Fraud and Abuse Anti-Kickback and Prohibited Referral provisions of 42 U.S.C. § 1320 7b(b) and the Stark Laws, and each of Defendants' tainted claims that were filed with the agencies of the United States government, including Medicare and Medicaid, constitute separate violations of the Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*

## COUNT III– FALSE CLAIMS ACT, TAINTED CLAIMS

(2008 Bonus Payment Pool)

184.      Plaintiff realleges each and every allegation above as if fully set forth herein.

185.      Relator believes that, prior to his employment, the Defendants paid certain physicians excessive compensation in connection with improperly calculated bonuses paid in or about April 2008.  Each bonus recipient remained as an employee of the Defendants.

186.      The above fair market value physician compensation levels constitute unlawful kickbacks designed by the Defendants to fraudulently induce illegal referrals of patients to the Defendants' health care facilities.  The unlawful kickbacks in fact did induce illegal referrals to the Defendants' health care facilities.

187.      Consequently, the Defendants knowingly engaged in systematic filing of Medicare and Medicaid claims with the United States which were derived from the illegal referrals thereby creating undeserved profits for the Defendants at the expense of the United States.

188.      The United States government, unaware of the falsity of the claims and in reliance on the accuracy and representations thereof, paid the claims for prohibited referrals.

189.      As a direct and proximate result of the Defendants' unlawful scheme, Medicare and Medicaid has been caused to pay monies to the Defendants which the Defendants would not otherwise be entitled to receive.

190.      The Defendants' fraudulent scheme violates the Fraud and Abuse Anti-Kickback and Prohibited Referral provisions of 42 U.S.C. § 1320 7b(b) and the Stark Laws, and each of Defendants' tainted claims that were filed with the agencies of the United States government, including Medicare and Medicaid, constitute separate violations of the Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*

## COUNT IV – VIOLATION OF CCA OBLIGATIONS

191.     Plaintiff realleges each and every allegation above as if fully set forth herein.

192.     Defendants' Holding Company and Memorial are parties to the Certification of Compliance Agreement (CCA) with the United States dated February 7, 2008. *See* Exhibit A.

193.     The terms of the CCA impose responsibilities and obligations upon the Holding Company and Memorial that are co-extensive with or exceed the obligations imposed by the Stark Act and the False Claims Act.

194.     As set forth above, Defendants Holding Company and Memorial have violated the terms of the CCA.

195.     The Defendants violation of the CCA has been the direct and proximate cause of financial loss of the United States in the form of false claims made by the Defendants.

196.     The United States is entitled to reimbursement of the false claims made by the Defendants in violation of the CCA.

## COUNT V – RETALIATORY DISCHARGE  IN VIOLATION OF § 3730(h)

197.     Plaintiff realleges each and every allegation above as if fully set forth herein.

198.     Relator Phillip S. Schaengold, was engaged in protected activity under 31 U.S.C. § 3730(h) as set forth above.

199.     The Defendants were aware of Mr. Schaengold's protected activities, as alleged above.

200.     In retaliation for Mr. Schaengold's protected conduct,  the Defendants discharged Mr. Schaengold from his employment with Memorial Health Inc. in violation of 31 U.S.C. § 3730(h).

201.     As a direct and proximate cause of his unlawful discharge from Memorial Health, Inc., Mr. Schaengold has suffered financial loss in the form of lost wages, bonuses, and employment benefits in a sum to be proved at trial but expected to exceed the sum of $2,000,000..

202.     Pursuant to 31 U.S.C. § 3730(h), Mr. Schaengold is entitled to two (2) times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the United States of America and  himself, prays

1.  That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of the Defendants' unlawful actions in accordance with law under 31 U.S.C. § 3729, such amount expected to exceed $10,000,000 prior to trebling;

2.  That the Court enter judgment against the Defendants in the form of a civil penalty of $11,000 for each and every false claim that Defendants presented in accordance with law under 31 U.S.C. § 3729;

3.  That the Court award pre- and post- judgment interest on the sums subject to judgment in this case;

4. That Relator be awarded an amount that the Court deems reasonable for collecting the civil penalty and damages on behalf of the United States, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claims if the United

States intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the United States does not intervene;

5. That the Relator be entitled to judgment on his retaliation claim pursuant to 31 U.S.C. § 3730(h) and be awarded two (2) times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees;

6. That Relator be awarded all costs and expenses incurred, including attorneys' fees;

7. That the Court order such other relief that is proper in the interests of justice.

Dated: March 8, 2011.

Respectfully submitted,

BOTHWELL BRACKER, P.C.
Mike Bothwell
Georgia Bar No. 069920
304 Macy Drive
Roswell, Georgia  30076
Main Telephone: (770) 643-1606
Fax: (770) 643-1442
Email: Mike@bbv-law.com

Lars H. Liebeler
1825 Eye Street, N.W.
Suite 400
Washington, D.C.  20006
Direct Telephone: (202) 587-4747
Main Telephone: (202) 466-4110
Fax: (202) 466-2693
Email: LLiebeler@TL-LawFirm.com
(*Pro Hac Vice* Motion Filed Herewith)

*Counsel for Relator, Phillip S. Schaengold*

## DEMAND FOR JURY TRIAL

Pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b), Plaintiff and Relator hereby demand trial by jury on all counts to which they are entitled under law.

Mike Bothwell