## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ) | |
| PHILLIP S. SCHAENGOLD, ) | |
| ) | Civil Action No. CV 4:11-058 |
|     Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| MEMORIAL HEALTH, INC., ) | |
| MEMORIAL HEALTH UNIVERSITY ) | **JURY TRIAL DEMANDED** |
| MEDICAL CENTER, INC. ) | |
| PROVIDENT HEALTH SERVICES, INC., ) | |
| MPPG, INC., d/b/a MEMORIAL HEALTH ) | |
| UNIVERSITY PHYSICIANS, ) | |
| ) | |
|     Defendants. ) | |

### THE UNITED STATES' COMPLAINT IN INTERVENTION

    Plaintiff, the United States of America, by and through its undersigned counsel, brings this action against Memorial Health, Inc., Memorial Health University Medical Center, Inc. Provident Health Services, Inc., and MPPG, Inc. d/b/a Memorial Health University Physicians (collectively "Defendants") for submitting and causing the submission of false claims to the Medicare program.  For its causes of action, the United States of America alleges as follows:

### Nature of the Action.

    1. This is an action brought by the United States of America to recover damages and civil penalties under the False Claims Act ("FCA") and to recover all available damages and other monetary relief under the common law and other equitable causes of action.  From 2008 until 2011, Defendants entered into compensation arrangements with certain physicians that exceeded fair market value, took into account the volume or value of referrals or other business, and were

not commercially reasonable, all in violation of provisions of the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute"), and regulations promulgated thereunder. By knowingly submitting claims for reimbursement based on referrals generated by physicians who received improper compensation pursuant to these relationships, Defendants violated the FCA, 31 U.S.C. § 3729, *et seq.*, were unjustly enriched, and were paid by mistake.

## Jurisdiction.

2. This action arises under the FCA and the common law.  The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1345 because the United States of America is the plaintiff.  In addition, the Court has subject matter jurisdiction over the FCA causes of action under 28 U.S.C. § 1331 and supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. §1367(a).

3. The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found within this District, have transacted business within this District, and committed acts in violation of 31 U.S.C. § 3729 within this District.

## Venue.

4. Venue is proper in the Southern District of Georgia under 28 U.S.C. §§ 1391(b)–(c) and 31 U.S.C. § 3732(a) because Defendants reside within this District, transact substantial business in this District, can be found within this District, and qualify to do business in Georgia.

## Parties.

5. Plaintiff is the United States of America (hereinafter, the "United States" or "Government").  The United States brings this action on behalf of the United States Department of Health and Human Services ("HHS"), including its sub-agency, the Centers for Medicare & Medicaid Services ("CMS").  At all times relevant to this Complaint, CMS was an operating

division of HHS that administered and supervised the Medicare Program, 42 U.S.C. §1395, *et seq.* ("Medicare").

6. Philip S. Schaengold is a resident of the State of Florida.  Mr. Schaengold served as President and Chief Executive Officer of Defendant Memorial Health, Inc. and Defendant Memorial Health University Medical Center, Inc. from June 1, 2009, until his termination on January 5, 2011.

7. Memorial Health, Inc. (the "Parent Company") is a non-profit corporation organized under the laws of the State of Georgia and maintains a principal business address of 4700 Waters Avenue, Savannah, Georgia 31401.  The Parent Company owns and operates a healthcare system, which consists of outpatient and inpatient medical facilities, physician practices, residency teaching programs, and other ancillary components.  The Parent Company has several wholly-owned subsidiaries, including Memorial Health University Medical Center, Inc. and Provident Health Services, Inc.

8. Memorial Health University Medical Center, Inc. ("Memorial Hospital") is a non-profit corporation organized under the laws of the State of Georgia and maintains a principal business address of 4700 Waters Avenue, Savannah, Georgia 31401.  Memorial Hospital operates a 654-bed medical center serving multiple counties in southeastern Georgia and southern South Carolina.  Memorial Hospital bills for and receives substantial revenue from Medicare and has done so during all relevant times set forth in this Complaint.  The Parent Company is the sole member of Memorial Hospital.

9. Provident Health Services, Inc. ("Provident") is a for-profit corporation organized under the laws of the State of Georgia and maintains a principal business address of 4700 Waters Avenue, Savannah, Georgia 31401.   Provident is a holding company for many of the

professional health service providers who are connected or affiliated with Memorial Hospital. Provident is a subsidiary of the Parent Company.  Provident has several wholly-owned subsidiaries including, among others, MPPG, Inc. d/b/a Memorial Health University Physicians.

10. MPPG, Inc. d/b/a Memorial Health University Physicians ("MHUP") is a for-profit corporation organized under the laws of the State of Georgia and maintains a principal business address of 4700 Waters Avenue, Savannah, Georgia 31401.  MHUP conducts business under the trade name Memorial Health University Physicians.  MHUP bills for and receives substantial revenue from Medicare and has done so during all relevant times set forth in this Complaint.

11. The Parent Company, Memorial Hospital, Provident, MHUP, and all other relevant subsidiaries (collectively herein referred to as "Memorial") operated as a unitary health system.

12. Senior management of the Parent Company and Memorial Hospital controlled, directed, and made all significant business decisions for the entire health system.

13. The members and officers of the Board of Directors of the Parent Company and the Board of Directors of Memorial Hospital consisted of the same individuals.  Any meeting held would serve, in effect, as a board meeting for both the Parent Company and Memorial Hospital. Thus, at all times relevant to this Complaint, the Board of Directors for each of the Parent Company and Memorial Hospital operated a single body (the members serving on each of the Board of Directors of the Parent Company and the Board of Directors of Memorial Hospital are hereinafter referred to as the "Board").

## **False Claims Act.**

14. The FCA[1] provides, in part, that any entity that

---

[1] The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009.  The current language of sections 3729(a)(1)(A) and 3729(a)(1)(G) applies to conduct on or after the date of enactment.  Sections 3729(a)(1) and 3729(a)(7) apply to conduct that occurred before FERA was enacted, and sections 3729(a)(1)(A)

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [2] [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .; [or]

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . . [3]

**** 

is liable to the United States for a civil penalty of not less than [$5,500] and not more than [$11,000] per violation, plus three times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. §§ 3729(a)(1)-(2) (2006), as amended by 31 U.S.C. §§ 3729(a)(1)(A)-(B) (2010).

15.   The FCA further provides that "knowing" and "knowingly"

(A)      mean that a person, with respect to information
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and

(B)      require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1) (2006), as amended by 31 U.S.C. § 3729(b)(1) (2010).

---

and 3729(a)(1)(G) apply to conduct after FERA was enacted.  As such, sections 3279(a)(1) and 3279(a)(7) of the prior statute are also applicable in this case.  Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of section 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008, which predates the relevant time for the filing of claims.

[2] Prior to FERA, section 3729(a)(1) regulated any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval[.]"

[3] Prior to FERA, section 3729(a)(7) regulated any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government[.]"

**The Stark Statute.**

16. In 1989, Congress enacted the federal physician self-referral prohibition, or "Stark Statute," to "curb overutilization of [Medicare] services by physicians who could profit by referring patients to facilities in which they have a financial interest."   *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 95 (3d Cir. 2009) (internal quotation marks omitted); *see generally* 42 U.S.C. § 1395nn.

17. The Stark Statute contains two broad prohibitions that, in turn, are subject to various exceptions.  First, the statute prohibits a physician from referring a patient to an entity for the furnishing of "designated health services" ("DHS") if the physician, or his or her immediate family member, has a "financial relationship" with the entity.  42 U.S.C. § 1395nn(a)(1)(A). Second, the statute prohibits the entity from "present[ing] or caus[ing] to be presented" any claim for Medicare reimbursement for DHS that was "furnished pursuant to a [prohibited] referral."  42 U.S.C. § 1395nn(a)(1)(B).

