UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES, *ex rel.*
PHILLIP S. SCHAENGOLD,

Plaintiff-Relator,

v.                          4:11-cv-58

MEMORIAL HEALTH, INC., et al.

Defendants.

## ORDER

## I. INTRODUCTION

Memorial Health, Inc. ("Memorial Health"), Memorial Health University Medical Center, Inc. ("Memorial Hospital"), Provident Health Services, Inc. ("Provident"), and MPPG, Inc., d/b/a Memorial Health University Physicians ("MHUP") (collectively "Defendants") have moved the Court to dismiss Count Three of the United States's Complaint in Intervention. ECF No. 73. In Count Three of its Complaint in Intervention, the United States ("Government") seeks recovery under the "reverse false claims" provision of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(G). ECF No. 50 at 42-43.

Defendants argue that the Government has failed to allege that any Defendant owed a clear and established obligation to the Government as required under Section 3729(a)(1)(G) and has not alleged that any Defendant used a false record to avoid an obligation owed to the Government. ECF No. 74 at 1. Thus, Defendants argue that Count Three of the Government's Complaint in Intervention is subject to dismissal under Federal Rules of Civil Procedure 12(b)(6) and 9(b). *Id.* at 2. Defendants also argue that Count Three of the Complaint must be dismissed as to Memorial Health, Provident, and MHUP, because the Complaint lacks any allegations that those entities violated the reverse false claims provision of the FCA. *Id.* at 15.

For the reasons set forth below, the Court *DENIES IN PART* and *GRANTS IN PART* Defendants' Partial Motion to Dismiss the Government's Complaint in Intervention, ECF No. 73.

## II. BACKGROUND

The Government has intervened as to Count I of the *qui tam* action brought by Phillip S. Schaengold ("Relator") for recovery under the FCA. ECF Nos. 2; 50; 51. In its most general form, the Government's Complaint in Intervention alleges that "[f]rom 2008 until 2011, Defendants entered into compensation arrangements with certain physicians that exceeded fair market value, took into account the volume of value of referrals or other business, and were not commercially reasonable, all in violation of provisions of the Social Security Act . . . and regulations promulgated thereunder." ECF No. 50 at 1-2 (citation omitted). Thus, the Government contends that Defendants violated the FCA "[b]y knowingly submitting claims for reimbursement based on referrals generated by physicians who received improper compensation pursuant to th[o]se relationships." *Id.* at 2.

## A. Statutory Background

### 1. The False Claims Act

"[T]he FCA makes it unlawful to knowingly submit a fraudulent claim to the government." *United States ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014). A "reverse false claim" under the FCA "is a false statement used not to obtain payments from the government, but to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 835 (7th Cir. 2011) (quotation omitted); *see also United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (stating "liability results from avoiding the payment of money due to the government" in a "reverse false claim" action).

A prima facie reverse false claim cause of action requires proof of "(1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation." *Matheny*, 671 F.3d at 1222.

### 2. The Stark Statute

Congress enacted the "Stark Statute" in 1989 as part of the Omnibus Budget Reconciliation Act of 1989. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, § 6204, 103 Stat. 2106, 2236-43 (1989). "The oft-stated goal of the Stark laws is to curb overutilization of services by physicians who could profit by referring patients to facilities in which they have a financial interest." Jo-Ellyn Sakowitz Klein, *The Stark Laws: Conquering Physician Conflicts of Interest?*, 87 Geo. L.J. 499, 511 (1999).

In its current form, the Stark Statute contains two general prohibitions. First, physicians may not refer patients to an entity with which the physician, or an immediate family member, has a financial relationship "for the furnishing of designated health services" ("DHS"). 42 U.S.C. § 1395nn(a)(1)(A). Second, the law prohibits entities from presenting claims for DHS provided pursuant to a prohibited referral. *Id.* § 1395nn(a)(1)(B).

With certain exceptions, the Stark Statute defines a financial relationship between a physician, or a physician's immediate family member, and an entity as "ownership or investment in the entity," or "a compensation arrangement . . . between the physician . . . and the entity." *Id.* § 1395nn(a)(2)(A)-(B). A "compensation arrangement" is any arrangement involving any remuneration between a physician, or a physician's immediate family member. *Id.* § 1395nn(h)(1)(A). "A direct compensation arrangement exists if remuneration passes between the referring physician . . . and the entity furnishing DHS without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1)(i). On the other hand, an "indirect compensation arrangement" is one where (1) "[b]etween the referring physician . . . and the entity furnishing DHS there exists an unbroken chain of any number . . . of persons or entities that have financial relationships . . . between them . . . "; (2)

"[t]he referring physician . . . receives aggregate compensation from the person or entity in the chain with which the physician . . . has a direct financial relationship that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS"; and (3) "[t]he entity furnishing DHS has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician . . . receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS." *See id.* §§ 411.354(c)(2)(i)-(iii).

The Stark Statute includes several exceptions to its general prohibition on compensation arrangements between referring physicians and health care entities. *See* 42 U.S.C. §§ 1395nn(b), (e); 42 C.F.R. § 411.357; *see also United States v. Halifax Hosp. Med. Ctr.*, 2013 WL 6017329, at *5 (M.D. Fla Nov. 13, 2013). Of particular relevance here, the Stark Statute excepts what the statute "describes as 'bona fide employment relationships.'" *Halifax Hosp. Med. Ctr.*, 2013 WL 6017329, at *5; *see also United States ex rel. Drakeford v. Tuomey Healthcare Sys, Inc.*, 675 F.3d 394, 398 (4th Cir. 2012). A compensation arrangement meets the strictures of this exception if:

> (A) the employment is for identifiable services,
>
> (B) the amount of the remuneration under the employment—

(i) is consistent with the fair market value of the services, and

(ii) is not determined in a manner that takes into account (directly or indirectly) the volume of any referrals by the referring physician,

(C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and

(D) the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(2).

The Stark Statute provides that no payment shall be made for DHS provided in violation of the statute. *Id.* § 1395nn(g)(1). Any person who collects funds billed in violation of the statute may be liable for civil money penalties and "shall refund on a timely basis . . . any amounts" collected in violation of the statute. *See id.* §§ 1395nn(g)(2)-(3); 42 C.F.R. § 411.353(d) ("An entity that collects payment for a [DHS] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis."). The regulations implementing the Stark Statute define a "timely basis" as "the 60-day period from the time the prohibited amounts are collected by the individual or the entity." 42 C.F.R. § 1003.101.