18. The Stark Statute initially regulated only physician referrals for clinical laboratory services, but was later amended to cover various additional DHS that Congress determined to be susceptible to overutilization, including inpatient and outpatient hospital services, clinical laboratory services, and radiology services.  *See* 42 U.S.C. § 1395nn(h)(6); 42 C.F.R. § 411.351; Pub. L. No. 103-66, § 13562, 107 Stat. 312, 596 (1993).

19. The term "financial relationship" is defined broadly to include any direct or indirect "compensation arrangement" involving "any remuneration between a physician . . . and an entity" that is not otherwise excepted by statute.  42 U.S.C. § 1395nn(a)(2) (defining "financial relationship"); *id.* § 1395nn(h)(1) (defining "compensation arrangement"); *see also* 42 C.F.R. § 411.354.

6

20. A "direct compensation arrangement" exists if the remuneration passes between the referring physician (or a member of his or her immediate family) and the entity furnishing DHS without any intervening persons or entities.  42 C.F.R. § 411.354(c)(1)(i).

21. An "indirect compensation arrangement" exists if three elements can be established: first, there must be an "unbroken chain" of financial relationships involving either ownership or compensation linking the referring physician to the DHS entity; second, the referring physician must receive aggregate compensation from the person or entity in this "unbroken chain" with which he or she has a direct financial relationship that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS; and, third, the DHS entity must have actual knowledge of, or act in reckless disregard or deliberate ignorance of, the fact that the referring physician's aggregate compensation varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the DHS entity.  42 C.F.R. § 411.354(c)(2).

22. The Stark Statute prohibits an entity that furnishes DHS from presenting a claim or causing a claim to be presented to Medicare for DHS that was referred to the entity by a physician with whom the entity has an improper "financial relationship," unless a statutory or regulatory exception applies.  42 C.F.R. § 411.353(b).

23. The Stark Statute, as well as companion regulations, contains exceptions for certain compensation arrangements if specific criteria can be established, including, for example, exceptions for "bona fide employment relationships" and "indirect compensation arrangements." 42 U.S.C. § 1395nn(e); 42 C.F.R. § 411.357(c), 42 C.F.R. § 411.357(p).  Each of these exceptions requires, among other things, that the compensation arrangement with the referring

physician be fair market value, not be determined in a manner that takes into account the volume or value of referrals by the physician, and be commercially reasonable.

24. No payment will be made for a designated health service provided in violation of the Stark Statute, 42 U.S.C. § 1395nn(g)(1); and an individual or entity that knowingly presents or causes to be presented claims for prohibited referrals may be subject to civil monetary penalties, 42 U.S.C. §§ 1395nn(g)(3), (4).

25. Reimbursements from the Government that are collected in violation of the prohibition must be refunded on a timely basis.  42 C.F.R. § 411.353(d).

### Medicare Program.

26. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals.

27. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426A.  Part A of the Medicare Program authorizes payment for institutional care, including hospital and skilled nursing facility care.  *See* 42 U.S.C. §§ 1395c-1395i-4.  Part B primarily covers physician and other ancillary services.  *See* 42 U.S.C. § 1395k.

28. Reimbursement for Medicare claims is made by the United States.  HHS is responsible for the administration and supervision of the Medicare program, which it does through CMS, an agency of HHS.

29. Under the Medicare program, CMS, through its contractors, makes payments retrospectively (after the patient is discharged) to hospitals for inpatient and outpatient services.

30. Providers who wish to participate in Medicare must complete and periodically update an enrollment application.  The application, which must be signed by an authorized representative of the provider, contains a certification statement that states

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

31. Defendant Memorial Hospital was, at all times relevant to this Complaint, enrolled in Medicare as a participating provider.  As a participating provider, Memorial Hospital certified to the language contained in the enrollment application.

32. Historically, CMS has contracted with "fiscal intermediaries," which were responsible for processing and paying hospital claims and cost reports.  In Georgia, Blue Cross and Blue Shield of Georgia, Inc. ("BCBS") served as the Medicare Part A fiscal intermediary until May 2009.

33. Beginning in November 2006, CMS began using Medicare Administrative Contractors ("MACs").  *See* Fed. Reg. 67960, 68181 (Nov. 2006). The MACs generally act on behalf of CMS to process and pay hospital claims and to perform administrative functions on a regional level.  *See* 42 C.F.R. § 421.5(b).

34. Cahaba Government Benefit Administrators, LLC ("Cahaba GBA") was awarded the Jurisdiction 10 A/B Medicare Administrator Contractor (MAC) contract on January 7, 2009.

35. Hospitals submit patient-specific claims for reimbursement of inpatient and outpatient hospital services on a Form UB-04.  Both the Form UB-04 and its predecessor form require hospitals to certify that the information reported on the form is accurate and complete.

36. CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a hospital submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

9

37. After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of reimbursement the provider believes it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1).  Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than it already received during the year or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

38. Defendant Memorial Hospital was, at all times relevant to this Complaint, required to submit annually a hospital cost report to the relevant fiscal intermediary or MAC.

39. During the relevant time period, Medicare payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-04s) during the course of the fiscal year.  On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider.  This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

40. Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries and MACs, had the right to audit the hospital cost reports and financial representations made by Defendants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.  *See* 42 C.F.R. § 413.64(f).

41. Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

42. For all relevant years, the responsible provider official for Memorial Hospital was required to certify, and did certify, in pertinent part:

> to the best of my knowledge and belief, [the hospital cost report and statement] are true, correct, complete, and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

43. For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

44. A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary or MAC.

45. Thus, the provider is required to certify that the filed hospital cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Statute.

46. For each of the years at issue, Memorial Hospital submitted cost reports to the fiscal intermediary or MAC attesting, among other things, to the certification quoted above.

11

47. In addition, from time to time, the Office of Inspector General of the Department of Health and Human Services ("OIG") may enter into integrity agreements with providers following investigations and settlements with the United States; such agreements identify obligations that the providers agree to in exchange for OIG's promise not to seek the providers' exclusion from participation in Medicare or other Federal healthcare programs.

48. On February 11, 2008, following an investigation by the Department of Justice, Memorial Health, Inc. and Memorial Health University Medical Center, Inc., and others entered into a "Certification of Compliance Agreement" (the "CCA") with the United States, through the OIG, requiring, among other things, that the Memorial-affiliated entities report any "matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health program for which penalties or exclusion may be authorized" including the Stark Statute.  *See generally United States ex rel. Boland v. Memorial Health University Medical Center, Inc., et al.*, No. 4:06-cv-157, Joint Stipulation of Dismissal and Settlement Agreement, (Doc. 36) (S.D. Ga. Feb. 11, 2008).

49. Defendants violated the Stark Statute by submitting or causing to be submitted Medicare claims for inpatient and outpatient hospital services furnished pursuant to prohibited referrals.

### Factual Background.

### Memorial's Strategy for Growth in the Savannah Market

50. During the relevant time, there were two major hospital systems in the local Savannah area:  Memorial and a system affiliated with St. Joseph's/Candler Health System, Inc. ("St. Joseph's/Candler").

51. These systems competed for referrals from physicians and practitioners of internal medicine to their respective hospitals and affiliated specialist practice groups.

52. At the end of 2007, Memorial's senior leadership recognized that they were facing financial problems.  In a meeting on November 20, 2007, Robert Colvin, then serving as Chief Executive Officer of the Parent Company and Memorial Hospital, distributed a handout describing "the causes of the hospital's financial issues," and cited as a major problem that "patient volume is down approximately 5% from 2006."

53. Following this meeting, on January 23, 2008, senior management of Memorial and the Board of Directors held a retreat, wherein attendees discussed "strategic priorities," "major objectives," and "tactics" to be addressed and implemented in the upcoming year (the "January 2008 Board Meeting").