### 3. The Medicare Program

Congress enacted Title XVIII of the Social Security Act in 1965, "establish[ing] the Medicare program to provide health insurance for the aged." Eleanor D. Kinney, *The Medicare Appeals System for Coverage and Payment Disputes: Achieving Fairness in a Time of Constraint*, 1 Admin. L.J. 1, 5 (1987). Today, eligible Medicare beneficiaries include people who are sixty-five years of age or older, people who are under sixty-five years of age with certain disabilities, and people with "End-Stage Renal Disease." Medicare Program – General Information, CMS.gov, http://www.cms.gov/Medicare/Medicare-General-Information/MedicareGenInfo/index.html (last updated July 25, 2014, 10:10 AM). Part A of the Medicare Program "helps cover inpatient care in hospitals . . . and skilled nursing facilities," as well as "hospice care and some home health care," while Part B of the Program "helps cover doctors' services and outpatient care." *Id.*

The Centers for Medicare and Medicaid Services ("CMS") is primarily responsible for the administration of the Medicare Program and CMS, in turn, "contracts with private entities known as Medicare administrative contractors ("MACs") to assist in it in administering the program." *Centro Radiológico Rolón, Inc. v. United States*, 2014 WL 556452, at *1 (D.P.R. Feb. 13, 2014). These MACs act on behalf of CMS, *see* 42 C.F.R. § 421.5(b), and "make[] payments retrospectively (after the services are furnished) to healthcare entities, such as hospitals, for inpatient and outpatient services." *Drakeford*, 675 F.3d at 397 n.5. CMS requires hospitals enrolled in the Medicare program to submit claims for reimbursement "using a 'Form UB-04,'" *Halifax Hosp. Med. Ctr.*, 2013 WL 6017329, at *1, and to "submit annually a Hospital Cost Report . . . which summarizes the amount of interim payments received and the amount to which they claim entitlement from Medicare." *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 328 (D. Conn. 2004). At all times relevant to the Government's Complaint, Memorial Hospital "was . . . enrolled in Medicare as a participating provider." ECF No. 50 at 9.

Every cost report contains a "Certification" that the covered provider's chief administrator, or a responsible designee, must sign. *Id.* at 11. Memorial Hospital's cost reports contained the following certification during the relevant time period:

> [T]o the best of my knowledge and belief, [the hospital cost report and statement] are true, correct and complete, and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

*Id.* (second alteration in original).

Additionally, Memorial Hospital's cost reports contained a notice advising its signer that any misrepresentation or falsification, as

well as any violation of applicable law, may result in civil, criminal, or administrative punishment. *Id.*

MACs rely on these cost reports and certifications in determining how much reimbursement is due to the provider and whether the government is due recoupment for any overpayments. *See* 42 C.F.R. § 405.1803. Falsely certifying compliance with the Stark Statute in connection with a claim for reimbursement under the Medicare program is actionable under the FCA. *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009).

## B. Factual Background

The scheme alleged in the Government's Complaint is complex and therefore bears explaining in some detail. For purposes of this background, the Court accepts all facts stated in the Government's Complaint in Intervention as true. *See Kwok v. Delta Air Lines Inc.*, 994 F. Supp. 2d 1290, 1292 (N.D. Ga. 2014).

### 1. Defendants and Their Relationship to Each Other

As an initial matter, it is important to identify the individual Defendants and their relation to each other. Memorial Health, a Georgia non-profit corporation, owns and operates a healthcare system made up of both outpatient and inpatient facilities, physician practices, residency teaching programs, and other ancillary facilities and programs (collectively "Memorial System"). ECF No. 50 at 3. Memorial Health also is the parent company of several wholly-owned subsidiaries. *Id.*

Memorial Hospital, a Georgia non-profit corporation and a wholly-owned subsidiary of Memorial Health, operates a 654-bed medical center serving counties in southeastern Georgia and southern South Carolina and is enrolled in the Medicare program as a participating provider. *Id.* at 3, 9.

Provident is a Georgia for-profit corporation and is a holding company for professional health service providers connected or affiliated with Memorial Hospital. *Id.* Provident is a subsidiary of Memorial Health and, additionally, owns several wholly-owned subsidiaries itself. *Id.* at 3-4. One of Provident's wholly-owned subsidiaries is MHUP. *Id.* at 4

The Government's Complaint alleges that Memorial Health and its subsidiaries operated Memorial System as a unitary system. *Id.* The Senior Management of Memorial Health and Memorial Hospital controlled Memorial System's business decisions. *Id.* Additionally, the members of Memorial Health's Board of Directors were the same as those of Memorial Hospital's Board of Directors and the two boards operated as a single body. *Id.*

### 2. The Savannah Health Care Market and Memorial System's Financial Problems

During all times relevant to this action, Memorial System and St. Joseph's/Candler Health System, Inc. ("St. Joseph's") were the two major hospital systems in the Savannah market. *Id.* at 12. As Savannah's two major suppliers of health services,

Memorial System and St. Joseph's competed for referrals from local physicians. *Id.*

In late 2007, Memorial System's leadership faced financial problems and cited a decrease of five-percent in patient volume as one of the causes of those problems. *Id.* at 13. In January 2008, Memorial System senior management held a Board Meeting ("January Board Meeting") to discuss tactics of addressing the identified financial problems. *Id.* The minutes of the Executive Session from the January Board Meeting reflect discussions relating to "'expanding [Memorial System's] employed primary care physician base'" and affirming that "'loyalty in primary and secondary markets is vital to moving our economic engine.'" *Id.* (alteration modified). During this session, Memorial System's leadership identified another problem of "'Specialists . . . not getting any referrals from [Memorial System's] primary care drs.'" *Id.* As a result of this discussion, the Government alleges that the then-Chief Executive Officer of Memorial Health and Memorial Hospital resolved to look into keeping "[r]eferrals within Memorial family." *Id.*

### 3. Recruitment of the EMA Physicians

Contemporaneous with the development of Memorial System's plan to expand its employed physician base, Memorial System was in preliminary negotiations with Dr. Paul S. Bradley, Dr. Steven K. Corse, and Dr. David J. Gaskin (collectively "Physicians") for their employment and the purchase of their medical practice, the Eisenhower Medical Associates ("EMA"). *Id.* at 14. At the time of these negotiations,

the Physicians had an existing employment agreement with SJC Medical Group, Inc., an affiliate of St. Joseph's. *Id.* The preliminary negotiations continued in earnest after the January Board Meeting. *Id.* Notes reflecting the progress of the negotiations with the Physicians reference the expected increase in patient volume "'could be as much as 10% of SJC inpatient volume.'" *Id.*

On April 28, 2008, Memorial System's Board of Directors met to review EMA's purchase and the Physicians' employment. *Id.* at 15. During this meeting, two of Memorial Health's executives presented information regarding the proposed acquisition. As part of the "Background Information" provided, the executives noted that EMA was a "high-volume practice with large numbers of hospital admission and referrals to specialists" and provided estimates as to EMA's referrals to St. Joseph's. *Id.* Proceeding to expected "'Benefits to MHUP and [Memorial Hospital],'" the executives identified "'growing primary care physician base in primary service area [as] a strategic imperative'" and noted that "EMA had 'a projected contribution margin of $3.5 − 5 million per year.'" *Id.* at 15-16.