54. Although MHUP employed a large number of primary care physicians at that time, the minutes of the Executive Session of the January 2008 Board Meeting contain a heading of "Market Growth" and, under this heading, reflect that discussions were held about "expanding [Memorial's] employed primary care physician base and [that] loyalty in primary and secondary markets is vital to moving our economic engine."

55. The minutes also note that the then-Chief Executive Officer of the Parent Company and Memorial Hospital identified another problem: "Specialists say they are not getting any referrals from our primary care drs."

56. The then-Chief Executive Officer concluded that Memorial would be "taking a look at how we can consolidate practice on our campus.  And make space for others who may want to be on.  Referrals within Memorial family."

57. With these objectives in mind, the Board, as well as the leadership of Memorial Hospital MHUP, sought to entice a primary care practice to join Memorial and address the dwindling patient volume.

## Recruitment of Eisenhower Medical Associates

58. Dr. Paul S. Bradley, Dr. Steven K. Corse, and Dr. David J. Gaskin (collectively the "Physicians") practiced internal medicine together (the practice is commonly known as and referred to herein as "Eisenhower Medical Associates" or "EMA").

59. At the same time in which the then-Chief Executive Officer and the Board set out their goals for the year, the Physicians and Memorial were already in preliminary negotiations regarding the purchase of the Physicians' medical practice, employment of the Physicians, and potential affiliation with Dr. Bradley and Dr. Gaskin's side business.

60. During their negotiations with Memorial, the Physicians each had an existing employment agreement with SJC Medical Group, Inc., which is an affiliate of St. Joseph's/Candler Health System, Inc. and Candler Hospital, Inc.

61. On January 30, 2008—only one week after the Board retreat—negotiations shifted into high gear.

62. Sharon Bell, the Executive Director of MHUP, emailed Mindy Bradley, the wife of Dr. Bradley and the Practice Manager of EMA, to request that the parties sign a confidentiality agreement with respect to the potential acquisition.

63. Negotiations progressed over the coming months—handwritten notes titled "BCG Group," dated, February 25, 2008, reflect that the Physicians were already targeting a July 1, 2008 start date for their employment with MHUP.

64. The February 25th "BCG Group" notes also expressly referenced the volume of patient referrals, stating "could be as much as 10% of SJC inpatient volume."

14

65. An acquisition of a physician practice and the employment of physicians is not a simple, ministerial task for administrators of a hospital.  Any acquisition and employment decision should be closely reviewed and analyzed from both business and compliance perspectives.

66. The Board, as well as senior leadership of the Parent Company, the Hospital, and MHUP, scrutinized the acquisition of EMA and employment of the Physicians.

67. On April 28, 2008, for example, the Finance Committee of the Board met to approve the purchase of EMA and employment of Drs. Bradley, Corse, and Gaskin.  Sharon Bell and Hart Williford, a former Chief Operating Officer and Senior Vice President of the Parent Company, prepared a PowerPoint Presentation to the Finance Committee in support of the addition of EMA (the "April 28 PowerPoint"), which was attached to the minutes of the meeting.

    a.  On a slide titled "Background Information," the April 28 PowerPoint notes that Drs. Bradley, Corse, and Gaskin are the "three busiest members of the Candler Medical Group" and EMA is a "high-volume practice with large numbers of hospital admission and referrals to specialists."

    b.  The next slide, also titled "Background Information," stated that "estimated gross revenues (including downstream revenues from referrals) to St J/C" are for

        2006: "$57 million + $3.4 million radiology"

        2007: "$63 million + $3.7 million radiology"

    c.  The slide indicated that the information was "reported by physician," and that these figures "account[] for almost 6% of St J/C total volume."

68. Consistent with Memorial's stated goal at the January 2008 Board Meeting to "expand primary care base," a subsequent slide titled "Benefits to MHUP and [Memorial Hospital]" listed

as a benefit "growing primary care physician base in primary service area is a strategic imperative" and that EMA had a "projected contribution margin of $3.5 – 5 million per year."

69. There were at least two versions of the April 28 PowerPoint.  Several significant changes were made to one version, including, the (1) deletion of any express reference to "referrals"; (2) deletion of any reference to "downstream revenue" that could be obtained through referrals from the Physicians; (3) deletion of the Physicians' "projected contribution margin" to Memorial; and (4) addition of a slide estimating that the net losses to Memorial due to purchasing EMA and employing the Physicians could be as high as $655,000 in the first year, $633,000 in the second year, and $631,000 in the third year of the contract.

70. Following the April 28 PowerPoint presentation, management of Memorial formally recommended to the Board that it approve hiring the Physicians.

71. The written recommendation stated that Dr. Bradley would be offered a $325,000 base salary; Dr. Corse would be offered a $325,000 base salary; and Dr. Gaskin would be offered a $275,000 base salary.

72. In a pro forma reflecting net income attached to its written recommendation to the Board, senior leadership of Memorial projected significant losses for each year of the Physicians' five-year term of employment:  Year 1 losses - $655,053; Year 2 losses - $633,385; Year 3 losses - $630,852; Year 4 losses - $616,307; and Year 5 losses - $629,422.

73. Despite the projected net income losses, an increase in "hospital revenue" was cited in Management's written recommendation as a primary justification in support of the proposed acquisition.

74. On June 23, 2008, the Personnel & Compensation Committee/Physician Compensation Sub-Committee of the Board voted to approve the transaction with the Physicians, including the

employment agreements for Dr. Bradley, Dr. Corse, and Dr. Gaskin; an asset purchase agreement; and a lease agreement for the EMA office at 340 Eisenhower Drive, Savannah, Chatham County, Georgia.

75. Prior to June 24, 2008, a clause was included in each draft employment agreement that stated:

> In order to facilitate appropriate continuity of patient care, when a patient referral is indicated, the referral should be to another member of the Memorial employed physician group, assuming that physician specialty is represented.  If you will not (prefer not to) make referrals to Memorial employed specialists and sub-specialists, please schedule a meeting with the Senior Vice President Physician Services to discuss your reasoning.  This proactive approach to issues that may affect patient care within Memorial Health System is encouraged.

76. This clause was deleted in a draft distributed on June 24, 2008.

77. In addition, as part of the Physicians' total compensation package, Memorial was willing to enter into financial relationships with businesses, called "Hourglass" and "HourLife," that were primarily owned and operated by Dr. and Mrs. Bradley and in which Dr. Gaskin was an equity owner.  These relationships included "leases" of employees and real estate.

78. On June 3, 2008, for example, a status update on the negotiations with EMA referenced Hourglass, noting that part of the term sheet would include "joint market[ing] to companies," "offer as employee benefit + pay 1/2 cost," and "NPs [Nurse Practitioners] leased to Hourglass."

79. On June 12, 2008, the minutes of the Personnel & Compensation Board Committee state that Memorial was close to finalizing the EMA transaction and had approved a "strategic affiliation" with Hourglass.

**The Physicians' Compensation Package**

80. On or around June 25, 2008, Memorial and the Physicians agreed to enter into a variety of compensation arrangements, as defined by the Stark Statute and its relevant regulations, with the Physicians.

81. Documentation related to this comprehensive compensation package was prepared and executed over the subsequent months.

A.   <u>The Physicians' Employment Agreements with MHUP.</u>

82. On June 25, 2008, Memorial, through MHUP, executed a "Senior-Physician Employment Agreement" with Dr. Bradley.

83. Dr. Bradley's employment contract with MHUP stated that Dr. Bradley is a licensed physician and would provide physician services on behalf of MHUP.

84. Dr. Bradley had a base salary of $415,000—an increase from the base salary approved on May 28th—and a guaranteed minimum base compensation of $550,000, provided that his work relative value units ("Work RVUs") for the applicable year were 8,700.