The executives' presentation, however, went through an editing process before being shown to the Memorial System's Board. *Id.* at 16. Previous versions of the presentation specifically referenced "'referrals,'" "'downstream revenue' that could be obtained through referrals from the Physicians," and the "Physicians' 'projected contribution margin' to Memorial [System]." *Id.* Further, the final version

included a section "estimating that the net losses to Memorial [System] due to purchasing EMA and employing the Physicians," which was not included in previous versions. *Id.*

Following the executives' presentation, Memorial System's management recommended that the Board approve hiring the Physicians. *Id.* The management's recommendation was that Dr. Bradley be offered a base salary of $325,000, that Dr. Corse be offered a base salary of $325,000, and that Dr. Gaskin be offered a base salary of $275,000. *Id.* Despite the significant losses Memorial System's management projected from the proposed compensation plans, the management's recommendation cited "an increase in 'hospital revenue' . . . as a primary justification in support of the proposed acquisition." *Id.*

On June 23, 2008, the compensation sub-committee of the Board approved the proposed transaction with the Physicians. *Id.* at 16-17.

### 4. The Physicians' Compensation Arrangements

On June 25, 2008, Memorial System, through MHUP, entered into employment agreements with the Physicians. *Id.* at 18-21. These employment agreements with MHUP constituted indirect compensation arrangements with Memorial Hospital under the Stark Statute. *Id.* at 21.

The salaries the Physicians received under their respective employment agreements "were well in excess of the 90th percentile of market benchmarks, including Medical Group Management Association (MGMA) Physician and Compensation Production Survey benchmarks." *Id.* The Government alleges that, primarily due to the expenses related to these salaries, "MHUP sustained significant losses." *Id.* at 22. Specifically, in the six-month period of 2008 during which the Physicians worked for MHUP, MHUP sustained losses "in excess of $199,000 per physician or $597,000 overall." *Id.* During 2009, these "losses were in excess of $369,000 per physician or $1.1 million overall." *Id.* In 2010, MHUP's losses related to the Physicians' employ "were in excess of $474,000 per physician or $1.4 million overall." *Id.* And, finally, during January and February of 2011, these "losses were in excess of $130,000 per physician or $392,000 overall." *Id.*

### 5. Discovery of Problems with the Physicians' Compensation

On June 1, 2009, Relator became the Chief Executive Officer of Memorial Health and Memorial Hospital. *Id.* at 25. Shortly thereafter, Relator started an investigation to evaluate the "losses being sustained by Memorial [System] as a whole, and MHUP specifically." *Id.* As part of this investigation, Relator focused on determining whether Memorial System's doctors, including the Physicians, were "being paid at fair market value." *Id.* The Government avers that, after an independent consultant reviewed Memorial System's compensation arrangements with its doctors, the Memorial System's senior leadership concluded that the Physicians were receiving above-fair-market-value compensation. *Id.* at 26.

In early 2010, after this review, MHUP approached the Physicians to renegotiate their compensation arrangements in light of the compliance concerns that the fair market value review brought up. *Id.* A February 23, 2010, email from the Senior Vice President of Physician Services of MHUP to the Physicians discussing the compensation arrangement highlighted these concerns. Specifically, the email noted that the Physicians' compensation was "out of proportion to [their] work productivity," that the Physicians' "[p]ractice losses for 2009 per doctor . . . [were] $369,000" despite the national figure of "only $50,000 to $75,000 per doctor," that no other Memorial System doctor shared the Physicians' unique compensation formula, and that the Physicians' compensation was "well above the 90th percentile" and was not proportional to the Physicians' Work Relative Value Units. *See id.* Dr. Gaskin's personal notes from February 23, 2010, following the discussion with the Senior Vice President of Physician Services, indicate that Memorial System "wanted to reduce the Physicians' compensation 'based on legal group recommendation.'" *Id.* Specifically, Dr. Gaskin noted that Memorial System did not want the Physicians' compensation to raise "red flags" with the Government, as it did not want "'to appear that they [were] buying referrals.'" *Id.* at 27.

### 6. Memorial System's Knowledge of Compliance Problems

Minutes from a meeting of the Personnel and Compensation Committee of the Board held on May 12, 2010, indicate that the Physicians declined a proposed change to their compensation arrangement and the Committee reiterated that "'[it] still [had] the fair [market] value issue'" and indicated that its outside counsel was working on resolving it. *See id.* During a July 28, 2010, meeting of the Internal Audit and Corporate Compliance Committee of the Board, Relator repeated his concerns about the fair market value aspect of the Physicians' compensation arrangement. *Id.* At this meeting, the Internal Audit and Corporate Compliance Committee "approved an audit report that listed 'EMA Compensation' as the highest compliance issue." *Id.*

The Government's Complaint alleges that notes and minutes from earlier meetings of the Personnel and Compensation Committee and the Board indicate that Memorial Systems knew of the compliance problems with the Physicians' compensation package. For instance, the minutes of a Personnel and Compensation Committee meeting show that Memorial System was judging the effectiveness of the Physicians' compensation arrangement by reference to patient volume. *See id.* at 30. Additionally, Board discussions from March 24, 2010 shed light on the motivation behind Memorial System's engagement with the Physicians. *Id.* The Chairman of the Finance Committee in 2008, who approved the Physicians' employment contracts, stated that Memorial System "'went after Bradley heavily for several years because aof [sic] volume.'" *Id.* at 31.

An October 3, 2010, email from Board Member Kay Ford to other members of the Board regarding physician compensation

stated, "'This is a difficult decision and we all recognize we cannot continue to pay the salaries at the same level. However, we cannot afford to lose paying referrals to the hospital.'" *Id.* at 31. Later, on October 21, 2010, Relator advised that the Board should revise compensation arrangements to bring physician compensation to fair market levels. *Id.* The minutes and notes from this meeting reflect the Board's concerns that a change in compensation levels would mean that Memorial System would lose referrals and its busiest physicians would leave. *See id.* at 31-32. Based on these concerns, the Board delayed making any changes to the existing compensation structure. *Id.* at 32.

However, Relator advised management that without a change in the compensation structure, the issues regarding fair market value would persist. *Id.* at 33. Early in 2011, with little progress made as to the fair market value issues, Relator advised that the April 2011 deadline for filing a Certificate of Compliance Agreement ("CCA") report was approaching. *Id.* Pursuant to a previous settlement agreement entered into between Memorial Hospital and the Government, Memorial Hospital was required "to submit to OIG/HHS any 'matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health program for which penalties or exclusion may be authorized' including the Stark Statute." *Id.* at 34-35. On January 3, 2011, Relator recommended that Memorial System retain independent counsel to prepare a CCA report detailing the fair market value issues. *Id.* at 35. Forty-eight hours later, the Board terminated Relator's employment. *Id.*

### 7.    False Claims

For the time period during which Memorial System, through MHUP, employed the Physicians at compensation levels that allegedly exceeded fair market value rates, Memorial Hospital billed Medicare. *Id.* The Government contends that Physicians referred patients, including Medicare patients, to Memorial Hospital and that these referrals were for the furnishing of DHS, as defined by statute. *Id.*

During this time period, the Government alleges that "Medicare collectively paid no less than $ 6,749,591.30 as a result of these . . . referrals for DHS to Memorial Hospital." *Id.* at 37. Despite the fact that Memorial Hospital knew, or should have known, that the Physicians' compensation arrangements violated the Stark Statute, it submitted claims for payment to the Medicare Program for DHS resulting from referrals from the Physicians from July 1, 2008, until around February 28, 2011, when the Physicians left MHUP. *Id.* at 38. Additionally, Memorial Hospital certified on each cost report it submitted during the relevant time period that all payments received complied with the requirements of the Stark Statute and its regulations. *See id.* at 38-39. As a result of Memorial Hospital's certifications on each claim, enrollment application, and cost report that it was entitled to payment of the claims submitted, the Government was unaware of these violations. *Id.* at 38-40.