85. Work RVUs represent the relative value of a physician's work for a particular service relative to the value of work for other physician services.  As is customary in the industry, Memorial leadership and the Board ostensibly extrapolated from the Physicians' historical Work RVU levels to set and justify the Physicians' compensation levels when they moved to MHUP.

86. Dr. Bradley was eligible for incentive compensation depending on the number of Work RVUs he produced annually, including a quarterly bonus based on a percentage of his "personal cash collections," plus a credit for 10.5% of "professional cash" of midlevel providers personally supervised by Dr. Bradley, less his base salary paid through the current calendar quarter.

87. Dr. Bradley's employment agreement contained a cap on incentive compensation for revenues derived from Medicare DHS, which the parties agreed would "constitute less than five percent (5%) of the Practice's total revenues, and the allocated portion of those revenues to each physician in the Practice constitutes five percent (5%) or less of Physician's total compensation from the Practice."

88. In addition to his base and incentive salary, Dr. Bradley's employment agreement provided for him to receive other benefits, including, but not limited to: health insurance, life insurance, long-term disability insurance, a 401K matching program, and payments for continuing medical education; in total, the value of these additional benefits had the potential to exceed $40,000.

89. Dr. Bradley's "annual total compensation" was subject to a cap equal to $830,000.

90. On May 1, 2009, Memorial, through MHUP, and Dr. Bradley amended his Employment Agreement to include additional compensation, a "Teaching Stipend," in an amount of $300 per week that he taught third-year medical students and $364 per week that he taught medical residents.

91. On June 25, 2008, Memorial, through MHUP, executed a "Senior-Physician Employment Agreement" with Dr. Corse.

92. Dr. Corse's employment contract with MHUP stated that Dr. Corse is a licensed physician and would provide physician services on behalf of MHUP.

93. Dr. Corse had a base salary of $375,000—an increase from the base salary approved on May 28th—and a guaranteed minimum base compensation of $500,000, provided that his Work RVUs for the applicable year were 10,100.

94. Dr. Corse was also eligible for incentive compensation, including a quarterly bonus calculated from a conversion factor related to Work RVUs, plus a credit for 10.5% of "professional cash" of midlevel providers personally supervised by Dr. Corse, less his base salary paid through the current calendar quarter.

95. In addition to his base and incentive salary, Dr. Corse's employment agreement provided for him to receive other benefits, including, but not limited to: health insurance, life insurance, long-term disability insurance, a 401K matching program, and payments for continuing medical education; in total, the value of these additional benefits had the potential to exceed $40,000.

96. Dr. Corse's "annual total compensation" was subject to a cap equal to $750,000.

97. On May 1, 2009, Memorial, through MHUP, and Dr. Corse amended his Employment Agreement to include additional compensation, a "Teaching Stipend," in an amount of $300 per week that he taught third-year medical students and $364 per week that he taught medical residents.

98. On June 25, 2008, Memorial, through MHUP, executed a "Senior-Physician Employment Agreement" with Dr. Gaskin.

99. Dr. Gaskin's employment contract with MHUP stated that Dr. Gaskin is a licensed physician and would provide physician services on behalf of MHUP.

100. Dr. Gaskin had a base salary of $275,000 and a guaranteed minimum base compensation of $325,000, provided that his Work RVUs for the prior year were equal to or greater than 6,100.

101. Dr. Gaskin's total compensation, which was to be paid quarterly, could rise based on a percentage of his "personal cash collections" and production of Work RVUs, plus a credit for

10.5% of "professional cash" of midlevel providers personally supervised by Dr. Gaskin, less his base salary paid through the current calendar quarter.

102. Dr. Gaskin's employment agreement contained a cap on incentive compensation for revenues derived from Medicare DHS, which the parties agreed would "constitute less than five percent (5%) of the Practice's total revenues, and the allocated portion of those revenues to each physician in the Practice constitutes five percent (5%) or less of Physician's total compensation from the Practice."

103. In addition to his base and incentive salary, Dr. Gaskin's employment agreement provided for him to receive other benefits, including, but not limited to: health insurance, life insurance, long-term disability insurance, a 401K matching program, and payments for continuing medical education; in total, the value of these additional benefits had the potential to exceed $30,000.

104. Dr. Gaskin's "annual total compensation" was subject to a cap equal to $550,000.

105. The Physicians' employment agreements with MHUP created indirect compensation arrangements with Memorial Hospital.

106. Memorial also employed and compensated Mindy Bradley as the administrative manager of EMA.

107. Throughout their employment, the Physicians' salaries were well in excess of the 90th percentile of market benchmarks, including Medical Group Management Association (MGMA) Physician and Compensation Production Survey benchmarks.

108. The Physicians' base and incentive compensation under their employment agreements was in excess of the following:

|  | 2008[4] | 2009 | 2010 | 2011[5] |
|---|---|---|---|---|
| Bradley | $229,853.35 | $612,782.98 | $646,974.68 | $137,628.04 |
| Corse | $208,451.71 | $501,388.75 | $683,874.51 | $133,661.78 |
| Gaskin | $151,513.27 | $418,109.81 | $324,628.34 | $87,081.76 |

109. The value of additional fringe benefits for some years was in excess of an additional $40,000 beyond the Physicians' base and incentive compensation.

110. MHUP sustained significant losses during the Physicians' employment with MHUP, primarily due to the expenses incurred because of the Physicians' employment agreements.

111. In 2008, for the six-month period in which the Physicians were employed, MHUP's EMA-related losses were in excess of $199,000 per physician or $597,000 overall.

112. In 2009, MHUP's EMA-related losses were in excess of $369,000 per physician or $1.1 million overall.

113. In 2010, MHUP's EMA-related losses were in excess of $474,000 per physician or $1.4 million overall.

114. In January and February 2011, MHUP's EMA-related losses were in excess of $130,000 per physician or $392,000 overall.

B. Additional Financial Relationships.

115. On June 25, 2008, Memorial, through MHUP (as tenant), executed a "Lease Agreement" with Dr. Bradley and Mindy Bradley (as landlords) for the lease of the Premises located at 340 Eisenhower Drive, Building 1200, Savannah, Chatham County, Georgia for use as a medical office.  Pursuant to the terms of the lease, MHUP would pay Dr. and Mrs. Bradley

---

[4] Note:  These salaries were paid over six months given that the Physicians' employment began July 1, 2008.
[5] Note:  These salaries were paid over two months given that the Physicians' employment ended on or about February 28, 2011.

twenty-two (22) dollars per square foot for an annual base rent of $239,778, which was subject to an annual adjustment.   On October 20, 2008, the Bradleys subsequently entered into an "Assignment of Lease" with entities associated with Dr. Corse and Dr. Gaskin assigning each a one third (1/3) interest in the 340 Eisenhower location.

116. On February 20, 2009, Memorial, through Provident, executed an "Asset Purchase Agreement" with BGC, LLC; Paul S. Bradley; David J. Gaskin; and Steven K. Corse for the purchase of the assets of and assumption of certain contracts related to EMA located at 340 Eisenhower Drive, Building 1200, Savannah, Chatham County, Georgia.

> a.  The assets included in the Asset Purchase Agreement included a variety of equipment and supplies, such as furniture, medical equipment, and machines.
>
> b.  The liabilities included in the Asset Purchase Agreement included the liabilities associated with five contracts, such as the license agreement for Allscripts, which EMA used for its electronic health record and practice management software.
>
> c.  The purchase price for the assets of the Asset Purchase Agreement was $159,500.