### III. STANDARD OF REVIEW

#### A. Rule 12(b)(6)

In considering a Federal Rule of Civil Procedure 12(b)(6) motion, all facts in the

plaintiff's complaint "are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto." *GSW, Inc. v. Long Cnty., Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court, however, is not limited to the four corners of the pleadings; rather a proper review of a motion to dismiss "requires the reviewing court to draw on its judicial experience and common sense." *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A complaint will not be dismissed so long as it contains factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Iqbal*, 556 U.S. at 678 (claim must have "facial plausibility"); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). Yet, "a plaintiff's obligation to provide 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original).

In *Iqbal*, the Supreme Court further explained the required level of specificity:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

556 U.S. at 678 (internal citation and quotation omitted).

In order to assess the plausibility of a complaint, a court must be mindful of two principles. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, *Iqbal* suggests a "two-pronged approach" to assessing a defendant's Rule 12(b)(6) motion: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679)). Importantly, however, the "plausibility standard is not akin to a 'probability requirement' at the pleading stage." *Id.* at 1289 (quoting *Iqbal*, 556 U.S. at 678). Instead, it "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements" of a plaintiff's claim for relief. *See McCray v. Potter*, 263 F. App'x 771, 773 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

## B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) applies to FCA actions. *United States ex rel. Clausen v. Lab. Corp.*, 290 F.3d 1301, 1309 (11th Cir. 2002). Thus, in addition to passing muster under *Twombly* and *Iqbal*, an FCA complaint must "'state with particularity the circumstances constituting fraud or mistake.'" *Matheny*, 671 F.3d at 1222 (quoting Fed. R. Civ. P. 9(b)).

Generally, "[t]he particularity requirement of Rule 9(b) is satisfied if the complaint alleges 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Id.* (quoting *Hopper v. Solvay Phram., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009)).

The purposes which Rule 9(b) serves, though, must be remembered. That is, Rule 9(b) "'serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.'" *Clausen*, 290 F.3d at 1310 (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). Additionally, the Eleventh Circuit consistently has cautioned that "'[t]he application of Rule 9(b) . . . 'must not abrogate the concept of notice pleading.'" *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007) (quoting *Ziemba*, 256 F.3d at 1202 (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988))).

Thus, although Rule 9(b) generally prefers allegations as to the who, what, when, and how of an alleged fraud, "'alternative means are also available to satisfy the rule,'" so long as those means put the defendants on notice as to precise misconduct alleged and provide the court with "some indicia of reliability . . . to support the allegation of *an actual false claim*." *See Clausen*, 290 F.3d at 1310-11 & n.18 (quoting *Durham*, 847 F.2d at 1512).

## IV. ANALYSIS

Defendants have moved to dismiss Count Three of the Government's Complaint in Intervention which seeks recovery under 31 U.S.C. § 3729(a)(1)(G), the "reverse false claims" provision of the FCA. ECF No. 74 at 1. In doing so, Defendants argue that the Government has failed set forth allegations sufficient to support a reverse false claim action. *Id.* Specifically, Defendants argue that the Government has "not allege[d] that any Defendant had a clear and established obligation to pay money to the Government," that the Government has not "allege[d] with particularity that any Defendant made or used a false record to conceal" such an obligation, that the reverse false claim merely recasts the Government's affirmative false claims allegations, and that the Government has failed to allege that any defendant other than Memorial Hospital was subject to Medicare's reporting and certification requirements and, thus, cannot be liable under the Government's theory of liability for violation of the reverse false claims provision of the FCA. *See id.* at 1-2, 15.

### A. Only Memorial Hospital is Subject to Liability for Reverse False Claims

The Government's theory of liability under the reverse false claims provision of the FCA turns on the submission of cost reports certifying compliance with the Stark Statute to conceal obligations owed to the Government to refund overpayments. The Government's Complaint in Intervention, however, alleges that only "Defendant

Memorial Hospital was . . . enrolled in Medicare as a participating provider," ECF No. 50 at 9, and only "Memorial Hospital was . . . required to submit annually a hospital cost report to the relevant fiscal intermediary." *Id.* at 10. Indeed, the Complaint alleges that only "Memorial Hospital presented, or caused to be presented claims for payment to the Medicare program for DHS resulting from referrals by the Physicians with whom they had entered into improper financial relationships." *Id.* at 38-43, at ¶¶ 180-82, 186-90, 192, 196, 202. In the absence of specific allegations of reverse false claims pertaining to Memorial Health, Provident, or MHUP, Defendants argue that Count Three of the Complaint must be dismissed against those entities. ECF No. 74 at 15-16. The Court agrees.

The Government seeks to avoid this result by arguing that "Memorial Hospital, Provident, MHUP and all other relevant subsidiaries . . . operated as a unitary health system that was controlled and operated through a centralized leadership and management team." ECF No. 88 at 21. Therefore, so the argument goes, because "the members and officers of the Board of Directors of the Parent Company Memorial Health, Inc. and the Board of Directors of Memorial Hospital consisted of the same individuals," and because the Complaint alleges involvement of individuals from both MHUP and Provident, Defendants all are liable for the reverse false claims that Memorial Hospital submitted. *Id.* at 22.

Tellingly, the Government cites no support for its argument. This is because merely being a parent, or an associated

corporation, of a subsidiary that commits an FCA violation is insufficient to support an FCA action against the parent or the associated corporation. *See United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 59-60 (D.D.C. 2007). Rather, the Government must demonstrate that the parent and the associated corporations are "liable under a veil piercing or alter ego theory, or that [they are] directly liable for [their] own role in the submission of false claims." *Id.* at 60. Neither the Government's Complaint, nor its arguments in support of its Complaint demonstrate that Defendants Memorial Health, Provident, and MHUP are liable for the for Memorial Hospital's alleged reverse false claims FCA violations.

### 1. Veil Piercing

"Because [the Government's] claims are brought under the False Claims Act and relate to the federal Medicare program, 'federal law, therefore, controls the veil-piercing question.'" *Id.* (quoting *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 39 (D. Mass. 2000)); *see also United States ex rel. Lawson v. Aegis Therapies, Inc.*, 2013 WL 5816501, at *4 (S.D. Ga. Oct. 29, 2013) (Wood, C.J.). In general, federal courts accord separate corporate entities great deference and will disregard the corporate form only in limited circumstances "when the incentive value of limited liability is outweighed by the competing value of basic fairness to parties dealing with the corporation." *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C. Cir. 1982).