117. On August 15, 2008, Memorial, through the Parent Company, Hourglass, LLC, and HourLife, LLC, executed a formal "Memorandum of Understanding" regarding the relationship between Memorial and the HourLife and Hourglass entities—entities owned or financially affiliated with Dr. Bradley, Mrs. Bradley, and Dr. Gaskin.   Later, on September 12, 2008, Memorial Hospital and Hourglass, Inc. executed a "Letter Agreement" further outlining the strategic relationship between Memorial and HourLife and Hourglass.   The Parent Company, Hourglass, Inc., and Hourglass, LLC, executed an "Affiliation Agreement," which formally memorialized the terms of the prior agreements on December 12, 2008.   The basic terms of the "strategic relationship," as Memorial referred to its contractual ties with Hourglass and HourLife,

were set forth in these various agreements. This "strategic relationship" included that Memorial agreed to

    a.  "Lease" nurse practitioners to Hourglass;

    b.  Pay half of the insurance cost of the wellness benefit for each Memorial employee or family member of a Memorial employee who was covered under Memorial's health benefit plan up to a maximum of $15 per month;

    c.  Establish a "joint marketing" program on wellness benefits both to Memorial's employees and to the public at large.

118. On September 15, 2008, Memorial, through Memorial Hospital (as landlord), executed a "Lease Agreement" with Hourglass, Inc. (as tenant) for the lease of the premises located at 4700 Waters Avenue, Savannah, Georgia, known as the "Center for Advanced Medicine" to provide medical and related wellness services (the "CAM Lease").

119. On September 12, 2008, Memorial, through the Parent Company, and HourLife, LLC, executed a "Nurse Practitioner Lease Agreement," which leased an employee of Memorial to HourLife to perform the medical services of a nurse practitioner.

    a.  The schedule for the "leased" personnel would be "mutually agreed upon."

    b.  Each quarter, HourLife agreed to pay Memorial for salary, benefits, medical malpractice insurance coverage, workers compensation insurance coverage, and other expenses arising out of the employment relationship between Memorial and the nurse practitioner.

    c.  Memorial "leased" nurse practitioners to HourLife, including Donna Patterson, Eleanor Simmons, Joanne Angstadt, Kimberly Kuebler, and Mary McCourt.

## Defendants' Scheme.

120. Beginning in July 2008 and continuing at least until February 2011, Defendants, including the senior management of Memorial and the Board, as well as senior management and the Executive Committee of MHUP, devised a scheme by which they:

  a. entered into compensation arrangements with the Physicians that exceeded fair market value, were not commercially reasonable, and took into account the volume or value of the referrals or other business generated between the Physicians, on the one hand, and Memorial Hospital, on the other hand; and

  b. in violation of the Stark Statute, submitted and/or caused others to submit false and fraudulent claims for payment to Medicare for designated health services furnished by Memorial Hospital pursuant to referrals made by the Physicians who had improper financial relationships with Memorial Hospital.

### Violations of the Stark Statute

121. Shortly after Mr. Schaengold became Chief Executive Officer on June 1, 2009, he initiated a comprehensive evaluation of losses being sustained by Memorial as a whole, and MHUP specifically, in hopes of turning around Memorial's overall financial health.

122. A focus of Mr. Schaengold's concern was to initiate a review in order to determine whether the physicians employed by Memorial, including Drs. Bradley, Corse and Gaskin, were being paid at fair market value.  At Mr. Schaengold's direction, Memorial internally reviewed whether physicians in MHUP were being paid above fair market value.

123. As a part of this review, and as is customary in the industry, Mr. Schaengold requested that Memorial retain an independent expert consultant to review physician compensation in order to determine if the salaries exceeded fair market value.

124. Memorial's senior leadership concluded that the Physicians were being compensated above fair market value.

125. At the direction of Mr. Schaengold, MHUP's senior management approached the Physicians early in 2010 to gauge their willingness to alter their employment agreements in light of these compliance concerns.

126. In an email dated February 23, 2010, Dr. John Angstadt, Senior Vice President of Physician Services of MHUP and a member of the MHUP Executive Committee Board, emailed the Physicians to discuss the issues with their compensation, stating:

> We discussed the following factors that present significant risk for you and your practice due to the level of your compensation:
>
> 1. Your compensation is out of proportion to your work productivity. The first two pages of the analysis I shared shows that for each of you, your compensation is well above the level of your wRVU production when benchmarked against MGMA standards.
> 2. Practice losses for 2009 per doctor in your practice are $369,000. Nationally this figure is only $50,000 to $75,000 per doctor.
> 3. You have a unique compensation formula that no other Memorial physician has – the model is different.
> 4. Your compensation is well above the 90th percentile.  At this level of compensation we are extrapolating well beyond survey data.  Your compensation must be proportional to your wRVU productivity and your current compensation is not.
>
> This analysis has been supported by an opinion we have from [the independent expert consultant].  To protect you and Memorial, we must address these compensation issues ASAP.

127. Dr. Gaskin's personal notes of the February 23rd meeting provide additional insight into Memorial's true motivations and concerns.   Dr. Gaskin's notes reflect that Dr. Angstadt, representing Memorial, articulated to the Physicians that

> a.  Memorial wanted to reduce the Physicians' compensation "based on legal group recommendation";

b. Memorial decided that it "can't risk anything with government" and compensation "need[s] to move lower so that there will be no red flags to trigger [an] audit"; and

c. Memorial's "goal is to not appear that they are buying referrals."

128. In addition to being above fair market value overall, Dr. Gaskin's incentive salary in 2009 included revenue derived from DHS performed by the physician practice that exceeded 5% of his total compensation by $11,038.67.

129. On May 12, 2010, in a meeting of the Personnel & Compensation Committee of the Board, the minutes reflect that the Physicians declined a proposal to move to a different compensation model.  As a result, the Personnel & Compensation Committee of the Board reiterated that "we still have the fair mkt value issue though and [Memorial's outside counsel, Hunter Maclean Exley & Dunn, P.C.] is working on it."

130. In July 2010, at the instruction of Mr. Schaengold, MHUP issued a 180-day termination notice to the Physicians regarding their employment agreements with MHUP.

131. On July 28, 2010, a meeting of the Internal Audit and Corporate Compliance Committee of the Board was held wherein Mr. Schaengold reiterated that "our goal is not to have that group leave us but we have concerns about fair mkt aspect of their comp."

132. At this July 28th meeting, the Internal Audit and Corporate Compliance Committee of the Board approved an audit report that listed "EMA Compensation" as the highest compliance issue.

133. The Board, as well as senior leadership of Memorial Hospital and MHUP, knew that the Physicians were being compensated in excess of fair market value.

134. During the recruitment of the Physicians, as described previously, the Board and management of the Parent Company, Memorial Hospital, and MHUP took into account the value and volume of "downstream" referrals or other business generated by the Physicians for Memorial Hospital when setting the amount of compensation involved in the arrangement.

135. Notes taken during a meeting occurring in approximately February 2008 reflect that, with the addition of the Physicians, Memorial initially thought it potentially could capture "as much as 10% of SJC inpatient volume."

136. After receiving specific and detailed referral figures from a representative of the Physicians, as indicated in the April 28 PowerPoint, Memorial proposed a compensation package that exceeded fair market value for the Physicians' services and justified this compensation because EMA was a "high-volume practice with large numbers of hospital admission and referrals to specialists." And, even though MHUP was expected to lose in excess of $600,000 every year because of EMA, Memorial was motivated to move forward with the deal because it projected a "contribution margin of $3.5 – 5 million per year" to Memorial Hospital based on the Physicians' referrals. As an added benefit, and based on specific figures received from a representative of the Physicians, senior leadership of Memorial projected that, if it could successfully lure the Physicians away from St. Joseph's/Candler, Memorial could possibly capture some or all of the "estimated gross revenues (including downstream revenues from referrals) to St J/C," which was approximately "6% of St J/C total volume."