The question whether to disregard the corporate form can be expressed as a two-step inquiry. The Court asks (1) whether there is such unity of interest that the separate personalities of Memorial Hospital and the parent corporation and the other subsidiaries no longer exist; and (2) if the acts are treated as those of Memorial Hospital alone, whether an inequitable result will follow. *See Hockett*, 498 F. Supp. 2d at 60 (quoting *Labadie Coal Co.*, 672 F.2d at 96). Thus, the Government's veil-piercing claims can survive Defendant's motion to dismiss only if its Complaint alleges facts sufficient to show that (1) there was such unity of interest between Memorial Hospital, the parent company, and the other subsidiaries that the companies had no "legal or independent significance of [their] own, *and* (2) that the corporate form was used to perpetrate some form of injustice or fraud." *See Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 347 (S.D.N.Y. 2013) (emphasis added) (quotation omitted) (applying New York, Delaware, and Nova Scotia law). The Government has failed this test.

The first prong of the veil-piercing test looks to "the degree to which formalities have been followed to maintain a separate corporate identity." *Labadie Coal Co.*, 672 F.2d at 96. The unity of interest between related corporations "is measured by 'the nature of the corporate ownership and control; failure to maintain corporate minutes or records; failure to maintain corporate formalities, commingling of funds and assets; diversion of one corporation's funds to the other's uses; and use of the same office or business location.'" *AGS*

*Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 90 (D.D.C. 2004) (quoting *Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.*, 62 F. Supp. 2d 13, 20 (D.D.C. 1999)).

Here, the Government has alleged no more than that Memorial Hospital, Memorial Health, Provident, and MHUP "operated as a unitary health system," that the senior management of Memorial Health, the parent company, and of Memorial Hospital "controlled, directed, and made all significant business decisions for the entire health system," and that the Boards of Memorial Health and of Memorial Hospital consisted of the same members and "operated as a single body." *See* ECF No. 50 at 4, at ¶¶ 11-13.

But "the type of overlap the [Government] allege[s] here is hardly unusual in corporate structure, and 'courts routinely refuse to pierce the corporate veil based on allegations limited to the existence of shared office space or overlapping management, allegations that one company is the wholly-owned subsidiary of another, or that companies are to be considered as a whole.'" *United States v. Universal Health Servs., Inc.*, 2010 WL 4323082, at *4 (W.D. Va. Oct. 31, 2010) (quoting *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 87-88 (S.D.N.Y. 2010)) (internal quotation marks omitted). Indeed, the principle has long been that "[c]ontrol through the ownership of shares does not fuse the corporations, even when the directors are common to each." *See Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929).

Nonetheless, even if the Government's allegations "rise to the level that indicates the kind of complete domination and control that is required under the first prong of the alter-ego analysis," *Spagnola*, 264 F.R.D. at 87, absent an allegation that injustice would result should the Court not disregard the corporate form, piercing the corporate veil is unwarranted. *See Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997) (applying New York law and finding that "the element of domination and control never was considered to be sufficient of itself to justify the piercing of a corporate veil").

To satisfy its burden as to the second prong, it is incumbent on the Government to "allege the kind of injustice that the alter-ego doctrine seeks to prevent, that is, injustice caused to third parties when a corporation (*i.e.*, [Memorial Hospital]) is itself operated as a constructive fraud or in an unjust manner." *Spagnola*, 264 F.R.D. at 88. Although inquiry into the injustice prong is inherently fact-dependent and will differ in every case, examples of allegations sufficient to support a finding of injustice in alter-ego cases include: "a failure to adequately capitalize the corporation for the reasonable risks of the corporate undertaking," *Labadie Coal Co.*, 672 F.2d at 99, diversion of profit from a corporate entity in order to avoid debts, *Valley Fin., Inc. v. United States*, 629 F.2d 162, 172-73 (D.C. Cir. 1980), and where the corporate entity is otherwise merely "used as a *sham* to perpetrate a fraud or to avoid personal liability." *Joslyn Mfg. Co. v. T.L. James & Co., Inc.*, 893 F.2d 80, 83 (5th Cir. 1990).

The Government's Complaint plainly is devoid of any factual averments tending to show that any injustice would result if the misconduct giving rise to the alleged reverse false claims violations of the FCA is treated as Memorial Hospital's alone. Accordingly, a veil-piercing theory cannot support the Government's reverse false claims against Memorial Health, Provident, or MHUP.

### 2.    Direct Involvement

Even absent allegations that the circumstances warrant veil piercing, Memorial Health, Provident, and MHUP may "be held liable if [they were] directly involved in submitting false claims or causing them to be submitted to the government." *See Hockett*, 498 F. Supp. 2d at 62. The Government's Complaint fails on this ground as well.

The Complaint alleges, and the Government argues, that Defendants other than Memorial Hospital participated in a scheme that culminated in the submission of false claims to the Government and were themselves parties to violations of the Stark Statute. *See* ECF Nos. 50 at 3-4; 88 at 21-22. But mere participation in a scheme that results in an eventual submission of a false claim is not sufficient for FCA liability to lie. Indeed, "[t]he [FCA] does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies." *Clausen*, 290 F.3d at 1311. Rather, the submission of a false claim itself is "the *sine qua non* of a False Claims violation." *Id.* Thus, without allegations sufficient to support a finding that Memorial Health, Provident, or MHUP actually submitted a falsely certified cost

report, or was directly involved in causing such a submission, "there is simply no actionable damage to the public fisc as required under the False Claims Act." *Id.*; *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) ("[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'"); *see cf. Hockett*, 498 F. Supp. 2d at 62 (finding direct involvement where there was evidence that an entity "was directly involved in the process of finalizing the cost report and billing the government" where "a . . . corporate official instructed an employee who was preparing the amended cost report to obscure the true nature of the cost overstatements in the original cost report").

The Government's Complaint simply cannot be read to allege that Memorial Health, Provident, or MHUP were *directly involved* with the submission of, or causing the submission of, falsely certified cost reports to the Government. At most, the Complaint alleges that Memorial Health, Provident, or MHUP were involved in setting up the compensation arrangements that allegedly violated the Stark Statute. Such involvement is insufficient to state a claim for violations of the FCA under the Government's reverse false claims theory of recovery. Accordingly, a theory of direct involvement cannot support the Government's reverse false claims allegations as to the Defendants other than Memorial Hospital.

The Government has asked that, if "the Court identifies any pleading deficiencies," it be given leave to amend its Complaint. ECF No. 88 at 9 n.4. District courts

generally should honor such requests except for where a "substantial ground" exists for denial. *See Reese v. Herbert*, 527 F.3d 1253, 1263 (11th Cir. 2008). Defendants' late-noticed reply argues that the Government's request should be denied on the bases of futility and undue delay. *See* ECF No. 94 at 13. The Court disagrees and finds that the Government's claims are better "heard on the merits" than barred from the courtroom by Defendants' newfound insistence on timeliness. *See In re Engle Cases*, 767 F.3d 1082, 1108 (11th Cir. 2014). The Court, therefore, allows the Government twenty days to amend its Complaint in order to replead its claims against Memorial Health, Provident, and MHUP.