137. After the Physicians' arrival, the Board and senior leadership of Memorial, reflected on whether Memorial's bargain with the Physicians was paying off by tracking referral rates—further illustrating the original objectives of the EMA acquisition and employment of the Physicians.

28

138. On or about late July 2009, Mindy Bradley received a complaint from an individual employed by Memorial that the Physicians were not referring enough patients to doctors within Memorial, and specifically, to Memorial Hospital.

139. In response, Mindy Bradley sent Mr. Schaengold an email summarizing the Physicians' recent referrals—both to Memorial and St. Joseph's/Candler.

140. Dr. Angstadt then sent an email to Mindy Bradley on July 28, 2009, wherein he referenced a spreadsheet created by Memorial that tracked the referrals made by the Physicians over a period of time.

141. The spreadsheet referenced by Dr. Angstadt detailed and summarized all inpatient cases for the third and fourth quarter of 2008, separating specific referrals from the Physicians by payor to each of Candler County Hospital, Candler Hospital – Savannah, Memorial Hospital, Select Specialty Hospital – Savannah, and St. Joseph's – Savannah.  The spreadsheet then summarized the exact percentage of referrals Memorial Hospital was receiving as opposed to the St. Joseph's/Candler-affiliated hospitals, broken down by both percentage of referrals by specific payor and overall.

142. After Dr. Angstadt commented that EMA was referring the vast majority of the practice's "commercial patients" to St. Joseph's/Candler, while referring the "self-pay/indigent patients" to Memorial Hospital, Mindy Bradley responded, "I don't think the issue is selfpay/indigent (sic).  The real problem is that we are not taking new patients and most of our patients are established.  We can only affect a new problem, not an ongoing problem.  So, if the patient had a problem and had seen that specialist before and had a positive experience, then typically they go back there."

143. The Board, as well as senior leadership of Memorial and MHUP, expressly considered the volume or value of referrals to Memorial Hospital when making physician compensation decisions.

144. On November 11, 2009, for example, the Personnel & Compensation Committee of the Board held a meeting wherein both the past arrangement with the Physicians and the proposed modification of physician compensation throughout MHUP were discussed:

> a. Memorial Health Personnel & Compensation Committee Member Michael Kaigler asked how losing "a million dollars a month" on physician practices would affect Memorial overall.
>
> b. Mr. Schaengold replied that "group of phys accts for 40% of our admission to the hospital.  They account for almost half of our admissions.  [Mr. Schaengold] said if we desolved (sic) employed phys other than hospital based, would we loose (sic) 40% of our volume?"
>
> c. Curtis G. Anderson, a member of the Board and the Executive Committee of the Board then commented "we have some data points that Bradley moved his practice to mem [Memorial Hospital].  If we could get a feel for the consequences re patient volume, we would have a better feel for where we are on this physician model."

145. On March 24, 2010, the Board discussed, *inter alia*, the motivation behind why Memorial purchased EMA and employed the Physicians at the compensation levels they did:

> a. Board Member J. Curtis Lewis, III – Chairman of the Finance Committee in 2008 that reviewed and approved the acquisition and related employment contracts of

the Physicians – stated to the group, "we went after Bradley heavily for several years because aof (sic) volume."

    b.  Mr. Schaengold then responded that "practice splits patients between [St. Joseph's/Candler] and [Memorial Hospital]."

    c.  Board Member Christopher L. Wixon, M.D. noted that "these things can't change over night (sic).   Said you can't just start admitting patients to [Memorial Hospital] that have been admitted in past to [St. Joseph's/Candler]."

146. On October 3, 2010, Board Member Kay Ford, wrote an email to two other Board Members J. Harry Haslam and Michael A. Kaigler regarding physician compensation in MHUP: "This is a difficult decision and we all recognize we cannot continue to pay the salaries at the same level.  However, we cannot afford to lose paying referrals to the hospital."

147. On October 21, 2010, in a meeting of the Finance Committee of the Board, Mr. Schaengold urged the Board to take action to revise compensation levels within MHUP in order to bring compensation levels into alignment with fair market value.

148. The minutes of this meeting reflect that a draft of the physician contracts was discussed and "discussions and concerns were raised by Committee Members and other Board Members attending the meeting" involving the change in physician compensation that included

        "Worst case scenario"
        "How many physicians will leave MHUP?"
        "Comments that some physicians are angry"
        "Impact on Memorial if busiest physicians leave"

149. Informal notes prepared from the October 21, 2010 meeting reinforce that the Board took into account the volume or value of referrals to Memorial Hospital when evaluating whether to adjust physician compensation levels:

    a.  Committee Member Kaigler "wants to see worst case."

b. Committee Member Charles McMillan asked "how many will leave" to which Committee Member Thomas J. Hogan, M.D. replied "he didn't know. Highest risk is loosing (sic) busiest physicians. Said paul brandley (sic) [Dr. Paul Bradley] is leaving and is just mad."

c. Committee Member Kay Ford stated that "[Mr. Schaengold] has not answered the questions I posed, my concern lies with looking at projections for hosp if worst case scenario happens . . . If we loose (sic) 50% of our top prodoucing (sic) phys and they left not happy, what would our top line revenue look like? What would happen to payor mix? We have not looked at that."

d. Mr. Schaengold replied "we have done those projections. We made assumptions on what happens if 4 groups we heard rumors about leave, what would impact be on entire system? Range is improvement of 1.3 to a loss of 4.7 million in net profit for the whole system. That is if those 4 leave and don't bring their patients here."

e. Committee Member Charles McMillan then asked "have you thought every scenario out? Such as specialists taking procedures where primary care dr practices."

f. Mr. Schaengold noted that "in a two health system community, not everyone will leave and never set foot here again. I can't determine what impact it has on their referred (sic) to physicians."

150. Based on their concerns about losing paying referrals, the Board decided to delay any decision to adjust the compensation structure of physicians employed by MHUP.

151. In response to the decision to delay, Mr. Schaengold reiterated that "without approval to proceed with the new net income model, the Committee would be directing management to continue with the current contract with extensions as set by the Board. [Mr. Schaengold] emphasized that if the new net income model is not approved, management must immediately resolve, with the Finance Committee, issues regarding fair market value."

152. Following the October 21, 2010 meeting, a memorandum prepared by Darcy J. Davis, Senior Vice President and Chief Financial Officer, dated October 28, 2010, and addressed to the "Finance Committee of the Board of Directors [of] Memorial Health" that was sent "in response to requests of several Committee members asking for additional information regarding physician practices," provided the requested information regarding "downstream" revenue and potential losses that would be incurred if practices separated from Memorial.

153. On November 11, 2010, additional discussions were held by senior leadership of Memorial, including Sharon Bromley (Executive Director of Physician Services at MHUP and a member of the MHUP Executive Committee) and Margaret Gill (former Chief Operating Officer of Memorial Hospital and current Chief Executive Officer of the Parent Company and Memorial Hospital).

154. Ms. Bromley and Ms. Gill scrutinized the "referral patterns" of certain practice groups and the overall potential downstream impact of the loss of physician practices.

155. Defendants took into account the volume or value of referrals or other business generated by the Physicians for Memorial Hospital when establishing the compensation necessary to entice the Physicians to leave the St. Joseph's/Candler system and join Memorial, and Defendants continued to take into account volume or value of referrals or other business generated by MHUP physicians for Memorial Hospital when discussing revisions to physician

compensation and when specifically evaluating the employment of the Physicians following the EMA acquisition.

156. Senior management of Memorial knew or had reason to know that the Physicians' compensation arrangements took into account the volume or value of referrals to Memorial Hospital or other business that would be generated by Memorial Hospital when setting compensation levels and entering into the financial relationships with the Physicians to induce them to leave the St. Joseph's/Candler system.

157. Prior to their employment with Memorial, the projected losses for MHUP related to EMA were expected to be approximately $200,000 per physician.