## B. Memorial Hospital's Obligation to Pay Money to the Government

A prima facie cause of action for a reverse false claim under the False Claims Act requires the identification of an obligation to pay money to the Government. *See Matheny*, 671 F.3d at 1223. Thus, "[i]t is of primary importance that a plaintiff show that the defendant owed a definite and clear obligation to the United States at the time of the false statement." *United States v. Aggarwal*, 2005 WL 6011259, at *7 (M.D. Fla. Feb. 10, 2005) (citing *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999); *Am. Textile Mfr. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 736 (6th Cir. 1999)). Defendants argue that the Government has failed to meet this burden, because "[t]he Complaint does not identify any particular payment obligation incurred by any Defendant." ECF No. 74 at 9. In doing so, Defendants focus only on the

factual averments contained in two paragraphs of the Government's 217 paragraph Complaint. *Id.* at 10 & n.4 (citing ECF No. 50, at ¶¶ 189, 202).

To be sure, as Defendants argue, a lone, conclusory allegation of concealment of an obligation to pay money to the Government would be insufficient to survive a motion to dismiss. *See, e.g., United States ex rel. Heesch v. Diagnostic Physicians Grp., P.C.,* 2014 WL 2154241, at *10 (S.D. Ala. May 22, 2014). But the Government's Complaint does more than that. The Complaint alleges (1) that 42 C.F.R. § 411.353(d) imposes an obligation to refund reimbursements from the Government collected in violation of the Stark Statute, *see* ECF No. 50 at 8, at ¶ 25, (2) that on June 25, 2008, Memorial System, through MHUP, entered into compensation arrangements with the Physicians which constituted prohibited indirect compensation arrangements with Memorial Hospital under the Stark Statute, *see id.* at 18, at ¶ 80, 21, at ¶ 105, (3) that, despite the existence of prohibited compensation arrangements, from July 2008 through February 2011, Memorial Hospital submitted claims for payment to Medicare for DHS furnished pursuant to referrals from the Physicians, *see id.* at 25, at ¶ 120, (4) that Memorial Hospital knew the Physicians' compensation arrangements violated the Stark Statute, *see generally id.* at 28-35, and (5) that, despite this knowledge, Memorial Hospital continued to bill Medicare in violation of the Stark Statute and to certify in its cost reports that the services identified in the report complied with applicable laws and regulations, thus concealing an obligation to refund

overpayments to the Government, *see generally id.* at 35-40. Accordingly, the Government's Complaint not only provides more than naked, conclusory averments regarding the concealment of an obligation, it specifically develops a theory of concealment of an alleged obligation. *Contra United States ex rel. Wilson v. Crestwood Healthcare, L.P.,* 2012 WL 1886351, at *8 (N.D. Ala. May 18, 2012) ("[Relator's] theory *appears* to be that, under its agreement with the Department of Health and Human Services, [Defendant] was required to remit to the government any funds that it received to reimburse false claims. However, that theory is not specifically developed in the complaint." (footnote omitted)).

Not to be deterred, Defendants argue that the obligation to refund payments obtained in violation of the Stark Statute amount not to an obligation for purposes of the FCA, but rather to "a legal disagreement as to whether the compensation arrangements entered into between the Physicians and MHUP were permissible under Stark." ECF No. 74 at 11. Seizing on the Stark Statute's exception permitting "bona fide employment relationships," Defendants assert that the Government "concedes that Defendants' refund liability to the Government is contingent upon . . . a judicial determination or administrative determination regarding whether MHUP compensated the Physicians in excess of fair market value or in a manner that was not commercially reasonable" and that "potential, contingent obligations are beyond the reach of the reverse false claims provision." *Id.* at 11.

16

Notwithstanding the fact that the Court is required to accept the Government's factually supported allegation that the Physicians' compensation arrangements exceeded fair market value and thus violated the Stark Statute, ECF No. 50 at 25, at ¶ 120(a),[1] Defendants' argument misconceives the nature of obligations sufficient to give rise to a claim under the FCA's reverse false claim provision.

It is clear that "the reverse false claims act does not extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed . . . and which do not arise out of an economic relationship between the government and the defendant . . . ." *See, e.g., United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004) (emphasis omitted). Thus, to the extent that Defendants argue that "contingent obligations are beyond the reach of the reverse false claims provision," they are correct. But Defendants' move from that correct statement of law to argue that "an 'obligation' exists under the FCA only where a person (1) had and breached a contractual relationship with the Government, (2) was liable to the Government under judgment or fine, or (3) had acknowledged indebtedness to the Government," ECF No. 74 at 12, is unwarranted and unsupported. Curiously, though Defendants cite *United States v. Q International Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997) in support of their

purported exhaustive list of recognized obligations under the FCA, palpably absent from Defendants' list is *Q International*'s recognition that "obligations" under the FCA can arise by *statute* or *regulation* in addition to arising by "contract, judgment, or acknowledgment of indebtedness. *Id.*

To be sure, contrary to Defendants' position, the FCA does not necessarily require that an obligation arise in a certain manner. What the FCA does require is an allegation of "*an existing legal obligation* to pay or transmit money or property to the government." *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195 (10th Cir. 2006) (quotation omitted). "[Q]uasi-contractual obligations created by statute or regulation" do suffice and are thus distinguishable from "[c]ontingent obligations—those that will arise only after the exercise of discretion by government actors—[which] are not contemplated by the statute." *See Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 738 (6th Cir. 1999).

Indeed, courts have recognized that the obligation to refund Medicare payments made in violation of the Stark Statute is an obligation under the FCA. *See United States ex rel. Willis v. Angels of Hope Hospice, Inc.*, 2014 WL 684657, at *8 & n.8, *12-13 (M.D. Ga. Feb. 21, 2014) (concluding that relator adequately alleged a reverse false claims cause of action where relator argued that the defendants used, *inter alia*, "false certifications of compliance with Medicare regulations" in order "to conceal, avoid, or decrease its obligation to repay Medicare" for hospice-related reimbursements). This is because the type of contingent liability that

---

[1] The Court finds factual support for this allegation throughout the Complaint. *See, e.g.*, ECF No. 50 at 26, at ¶ 126, 27-28, at ¶¶ 132-36, at 30-35, at ¶¶ 143-65.

courts have excepted from the scope of reverse false claims liability is liability which "attach[es] only after the exercise of administrative or prosecutorial discretion, and often after a selection from a range of penalties." *Am. Textile Mfrs.*, 190 F.3d at 738; *see also United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 391 (5th Cir. 2008) ("[W]hen potential fines depend on intervening discretionary governmental acts, they are not sufficient to create 'obligations to pay' under the False Claims Act."); *Hoyte v. Am. Red Cross*, 439 F. Supp. 2d 38, 44-45 (D.D.C. July 14, 2006) (finding no "obligation" within the meaning of the FCA where "no obligation w[ould] arise until the FDA decide[d] to exercise its authority"); *United States ex rel. Huangyan Import & Export Corp. v. Nature's Farm Prods., Inc.*, 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005) ("[P]otential obligations—fines, penalties and the like—that are contingent upon the exercise of some discretion or intervening act by the government are not properly the subject of a suit under the FCA.").