158. MHUP's senior leadership stated in communications with the Physicians that "[n]ationally this figure is only $50,000 to $75,000 per doctor."

159. In reality, annual and annualized losses for MHUP related to EMA exceeded the internal projections – at its peak, in 2010,  for example, EMA-related losses for MHUP were in excess of $474,000 per physician or $1.4 million overall.

160. A significant part of the losses related to the compensation of the Physicians.

161. The employment of the Physicians following the acquisition of EMA, therefore, was not commercially reasonable in the absence of the "projected contribution margin of $3.5 – 5 million per year," resulting from the revenue Memorial expected to capture from referrals by the Physicians to Memorial Hospital.

162. After making little to no progress over the course of 2010 and early 2011 to bring physician compensation in line with fair market value, Mr. Schaengold advised the Board that a CCA report deadline in April 2011 was fast approaching.  The CCA report required Memorial to submit to OIG/HHS any "matter that a reasonable person would consider a probable violation of

criminal, civil, or administrative laws applicable to any Federal health program for which penalties or exclusion may be authorized" including the Stark Statute.

163. On or about January 3, 2011, and in light of the aforementioned issues, Mr. Schaengold specifically recommended to the Chairman of the Board, William T. Daniel, *inter alia*, that Memorial retain new, independent outside legal counsel to prepare the CCA report in which Mr. Schaengold intended to disclose that Memorial was compensating the Physicians above fair market value and outline plans to remedy fair market compensation issues throughout MHUP.

164. Forty-eight hours later, the Board terminated Mr. Schaengold's employment.

165. Memorial Hospital continued to bill Medicare in violation of the Stark Statute for referrals originated by the Physicians during all relevant times, despite repeatedly and openly acknowledging that the Physicians' compensation levels were above fair market value and not commercially reasonable.  There was a simple, driving reason behind the decision of the Board and Memorial's senior management to first set the level of Physicians' compensation above fair market value and, after acknowledging that compensation levels exceeded fair market value, refuse to decrease the Physicians' compensation levels:  the Board, as well the senior leadership of Memorial Hospital and MHUP, took into account the volume and value of referrals to Memorial Hospital when making physician compensation decisions and did whatever was necessary to capture new referrals and protect existing referrals.

**False and Fraudulent Claims and Statements**

166. An unbroken chain of entities with financial relationships existed between the Physicians and Memorial Hospital given Memorial Hospital's ownership by the Parent Company and the Parent Company's ownership (through Provident) of MHUP, the entity with which the Physicians executed their employment agreements.

167. The Physicians received aggregate compensation from MHUP that took into account the volume or value of referrals or business generated by the Physicians for Memorial Hospital.

168. The Board and senior leadership of Memorial Hospital had actual knowledge of, or acted in reckless disregard or deliberate ignorance of, the fact that the Physicians' aggregate compensation took into account the volume or value of referrals or other business generated by the Physicians for Memorial Hospital.

169. As a result, the Physicians' employment agreements with MHUP created indirect compensation arrangements, as defined by 42 C.F.R. § 411.354(c)(2). Because these compensation arrangements were in excess of fair market value, not commercially reasonable, and took into account the volume and value of potential "downstream" revenue for Memorial Hospital, the arrangements did not meet the exception for indirect compensation arrangements or bona fide employment arrangements.

170. The Physicians, with whom Defendants, more specifically MHUP and Memorial Hospital, entered into the indirect compensation arrangements specified above, referred patients, including Medicare patients, to Memorial Hospital in violation of the Stark Statute.

171. Referrals were for the furnishing of DHS, as that term is defined under relevant authorities, at Memorial Hospital to Medicare patients.  These services included inpatient hospital services related to, for example, acute pancreatitis, septicemia, and pneumonia; outpatient hospital services related to, for example, chest pain, aortic aneurysms, and chronic kidney disease; and clinical laboratory services.  Attached as "Exhibit 1" is an illustrative list of the DHS claims and procedures currently known to the United States that Memorial Hospital charged to Medicare based on referrals from the Physicians during their employment with MHUP, which is incorporated by reference.

172. Upon information and belief, Memorial Hospital used an external billing entity, Conifer Health Solutions, LLC, for some of the claims at issue.

173. During the Physicians' employment, Medicare collectively paid no less than $6,749,591.30 as a result of these prohibited referrals for DHS to Memorial Hospital.

174. Given that Memorial provided the Physicians with remuneration well in excess of industry benchmarks and not in proportion to their productivity, as set forth previously, Defendants could not reasonably have concluded that the Physicians' employment agreements were fair market value for the services provided; thus, Defendants could not have concluded that the Physicians' agreements did not violate the Stark Statute.

175. Given that senior leadership of Memorial projected EMA losses to exceed $600,000 each year for every year of the contract and that such losses did occur, as set forth previously, Defendants could not reasonably have concluded that the compensation arrangements in those contracts were commercially reasonable if no referrals were made; thus Defendants could not have concluded that these financial relationships did not violate the Stark Statute.

176. Given that the Physicians' aggregate compensation took into account the volume or value of referrals or other business generated by the referring physician for Memorial Hospital, as set forth previously, Defendants could not have concluded that the Physicians' employment arrangements did not violate the Stark Statute.

177. As a result, the financial relationships established through the employment agreements between the Defendants and Physicians were improper under the Stark Statute.

178. The billing to Medicare based on referrals for DHS from the Physicians to Memorial Hospital during the Physicians' employment was, therefore, prohibited under the Stark Statute.

179. Defendants knew, recklessly disregarded and/or deliberately ignored that billing Medicare based on the referrals from the Physicians for DHS was prohibited under the Stark Law and that the claims for these DHS were not payable by Medicare.

180. Nonetheless, Memorial Hospital presented, or caused to be presented claims for payment to the Medicare program for DHS resulting from referrals by the Physicians with whom they had entered into improper financial relationships.

181. Memorial Hospital thereby obtained payments from the United States in violation of the Stark Statute.

182. All claims presented and submitted to Medicare by Memorial Hospital for DHS referred by the Physicians after the start of their employment (July 1, 2008) until they departed from Memorial (approximately February 28, 2011) were not payable under the Stark Statute and constitute false or fraudulent claims under the FCA.

183. Defendants knew, recklessly disregarded, and/or deliberately ignored that the claims they presented and submitted to Medicare for DHS that were referred by the Physicians during their employment were not payable and were false and fraudulent.

184. The United States was unaware of the falsity of the claims and, acting in reliance on the statements and representations made by Defendants, paid claims based on the prohibited referrals.

185. Because the Stark Statute expressly provides that "no payment" shall be made for DHS provided as a result of a referral from a physician who has an improper financial relationship under the Stark Statute, Memorial Hospital's certifications on its enrollment application, claim forms, and cost reports that its statements were "true" and/or "correct" and that it was entitled to

payment of its claims for such services were material because the Stark Statute prohibits entities from receiving payments from the United States for claims resulting from prohibited referrals.

186. Memorial Hospital submitted or caused others to present and submit false and fraudulent claims for payment to Medicare, which included claims relating to inpatient and outpatient DHS rendered to patients pursuant to prohibited referrals made by the Physicians whose financial relationships with Memorial Hospital did not comply with the Stark Statute.

187. Memorial Hospital knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and knowingly presented or caused to be presented to an officer or employee of the United States Government false or fraudulent claims for payment or approval, in violation of the pre-FERA version of 31 U.S.C. § 3729(a)(1).   The claims set forth above were false and/or fraudulent because Defendants had actual knowledge of, or acted in reckless disregard or deliberate ignorance of, the fact that they were presenting or causing to be presented a claim to obtain payment from the United States for DHS resulting from prohibited referrals made by the Physicians with whom Memorial Hospital had entered into improper financial relationships.   The false claims were part of Defendants' unlawful scheme to defraud Medicare.