An "obligation" is not contingent, and thus excepted from the purview of the FCA, merely because there is disagreement regarding the amount or existence of such an obligation. "[T]here are instances in which a party is required to pay money to the government, but, at the time the obligation arises, the sum has not been precisely determined." *Bahrani*, 465 F.3d at 1201. By dismissing the Government's allegations regarding the alleged reverse false claims as mere legal disagreements, Defendants "ignore the complaint's allegations that at the time" Memorial Hospital submitted cost reports certifying that the services identified

complied with the applicable statutes and regulations Memorial Hospital knew that it had furnished services pursuant to referrals from the Physicians whose compensation arrangements violated the Stark Statute, thus concealing an obligation imposed by regulation to refund Medicare overpayments. *Cf. Pemco Aeroplex Inc.*, 195 F.3d at 1237 (determining that defendant's arguments that the government's allegations "at best . . . created only a contingent obligation . . . ignore[d] the complaint's allegations").

Because the Government's theory regarding the concealment of Memorial Hospital's obligation to refund overpayments obtained from Medicare in violation of the Stark Statute is specifically borne out in the Government's Complaint, the Court finds that the Government has adequately alleged an obligation to pay or transmit money to the Government sufficient to support a reverse false claim cause of action under the FCA.[2]

---

[2] Defendants argue in their Reply to the Government's Response that the Government failed to "allege that any Defendant identified an overpayment that it received" and therefore failed to adequately allege an obligation to refund an overpayment ever arose. *See* ECF No. 94 at 5. As an initial matter, Defendants failed to immediately notify the Court of their intent to file a reply to the Government's response, *see* ECF No. 92 (noticing Defendants' intent to reply to the Government's response ten days after the Government filed its response), as the local rules require. LR 7.6, SDGa. Therefore, Defendants' Reply is not properly before the Court.

To the extent that their argument bears responding to, it simply does not carry any water. Defendants appear to be asking that the Government's Complaint show that Memorial Hospital actually identified the overpayments. *See* ECF No. 94 at 5-7. The False Claims Act, however,

## C. The Government's Allegation that Memorial Hospital Made or Used a False Record

Defendants also argue that Count Three of the Government's Complaint fails to state a claim under Count Three because it fails to "allege with particularity that any Defendant made or used a false record." ECF No. 74 at 13. In so arguing, Defendants revert to Rule 9(b)'s who, what, when, where, and how particularity requirements to contend that the Government's averment that Memorial Hospital submitted cost reports and certifications for each of the years at issue is insufficient to withstand their motion to dismiss. *Id.* at 13-14.

But Defendants' argument takes too narrow a view of Rule 9(b)'s role in FCA actions. Such a view is not necessarily surprising. Ever since *Clausen* held that FCA actions are subject to Rule 9(b)'s

pleading standards "[i]t seems just about every FCA complaint draws a Rule 9(b) motion" and "[i]f a relator cannot allege, based on personal knowledge, that false claims were actually presented to the Government, those motions are usually successful." *Willis*, 2014 WL 684657, at *6. Alleging the who, what, when, where, and how of the presentment of a claim, however, is not the only way in which to skin the FCA-pleading cat.

*Clausen* requires that "some indicia of reliability . . . be given in the complaint to support the allegation of an *actual false claim* for payment being made to the Government." 290 F.3d at 1311. Thus, the Eleventh Circuit has found allegations based on a relator's personal knowledge of the circumstances surrounding alleged false claims were sufficient to withstand a motion to dismiss even without the specification of the actual presentment of claims, because the allegations were "sufficient to explain" why the relator believed the defendant submitted false claims. *See United States ex rel. Walker v. R&F Props. of Lake Cnty, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005). Though always subjecting FCA complaints to Rule 9(b) scrutiny, the Eleventh Circuit is "more tolerant towards complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." *Matheny*, 671 F.3d at 1230.

Indeed, most recently, the Eleventh Circuit has reiterated that "[p]roviding exact billing data—name, date, amount, and services rendered—or attaching a representative sample claim is" just one of

---

plainly does not require actual identification of an overpayment for an obligation to arise. Rather, a defendant knowingly conceals an obligation under 31 U.S.C. § 3729(a)(1)(G) when that defendant does so with "actual knowledge" of the facts giving rise to the obligation, "acts in deliberate ignorance" of those facts, or "acts in reckless disregard" of those facts. *See* 31 U.S.C. § 3729(b)(1); *see also* 42 C.F.R. § 411.354(c)(2)(iii) (a prohibited "indirect compensation arrangement exists if . . . [t]he entity furnishing DHS has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician . . . receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS"); *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 451 (6th Cir. 2005) (defining "knowingly" as applied in false claims action). The Government's Complaint is rife with allegations sufficient to support an inference that Memorial Hospital acted at least in reckless disregard of the facts giving rise to its obligations to refund overpayments to the Government.

the ways in which "a complaint can establish the necessary indicia of reliability." *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, ___ F. App'x ___, 2014 WL 5471925, at *9 (11th Cir. Oct. 30, 2014) (citing *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009)). Accordingly, contrary to Defendants' argument that the Government is required to allege the who, what, when, and how of the alleged presentment, there simply is no talismanic requirement that FCA plaintiffs allege such information. *See id.* (citing *Clausen*, 290 F.3d at 1312 & n.21). Under the Eleventh Circuit's "nuanced, case-by-case approach," allegations based on a relator's "first-hand knowledge of the defendants' submission of false claims gained though her employment with the defendants may [provide] a sufficient basis for asserting that the defendants actually submitted false claims." *Id.*

Thus, with the Eleventh Circuit's most recent decision in mind, the Court turns to the nature of the allegations in the Government's Complaint. To summarize, the Government's allegations are based, in large part, on Relator's personal knowledge gleaned from access to financial information and other corporate documents during his time as Chief Executive Officer and President of Memorial Health and Memorial Hospital. Based on this knowledge, the Government asserts that from 2008 to 2011 Memorial Hospital was required to submit cost reports as part of its participation in the Medicare program, that Memorial Hospital did indeed submit those cost reports, and that those cost reports contained false certifications that the services included in

the cost reports complied with relevant laws and regulations. Additionally, the Government attached to its Complaint "an illustrative list of the DHS claims and procedures currently known to the United States that Memorial Hospital charged to Medicare based on referrals from the Physicians during their employment with MHUP." ECF Nos. 50 at 36; 50-1 (reporting hundreds of pages of claims).

The Court finds that although the Government has not identified the who, what, when, where, and how of the alleged presentment of false claims, the Government has provided sufficient indicia of reliability through allegations based on Relator's first-hand knowledge and identification of referrals from the Physicians whose compensation arrangement is alleged to have violated the Stark Statute to withstand Defendants' motion to dismiss.

### D. Redundancy of Reverse False Claims Liability

Defendants' motion's last breath seeks dismissal of the Government's reverse false claims action on the grounds that it merely recasts the Government's affirmative false claims allegations. *See* ECF No. 74 at 17. The Court disagrees.

In support of their argument, Defendants marshal four cases which conclude, in sum, that the reverse false claims act is not meant to provide a "redundant basis" of liability under the FCA and that dismissing reverse false claims is proper where such claims merely seek liability for the same acts that constitute affirmative false claims. *See id.* at 16-17 (citing *United States ex rel. Ruscher v. Omnicare, Inc.*, 2014 WL 2618158, at

*27-28 (S.D. Tex. June 12, 2014); *United States ex rel. Porter v. HCA Health Servs. of Okla., Inc.*, 2011 WL 4590791, at *7-8 (N.D. Tex. Sept. 30, 2011); *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505 (E.D. Pa. 2010); *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 338-39 (S.D.N.Y. 2004)). But the cases cited in Defendants' brief are distinguishable from the facts presented in this case.