188. Memorial Hospital also knowingly made, used, or caused to be made or used a false record or statement material to false or fraudulent claims of DHS resulting from referrals from the Physicians with whom Defendants had entered into improper financial relationships as set forth previously, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).   The claims set forth above were false and/or fraudulent because Defendants knowingly made false records or statements material to obtaining payment from the United States for DHS resulting from referrals from the Physicians in certifying on its enrollment application, claim forms, and cost reports that

its statements were "true" and/or "correct" and, with respect to the cost report, that the services identified in the report were provided in compliance with applicable laws and regulations.  The false records and statements were part of Defendants' unlawful scheme to defraud Medicare.

189. Memorial Hospital also knowingly made, used, or caused to be made or used false records and statements material to an obligation to pay or transmit money to the United States or knowingly concealed or knowingly and improperly avoided or decreased its obligations to pay or transmit money to the United States (*i.e.*, to avoid refunding payments made in violation of the Stark Statute) by certifying on their annual cost reports that the services were provided in compliance with federal law, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), and knowingly made, used, or caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States, in violation of the pre-FERA version of 31 U.S.C. § 3729(a)(7).  The false certifications, made with each annual cost report submitted to the Government, were part of Defendants' scheme to defraud Medicare.

190. Because of Memorial Hospital's awareness of its non-compliance with the Stark Statute, Memorial Hospital presented, or caused to be presented, all of said false claims with actual knowledge of their falsity or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

### Count One

### False Claims Act – 31 U.S.C. § 3729(a)(1) and (a)(1)(A)

191. The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

192. By virtue of the acts described above, Defendants, specifically Memorial Hospital, knowingly presented, or caused to be presented, false and fraudulent claims for payment or

approval to the United States and knowingly presented or caused to be presented to an officer or employee of the United States Government a false or fraudulent claim for payment or approval, including those claims for reimbursement identified above for DHS rendered to patients who were referred by physicians with whom MHUP and Memorial Hospital had entered into improper financial relationships in violation of the Stark Statute.

193. Said claims were presented with actual knowledge of their falsity, with reckless disregard of whether or not they were false, or with deliberate ignorance of whether or not they were false.

194. As a result of the false or fraudulent claims made by Defendants, the United States has suffered damages and is therefore entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count Two

### False Claims Act – 31 U.S.C. § 3729(a)(1)(B)

195. The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

196. By virtue of the acts described above, Defendants, specifically Memorial Hospital, knowingly made, used, or caused to be made or used, material false records or statements—*i.e.*, the false certifications and representations made or caused to be made by Memorial Hospital when initially submitting the false claims for payments and the false certifications made by Memorial Hospital in submitting the cost reports—to get a false or fraudulent claim approved and paid by the United States.

197. The false certifications and representations made or caused to be made by Defendants were material to obtain approval and payment of the false claims by United States.

198. Defendants' false records or statements were made for the purpose of receiving payment for false or fraudulent claims, and the payment of said false or fraudulent claims were a reasonable and foreseeable consequence of Defendants' statements and actions.

199. Said claims were presented with actual knowledge of their falsity, with reckless disregard of whether or not they were false, or with deliberate ignorance of whether or not they were false.

200. As a result of the false or fraudulent claims made by Defendants, the United States has suffered damages and is therefore entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count Three

### False Claims Act – 31 U.S.C. § 3729(a)(7) and (a)(1)(G)

201. The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

202. Defendants, specifically Memorial Hospital, knowingly made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States, and knowingly made, used, or caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States—*i.e.*, the false certifications made by Defendants in submitting the cost reports and other forms, which were all material to obtaining the approval and payment by United States of the false claims.

203. Said false records or statements were made with actual knowledge of their falsity or with reckless disregard or deliberate ignorance of whether or not they were false.

42

204. As a result of the false or fraudulent claims made by Defendants, the United States has suffered damages and is therefore entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count Four

### Unjust Enrichment

205. The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

206. This is a claim for the recovery of monies by which Defendants, specifically, Memorial Hospital, have been unjustly enriched.

207. By the actions described in detail herein, Defendants induced the United States to make the payments at issue.

208. The United States conferred a benefit upon Defendants when it paid the claims.

209. Defendants had knowledge of the payments and benefits conferred.

210. Defendants retained the payments made by the United States for the claims at issue.

211. By virtue of the conduct described above (*i.e.* directly or indirectly obtaining government funds to which it was not entitled), Defendants were unjustly enriched at the expense of the United States in an amount to be determined at trial; and under the circumstances, in equity and good conscience, this amount should be returned to the United States.

## Count Five

### Payment by Mistake

212. The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

213. This is a claim for the recovery of monies paid by the United States to Defendants (directly or indirectly), specifically to Memorial Hospital, as a result of mistaken understandings of fact.

214. Defendants were not entitled to receive payment from the United States for DHS referred by any physician in an improper financial relationship with the entity billing for DHS, as those terms are defined by the Stark Statute.

215. The United States paid Defendants for claims for DHS referred by physicians who were in improper financial relationships with the entity billing for DHS, as those terms are defined by the Stark Statute, without knowledge of material facts, and under the mistaken belief that Defendants were entitled to receive payment for such claims, but were not in fact eligible for payment.

216. The United States' mistaken belief was material to its decision to pay Defendants for such claims.

217. As a consequence of the conduct and the acts set forth above, Defendants were paid by mistake by the United States in an amount to be determined at trial, and, in equity and good conscience, this amount should be returned to the United States.

## Prayer for Relief

WHEREFORE, the United States respectfully prays for judgment in its favor as follows:

(1)     As to Count One (False Claims Act) against Defendants for: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; and (ii) the costs of this action, plus interest, as provided by law.

(2)     As to Count Two (False Claims Act) against Defendants for: (i) statutory damages

in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; and (ii) the costs of this action, plus interest, as provided by law.

(3)      As to Count Three (False Claims Act) against Defendants for: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; and (ii) the costs of this action, plus interest, as provided by law.

(4)      As to Count Four (Unjust Enrichment), for:  (i) an amount equal to the money paid by the United States through the Medicare Program to Defendants, or the amount by which Defendants were unjustly enriched, plus interest; and (ii) the costs and expenses of this action, plus interest, as provided by law.

(5)      As to Count Five (Payment By Mistake), for:  (i) an amount equal to the money paid by the United States through the Medicare Program to Defendants, and unlawfully retained by Defendants, plus interest; and (ii) the costs and expenses of this action, plus interest, as provided by law.

(6)      As to all Counts for: (i) disgorgement of illegal profits, (ii) for an accounting of all revenues obtained by Defendants, and (iii) the imposition of a constructive trust upon such revenues.

And for all other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

The United States demands a trial by jury.


This 8th day of August, 2014.


Respectfully submitted,

EDWARD J. TARVER
UNITED STATES ATTORNEY

  /s/ Edgar D. Bueno

EDGAR D. BUENO
Assistant United States Attorney
Virginia Bar No. 41307
edgar.bueno@usdoj.gov

J. THOMAS CLARKSON
Assistant United States Attorney
Georgia Bar No. 656069
thomas.clarkson@usdoj.gov

U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia  31412
Telephone:  (912) 652-4422

**<ins>CERTIFICATE OF SERVICE</ins>**

This is to certify that I have on August 8, 2014, served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

 /s/ Edgar D. Bueno

EDGAR D. BUENO
Assistant United States Attorney
Virginia Bar No. 41307
edgar.bueno@usdoj.gov

J. THOMAS CLARKSON
Assistant United States Attorney
Georgia Bar No. 656069
thomas.clarkson@usdoj.gov

U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia  31412
Telephone:  (912) 652-4422