For instance, in *Gabelli*, winning bidders at FCC spectrum license auctions allegedly falsely certified that they were eligible for federal discounts. *See* 345 F. Supp. 2d at 338. The reverse false claims argument went as follows: the defendants' "obligation to pay attached at the close of the spectrum auctions," but the defendants' false certification of eligibility for discounts reduced their obligation to pay. *Id.* Thus, "the reduction in money owed to the Government . . . [was] the very same money that the defendants [would] procure from the U.S. Treasury (as a government payment) . . . ." *Id.* Accordingly, absent an obligation to refund money to the government independent of the alleged affirmative false claims, the United States District Court for the Southern District of New York found that the relator's affirmative and reverse false claims actions were "redundant—two ways of describing the same transaction." *Id.* at 339.

Similarly, in *Thomas*, a government contractor allegedly failed to disclose all discount information to the government in its bids. 708 F. Supp. 2d at 514. The relator argued that, as a result, "each invoice was inflated, imposing an affirmative obligation on [the defendant] to refund payments it

impermissibly received from the government." *Id.* Thus, by not refunding the payments, defendant "avoided or decreased its obligation to the government." *Id.*

Ultimately, the United States District Court for the Eastern District of Pennsylvania concluded that because the relator "ha[d] not alleged the existence of a 'clear' obligation or liability to the government that [the defendant] failed to pay, he ha[d] not stated a 'reverse false claim . . . .'" *Id.* Importantly, too, the relator did not allege a false statement aimed at concealing the overpayment, rather the relator merely alleged that defendant "failed to comply with its affirmative obligation . . . to disclose to the government subsequent price reductions it offered to other customers after the government had awarded it contracts and to offer the government a price adjustment." *Id.* Without the submission of a false statement aimed at concealing an obligation, however, the relator was "essentially alleging that [defendant] failed to refund the false claims that the government paid." *See id.* Accordingly, the court read through the relator's allegations to find that "he [was] merely recasting his [affirmative] false statement claim" and was thus seeking "redundant" liability, something the FCA does not permit. *Id.*

Relying on *Thomas*, the United States District Court for the Northern District of Texas in *Porter* found the relator's reverse false claim cause of action redundant where the relator was "essentially alleging that Defendants failed to refund the false claims the government paid." *See* 2011 WL 4590791, at *8. There, the gist of relator's

allegations was that the defendant clinical laboratories "concealed the fact that they were not in compliance with [the Clinical Laboratories Improvement Act and the Clinical Laboratory Improvements Amendments] and therefore were not entitled to accept interim reimbursements." *Id.* at *7. Thus, so the argument went, "because of Defendants' false statements in the Cost Reports, the government did not seek to recover the improperly paid claims." *Id.*

Though sounding analogous to the facts of this case, *Porter* involves important distinguishable facts. Significantly, the defendants in *Porter* "did not have an existing obligation to reimburse the monies it had received from Medicare because the government never imposed any obligation on Defendants to reimburse any Medicare payments." *Id.* at *8. Accordingly, the court found that the false statements sought not to conceal an obligation, but rather sought "to avoid revocation of their lab certificates and Medicare participation." *See id.* at *7. As such, the court concluded that, like in *Thomas*, the relator was "essentially alleging that Defendants failed to refund the false claims the government paid" and was therefore merely advancing a "redundant false claim." *See id.* at *8 (citing *Thomas*, 708 F. Supp. 2d at 514).

Finally, in *Ruscher*, the United States District Court for the Southern District of Texas relied on *Gabelli*, *Thomas*, and *Porter* to dismiss the relator's reverse false claims action as redundant. 2014 WL 2618158, at *28. The court found that the relator's affirmative false claims action, premised on defendant's use of "Medicare and Medicaid cost reports to get claims paid" despite the fact "that those claims were false because they were tainted by kickbacks," and the relator's reverse false claims action, premised on defendant's use of "those same reports to conceal that [defendant was] duty-bound to reimburse the Government for all the claims it paid, because those claims, tainted by . . . kickbacks, were false," merely "represent[ed] two sides of the same coin." *See* 2014 WL 2618158, at *27. Guiding the court's decision was its determination that no obligation to refund improper payments arose independent of the affirmative false certification that the payments complied with anti-kickback laws, thus "the same set of operative facts g[a]ve rise [to] Relator's claims under both sections." *See id.*

The principle drawn from this discussion distinguishes this case from those that have found redundancy in allegations of reverse false claims. Important to each of the decisions Defendants cite in support of their redundancy argument was that the relator had not identified an independent obligation which the defendant, by its alleged false statement, sought to conceal, reduce, or otherwise avoid.

In *Thomas* and *Porter* such an obligation never arose and, in *Thomas*, the relator did not allege a false statement aimed at concealing an obligation if one in fact existed. Similarly, in *Gabelli* and *Ruscher*, the relator did not identify an obligation that arose independent of the affirmative false claims themselves. Accordingly, the Government's reverse false claim cause of action here is distinguishable in that, as explained more fully above, the Government

has identified obligations that arose independent of the alleged false certifications in Memorial Hospital's cost reports—i.e., obligations to refund payments received for services provided pursuant to prohibited referrals. Additionally, the Government alleges that Memorial Hospital's cost reports included false certifications aimed at concealing those then-existing obligations.

As such, the Court finds that the Government's reverse false claim cause of action is not a redundant basis to state an affirmative false claim, but rather is a basis for liability independent of the Government's affirmative false statement claims. In so finding, the Court notes that other courts considering similar actions have found the same. *See United States ex rel. Saldivar v. Fresenius Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1272-73 (N.D. Ga. 2012) (interpreting *Thomas* and concluding that the purpose of reverse false claim liability is to "create a separate liability where there is a clear obligation to return overpayment"); *United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, 2008 WL 5282139, at *13 (S.D. Ohio Dec. 18, 2008) ("[T]he Court finds Plaintiff's reverse false claims survive, as it alleges Defendants' submission of false claims in the course of their kickback scheme achieved concealment of their obligation to repay amounts due.").

### V. CONCLUSION

In light of the discussion above, the Court **DENIES** Defendants' motion to dismiss Count Three of the Government's Complaint in Intervention, ECF No. 73.

However, in the absence of allegations pertaining to Memorial Health's, Provident's, and MHUP's involvement in the submission of falsely certified cost reports aimed at concealing Memorial Health's obligations, the Court **GRANTS** Defendants' motion to dismiss Count Three as to those entities, ECF No. 73.

The Government has asked for leave to cure any pleading deficiencies the Court finds in its Complaint. ECF No. 88 at 9 n.4. Finding no grounds for denying the Government's request, the Court **GRANTS** the Government's request and will allow it twenty days to replead its claims against Memorial Health, Provident, and MHUP.

This _7_ day of December 2014.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA