# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

**UNITED STATES OF AMERICA, *ex rel.*
PHILLIP S. SCHAENGOLD,**

**Plaintiff-Relator**

**v.**                    **4:11-cv-58**

**MEMORIAL HEALTH, INC., et al.**

**Defendants.**

## ORDER

## I. INTRODUCTION

Memorial Health, Inc. ("Memorial Health"), Memorial Health University Medical Center, Inc. ("Memorial Hospital"), Provident Health Services, Inc. ("Provident"), and MPPG, Inc., d/b/a Memorial Health University Physicians ("MHUP") (collectively "Defendants") have moved the Court to dismiss Phillip S. Schaengold's ("Relator") First Amended Complaint. ECF No. 75. Relator's First Amended Complaint ("Complaint") in this *qui tam* action advances causes of action under the False Claims Act ("FCA") and a breach of contract cause of action on behalf of the United States ("Government"), as well as a cause of action for retaliatory discharge under 31 U.S.C. § 3730(h), providing relief from retaliatory actions for false claims plaintiffs. ECF No. 51 at 32-35.[1] Defendants assert that Relator's false

claims causes of action should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and for failing to meet Federal Rule of Civil Procedure 9(b)'s particularity requirements. *See* ECF No. 76 at 7. Further, Defendants argue that Relator lacks standing to assert the Government's breach of contract claim and that the Court lacks jurisdiction over Relator's retaliation claim, because it is subject to arbitration. *Id.* at 21, 22.

For the reasons set forth below, the Court ***GRANTS IN PART*** and ***DENIES IN PART*** Defendants' Motion to Dismiss Relator's First Amended Complaint, ECF No. 75. The Court also ***GRANTS*** Relator's request for leave to file an amended complaint, ECF No. 89 at 15, 16.

## II. BACKGROUND

Relator's Complaint alleges a complex scheme whereby Defendants compensated physicians at above-fair-market-value rates "in return for the promise of patient referrals from those physicians to the Defendants' health care facilities and for ancillary services," thus violating the Anti-Kickback Statute ("AKS") and the Stark Laws ("Stark Statute") and tainting "Medicare and Medicaid payments in violation of the Federal False Claims Act." ECF No. 51 at 14, ¶ 55. The statutory backdrop against which Relator's allegations play out is

---

[1] The Government has intervened as to Count I of Relator's initial Complaint, advancing a False Claims cause of action premised on Defendants' acquisition

of Einstein Medical Associates and the compensation agreements entered into with the Einstein Medical Associates physicians. *See* ECF Nos. 2 at 25; 50 at 40-44; 51 at 52. Therefore, the Government's Complaint in Intervention is the operative complaint as to that Count and Relator's Complaint may proceed only on those Counts "as to which the Government has not intervened." *See United States ex rel. Feldman v. City of N.Y.*, 808 F. Supp. 2d 641, 648 (S.D.N.Y. 2011).

similarly complex. Therefore, the Court will detail both the statutory background and the factual background in turn.

## A. Statutory Background

### 1. The False Claims Act

"[T]he FCA makes it unlawful to knowingly submit a fraudulent claim to the government." *United States ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014). Falsely certifying compliance with the Stark Statute or the AKS can form the basis of FCA liability. *See United States v. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009); *see also McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005) (concluding that an alleged violation of the AKS provides grounds for an FCA action).

### 2. The Stark Statute

Congress enacted the "Stark Statute" in 1989 as part of the Omnibus Budget Reconciliation Act of 1989. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, § 6204, 103 Stat. 2106, 2236-43 (1989). "The oft-stated goal of the Stark laws is to curb overutilization of services by physicians who could profit by referring patients to facilities in which they have a financial interest." Jo-Ellyn Sakowitz Klein, *The Stark Laws: Conquering Physician Conflicts of Interest?*, 87 Geo. L.J. 499, 511 (1999).

In its current form, the Stark Statute contains two general prohibitions. First, physicians may not refer patients to an entity with which the physician, or an immediate family member, has a financial relationship "for the furnishing of designated health services" ("DHS"). 42 U.S.C. § 1395nn(a)(1)(A). Second, the law prohibits entities from presenting claims for DHS provided pursuant to a prohibited referral. *Id.* § 1395nn(a)(1)(B).

With certain exceptions, the Stark Statute defines a financial relationship between a physician, or a physician's immediate family member, and an entity as "ownership or investment in the entity," or "a compensation arrangement . . . between the physician . . . and the entity." *Id.* § 1395nn(a)(2)(A)-(B). A "compensation arrangement" is "any arrangement involving any remuneration between a physician . . . and an entity." *Id.* § 1395nn(h)(1)(A). "A direct compensation arrangement exists if remuneration passes between the referring physician . . . and the entity furnishing DHS without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1)(i). On the other hand, an "indirect compensation arrangement" is one where (1) "[b]etween the referring physician . . . and the entity furnishing DHS there exists an unbroken chain of any number . . . of persons or entities that have financial relationships . . . between them . . . "; (2) "[t]he referring physician . . . receives aggregate compensation from the person or entity in the chain with which the physician . . . has a direct financial relationship that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS"; and (3) "[t]he entity furnishing DHS has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician . . .

receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS." *See id.* §§ 411.354(c)(2)(i)-(iii).

The Stark Statute includes several exceptions to its general prohibition on compensation arrangements between referring physicians and health care entities. *See* 42 U.S.C. §§ 1395nn(b), (e); 42 C.F.R. § 411.357; *see also United States v. Halifax Hosp. Med. Ctr.*, 2013 WL 6017329, at *5 (M.D. Fla Nov. 13, 2013). Of particular relevance here, the Stark Statute excepts what it describes as 'bona fide employment relationships.'" *Halifax Hosp. Med. Ctr.*, 2013 WL 6017329, at *5; *see also United States ex rel. Drakeford v. Tuomey Healthcare Sys, Inc.*, 675 F.3d 394, 398 (4th Cir. 2012). A compensation arrangement meets the strictures of this exception if:

> (A) the employment is for identifiable services,
>
> (B) the amount of the remuneration under the employment—
>
> > (i) is consistent with the fair market value of the services, and
> >
> > (ii) is not determined in a manner that takes into account (directly or indirectly) the volume of any referrals by the referring physician,
>
> (C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and

> (D) the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(2).

The Stark Statute provides that no payment shall be made for DHS provided in violation of the statute. *Id.* § 1395nn(g)(1). Any person who collects funds billed in violation of the statute may be liable for civil money penalties and "shall refund on a timely basis . . . any amounts" collected in violation of the statute. *See id.* §§ 1395nn(g)(2)-(3); 42 C.F.R. § 411.353(d) ("An entity that collects payment for a [DHS] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis."). The regulations implementing the Stark Statute define a "timely basis" as "the 60-day period from the time the prohibited amounts are collected by the individual or the entity." 42 C.F.R. § 1003.101.

### 3. The Anti-Kickback Statute

"The Anti-Kickback Statute makes it a felony to offer kickbacks or other payments in exchange for referring patients 'for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.'" *McNutt*, 423 F.3d at 1259 (quoting 42 U.S.C. § 1320a-7b(b)(2)(A)). Congress enacted the AKS in response to "a disturbing degree" of "fraudulent and abusive practices associated with the provision of health services financed by the medicare and medicaid programs." H.R. Rep. No. 95-393, pt. 2, at 44 (1977). Thus,

in addition to facing criminal penalties, violators of the AKS are also "disqualified from participating in a Medicare program" and false certification of compliance with the AKS in connection with submission of Medicare claims can provide the basis of FCA liability. *See McNutt*, 423 F.3d at 1257 ("Because it is undisputed that a violator of the [AKS] is disqualified from participating in a Medicare program, the government stated a claim, under the [FCA], when it alleged that [defendants] had submitted claims for Medicare reimbursement with knowledge that they were ineligible for that reimbursement.").

#### 4. The Medicare Program

Congress enacted Title XVIII of the Social Security Act in 1965, "establish[ing] the Medicare program to provide health insurance for the aged." Eleanor D. Kinney, *The Medicare Appeals System for Coverage and Payment Disputes: Achieving Fairness in a Time of Constraint*, 1 Admin. L.J. 1, 5 (1987). Today, eligible Medicare beneficiaries include people who are sixty-five years of age or older, people who are under sixty-five years of age with certain disabilities, and people with "End-Stage Renal Disease." Medicare Program – General Information, CMS.gov, http://www.cms.gov/Medicare/Medicare-General-Information/MedicareGenInfo/index.html (last updated July 25, 2014, 10:10 AM). Part A of the Medicare Program "helps cover inpatient care in hospitals . . . and skilled nursing facilities," as well as "hospice care and some home health care," while Part B of the Program "helps cover doctors' services and outpatient care." *Id.*

The Centers for Medicare and Medicaid Services ("CMS") is primarily responsible for the administration of the Medicare Program, and CMS, in turn, "contracts with private entities known as Medicare administrative contractors ("MACs") to assist in it in administering the program." *Centro Radiológico Rolón, Inc. v. United States*, 2014 WL 556452, at *1 (D.P.R. Feb. 13, 2014). These MACs act on behalf of CMS, *see* 42 C.F.R. § 421.5(b), and "make[] payments retrospectively (after the services are furnished) to healthcare entities, such as hospitals, for inpatient and outpatient services." *Drakeford*, 675 F.3d at 397 n.5. CMS requires hospitals enrolled in the Medicare program to submit claims for reimbursement "using a 'Form UB-04,'" *Halifax Hosp. Med. Ctr.*, 2013 WL 6017329, at *1, and to "submit annually a Hospital Cost Report . . . which summarizes the amount of interim payments received and the amount to which they claim entitlement from Medicare." *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 328 (D. Conn. 2004). At all times relevant to the Government's Complaint, Memorial Hospital "was . . . enrolled in Medicare as a participating provider." ECF No. 50 at 9.

Every cost report contains a "Certification" that the covered provider's chief administrator, or a responsible designee, must sign. *Id.* at 11. Memorial Hospital's cost reports contained the following certification during the relevant time period:

> [T]o the best of my knowledge and belief, [the hospital cost report and statement] are true, correct and complete, and prepared from the books

and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

*Id.* (second alteration in original).

Additionally, Memorial Hospital's cost reports contained a notice advising its signer that any misrepresentation or falsification, as well as any violation of applicable law, may result in civil, criminal, or administrative punishment. *Id.*

MACs rely on these cost reports and certifications in determining how much reimbursement is due to the provider and whether the government is due recoupment for any overpayments. *See* 42 C.F.R. § 405.1803. Falsely certifying compliance with the Stark Statute in connection with a claim for reimbursement under the Medicare program is actionable under the FCA. *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009).

**B. Factual Background**

As a general matter, Relator alleges that "Defendants knowingly presented . . . numerous false or fraudulent claims for payment . . . to the United States in connection with the operation of their health care facilities in Savannah, Georgia." ECF No. 51 at 1. More specifically, Relator contends that "prohibited patient referrals to the Defendants" violated the AKS and the Stark Statute and that the false certification

of compliance with those laws violated the FCA. *See id.* at 1, 12.

Because the facts underlying these general allegations are particularly complex, the scheme alleged in Relator's Complaint bears explaining in some detail. For purposes of this background, the Court accepts, without deciding, all facts stated in the Relator's Complaint in Intervention as true. *See Kwok v. Delta Air Lines Inc.*, 994 F. Supp. 2d 1290, 1292 (N.D. Ga. 2014).

### 1. Relator's Employment With Memorial Health and Memorial Hospital

On April, 13, 2009, Memorial Health's and Memorial Hospital's (collectively "Memorial") nationwide search for a Chief Executive Officer ("CEO") concluded with Relator and Memorial entering an Employment Agreement. *See* ECF No. 51 at 15. Pursuant to this agreement, Relator became the President and CEO of Memorial for a term of five years—June 1, 2009, to May 31, 2014. *Id.* Before starting his term as President and CEO, Memorial advised Relator that, because the medical center was facing significant financial problems, his primary focus was to be on addressing its financial performance. *Id.*

### 2. Relator's Review of Memorial's Financials

#### a. Discovery of Inflated Bonuses

In order to address Memorial's financial performance, Relator reviewed physician billing practices and collection service, which had been outsourced prior to the start of his employment. *Id.* at 19. While

conducting this investigation, between October and November of 2010, Relator discovered what he alleges are "excessive bonus payments." *Id.* According to his review, Memorial paid "approximately $4.2 million in bonuses to its employed physicians" and "approximately $3.0 million in bonuses" to the Community-based physicians. *Id.* Relator alleges that "erroneous collection data caused" these "inflated bonuses." *Id.* After discovering this problem with the bonus calculations, Relator alleges that, in November or December of 2010, he advised Board members that the inflated bonuses could put "Memorial at legal risk under the Stark Law and the [AKS]" and that Memorial could also face liability for violations of the FCA. *Id.* at 20.

### b. Discovery of MHUP Fair Market Value Issues

MHUP employs about 100 physicians. Forty-five of these physicians work as hospital-based physicians, while fifty-five work in "Community-based" practices. *Id.* In 2009, Relator became concerned that MHUP's Community-based physicians were being overcompensated and causing "substantial financial losses for Memorial Health." *Id.* at 21. "The 2009 audited financials were released in April 2010 and reported an $18.6 million loss from operations for MHUP and its physician practices, of which $8.5 million loss was attributed to the Community-based practices." *Id.*

Relator then requested that an outside consulting firm conduct a fair market value

review of the physicians' compensation. *Id.* As a result of this investigation into physician compensation, Relator alleges that "several physicians were compensated in a manner inconsistent with [fair market value] guidelines." *Id.* at 22. Specifically, Relator contends that "these physicians received approximately $1.8 million each year in excess compensation when compared to the 75th percentile of total compensation as calculated by the Medical Group Management Association" ("MGMA"). *Id.* Relator believes that this compensation "was not consistent with [fair market value] guidelines." *Id.*

Concerned about compliance issues and the losses resulting from the Community-based physicians' compensation structure, Relator advised the Board that the discovered fair market value issues potentially violated federal law and asked the Board to issue "non-renewal" notices to the physicians. *Id.* The Board issued the requested notices on June 28, 2010. *Id.*

The Board then engaged a group of physicians and Memorial Director of Human Resources for Chatham County "to negotiate a new Net Income compensation model that would eliminate the [fair market value] issues and reduce Memorial's financial losses." *Id.* At the same time, the Board was also informed of the fair market value issue and its potential legal consequences. *Id.* at 23. In particular, Relator informed the Chairman of the Board's Strategic Planning Committee "that every member of the Chatham Medical Group . . . . received compensation . . . at or above the 90th percentile of the MGMA." *Id.* at 23.

Despite the ongoing fair market value concerns, the Board resisted Relator's proposed revision to the compensation plan. *See id.* On October 3, 2010, the Chairman of Memorial's Strategic Planning Committee advised two Board members "that addressing [fair market value] issues was a difficult decision and the Board recognized that Memorial could not continue to pay the salaries at the same [then current] level," but that Memorial also "could not afford to lose paying patient referrals to the hospital." *Id.* (second alteration in original).

By mid-October, Relator had prepared a new "compensation model that would reduce compensation for Community-based physicians by $2.9 million and was projected to reduce MHUP's financial loss in 2011 to approximately $13.8 million." *Id.* at 25. On October 27, 2010, however, the Board rejected Relator's proposed compensation model and, instead, voted to extend the existing compensation agreements through June 30, 2011. *Id.* As a result, the Board maintained what Relator alleges were compensation levels in excess of fair market value. *Id.*

### 3. The Board's Alleged Knowledge of Unlawful Compensation Arrangements

Relator alleges that two employed internal medicine groups (collectively employing eleven physicians) actively opposed renegotiating their compensation arrangements. *See id.* In doing so, the groups allegedly threatened to leave Memorial's employment, a threat that Relator alleges implied "that referrals to Memorial specialists and admissions to Memorial Health University Medical Center would be adversely impacted." *Id.* at 26. Relator's Complaint states that "[s]everal of these physicians were receiving compensation in excess of [fair market value guidelines]." *Id.* As part of his advice to the Board, Relator alleges that he warned "that 'downstream' income and patient referrals should not be included in determining physician compensation," because such considerations violated the AKS and Stark Statute." *Id.* But Relator contends that "the Board demanded that downstream income and patient referrals from [the two objecting internal medicine groups] be calculated and included in the . . . budget process." *Id.* Board members also allegedly "insisted that downstream income and patient referrals be considered in negotiating a new compensation model for the Community-based physicians." *Id.*

Pursuant to these demands, Relator's Complaint states that "management included in the FY 2011 budget a downstream volume and revenue negative impact of $80 million in gross charges, which translated to a reduction of $12 million in Net Revenue or a loss of $800,000 in Net Revenue per physician if the . . . physician groups" left Memorial. *Id.* Allegedly due to these possible losses in downstream revenue and patient referrals, the Board rejected the proposed compensation revision. *Id.* Relator alleges that, as a result of this rejection and in consideration of potential losses in patient referrals, the Board maintained compensation agreements that

exceeded fair market value levels through June 30, 2011. *Id.*

### 4.  Alleged FCA Violations

Relator alleges that the compensation arrangements with employed internal medicine groups resulted in Above-Fair-Market-Value compensation levels, unlawful under the AKS and the Stark Statute. *See* ECF No. 51 at 32-33. He alleges that, during the time that those compensation arrangements were in effect, "Defendants . . . engaged in a systematic filing of Medicare and Medicaid claims with the United States which were derived from the illegal referrals." *Id.* at 32. In doing so, Defendants represented to the Government that they were entitled to Medicare and Medicaid payments despite the fact that their claims were tainted by illegal referrals. *See id.* at 32-33.

Similarly, Relator alleges that bonuses paid in or around April 2008 were improperly calculated and resulted in compensation that was above fair market value.  *Id.* at 33. He contends that Defendants designed this compensation level "to fraudulently induce illegal referrals of patients to the Defendants' health care facilities." *Id.* Relator alleges that, despite this unlawful compensation arrangement, Defendants filed Medicare and Medicaid claims to the Government, certifying compliance with Medicare and Medicaid regulations thereby obtaining payments from the Government to which they were not entitled. *See id.* at 33-34.

### 5.  Alleged Retaliation Against Relator

After the Board's October 27, 2010, meeting where it rejected Relator's proposed compensation plan, "the Board Removed Relator and his senior management team from future physician contract negotiations." *Id.* at 27. Before being removed from those negotiations, Relator had advised Board members of the fair market value issues that Memorial faced due to the existing compensation arrangements. *Id.* However, despite the issues that Relator raised, he alleges that, by rejecting management's proposed plan to eliminate the fair market value issues, "[t]he Board interfered in the remedial process," opting instead to continue "the existing problematic compensation." *Id.* at 28.

On January 3, 2011, after the Board had rejected the proposed compensation plan, Relator alleges he requested that the Chairman of the Board permit management to regain control over the negotiation process and also recommended that Memorial retain outside counsel to prepare an "accurate CCA Annual Report which was due to be filed with HHS on February 7, 2011."[2] *Id.* On January 5, 2011, the Board terminated Relator's employment. *Id.* at 29. Relator alleges that his termination "was in direct retaliation for" his "efforts to report

---

[2] On February 7, 2010, Memorial entered into a Certification of Compliance Agreement ("CCA") with HHS-OIG as part of a settlement of previous False Claims Act allegations. ECF Nos. 51 at 15; 51-1. Under the terms of the CCA, Memorial and Memorial Hospital were subject to "annual and incident related reporting requirement . . . through February 2011." ECF Nos. 51 at 16; 51-1 at 3-4, § II.E.

Stark and Anti-Kickback issues to HHS and rectify the compensation structure that was resulting in compensation in excess of [fair market value] and causing violations of the [FCA]." *Id.*

Following Relator's termination, Memorial Health characterized the discharge as "without cause." *Id.* Therefore, under the terms of his Employment Agreement, Relator alleges that he "was entitled to certain compensation . . . including compensation in lieu of thirty . . . days' notice and [eighteen] months of severance pay." *Id.* But Memorial Health allegedly refused to pay Relator what was owed under the terms of the Employment Agreement "and . . . threatened to withhold the payment of these benefits unless [Relator] executed a written release of all claims including the federal and state False Claims Acts . . . , the Stark Law, the federal Anti Kickback Statute, [and] the IRS Whistleblower Statute . . . ." *Id.* (internal quotation marks omitted). Relator refused to release claims under the FCA, the Stark Statute, and the AKS. *Id.* at 30. He alleges that on March 30, 2011, as a result of this refusal, the Board "unanimously voted to re-classify the discharge into a termination 'for cause' . . . ." *Id.* Relator then filed an arbitration demand and, on May 30, 2012, the arbitrator denied Relator's claim for severance. *Id.* at 31. The arbitrator did not, however, exercise jurisdiction over Relator's retaliatory discharge claim. *Id.*

### III. STANDARD OF REVIEW

#### A. Rule 12(b)(6)

In considering a Federal Rule of Civil Procedure 12(b)(6) motion, all facts in the plaintiff's complaint "are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto." *GSW, Inc. v. Long Cnty., Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court, however, is not limited to the four corners of the pleadings; rather a proper review of a motion to dismiss "requires the reviewing court to draw on its judicial experience and common sense." *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A complaint will not be dismissed so long as it contains factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Iqbal*, 556 U.S. at 678 (claim must have "facial plausibility"); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). Yet, "a plaintiff's obligation to provide 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original).

In *Iqbal*, the Supreme Court further explained the required level of specificity:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

556 U.S. at 678 (internal citation and quotation omitted).

In order to assess the plausibility of a complaint, a court must be mindful of two principles. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, *Iqbal* suggests a "two-pronged approach" to assessing a defendant's Rule 12(b)(6) motion: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679)).

Importantly, however, the "plausibility standard is not akin to a 'probability requirement' at the pleading stage." *Id.* at 1289 (quoting *Iqbal*, 556 U.S. at 678). Instead, it "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements" of a plaintiff's claim for relief. *See McCray v. Potter*, 263 F. App'x 771, 773 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

**B. Rule 9(b)**

Federal Rule of Civil Procedure 9(b) applies to FCA actions. *United States ex rel. Clausen v. Lab. Corp.*, 290 F.3d 1301, 1309 (11th Cir. 2002). Thus, in addition to passing muster under *Twombly* and *Iqbal*, an FCA complaint must "'state with particularity the circumstances constituting fraud or mistake.'" *Matheny*, 671 F.3d at

1222 (quoting Fed. R. Civ. P. 9(b)). Generally, "[t]he particularity requirement of Rule 9(b) is satisfied if the complaint alleges 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Id.* (quoting *Hopper v. Solvay Phram., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009)).

The purposes which Rule 9(b) serves, though, must be remembered. That is, Rule 9(b) "'serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.'" *Clausen*, 290 F.3d at 1310 (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). Additionally, the Eleventh Circuit consistently has cautioned that "'[t]he application of Rule 9(b) . . . 'must not abrogate the concept of notice pleading.'" *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007) (quoting *Ziemba*, 256 F.3d at 1202 (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988))).

Thus, although Rule 9(b) generally prefers allegations as to the who, what, when, and how of an alleged fraud, "'alternative means are also available to satisfy the rule,'" so long as those means put the defendants on notice as to the precise misconduct alleged and provide the court with "some indicia of reliability . . . to support the allegation of *an actual false claim*." *See Clausen*, 290 F.3d at 1310-11 & n.18 (quoting *Durham*, 847 F.2d at 1512).

## IV. ANALYSIS

Defendants seek dismissal of Relator's First Amended Complaint in its entirety. As to Relator's claims under the FCA, Counts II and III, Defendants argue that Relator has failed to plead those claims with sufficient particularity to survive scrutiny under Rule 12(b)(6) and Rule 9(b). ECF No. 76 at 7-20. Defendants further allege that Count IV is subject to dismissal because Relator lacks standing to advance breach of contract claims based on the CCA entered into between Memorial Health and Memorial Hospital and the Government. *Id.* at 21-22. And, finally, Defendants argue that the Court lacks jurisdiction over Relator's retaliation claim, Count V, because his Employment Agreement with Memorial Health and Memorial Hospital requires such claims to be submitted to arbitration. *Id.* at 22-25.

The Court will take up each of these arguments in turn.

### A. Counts II & III: False Claims

Defendants seek dismissal of Counts II and III of Relator's First Amended Complaint on various grounds. *See generally id.* at 7-20. The Court will address each argument in order.

#### 1. Relator's Failure to Identify the Provisions of the FCA Under Which He Seeks Relief

Defendants take issue with Relator's purported failure to identify the provisions of the FCA that Relator alleges Defendants violated. *Id.* at 8. The Court, however, has no difficulty in surmising from Relator's Complaint, *see* ECF No. 51 at 4, and the parties' briefs, *see* ECF Nos. 76 at 8; 89 at 12; 95 at 23, that Relator's Complaint seeks recovery under 31 U.S.C. § 3729(a)(1)(a)-(b) of the FCA. Defendants' contention appears to be that by incorporating by reference legal and regulatory background into Relator's causes of action, *see* ECF 51 at ¶¶ 142, 149, 156, 162, Relator has engaged in improper "shotgun" pleading. ECF No. 95 at 9.

As an initial matter, this is not an instance, typical of "quintessential 'shotgun' pleadings," where the Court is left in "a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions" making the Court's task in testing "the sufficiency of a claim . . . . quite onerous." *See Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002). Rather, despite Relator's failure to include the specific provisions of the FCA under which he seeks relief under the False Claims Counts headings, the structure of the Complaint and the nature of the claims make it quite clear which facts and statutes pertain to the False Claims Counts as opposed to the two other Counts of his Complaint.

To the extent that Defendants stand by their objection to the form of Relator's pleading, the proper course of action is for Defendants "to move the court, pursuant to Rule 12(e), to require the plaintiff to file a more definite statement" so that they may prepare a responsive pleading. *See Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996). Defendants have not made a formal motion to the Court, nor have they requested such relief in their motion to dismiss.

Further, the Court will not order repleader on its own motion as it finds that a more definite statement is not needed to put Defendant on sufficient notice of the provisions of the FCA under which Relator seeks relief. *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 984 (11th Cir. 2008) (concluding that where a defendant failed to request a repleader, the district court should have ordered repleader on its own motion where "the necessity for doing so should have become starkly apparent on reading the complaint").

## 2. Sufficiency of Relator's Allegations of Stark Violations

Before moving on to the sufficiency of Relator's FCA claims, Defendants contend that Relator has failed to allege with sufficient particularity violation of the Stark Statute. ECF No. 76 at 9.

> In its most general terms, the Stark statute prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified types of 'financial relationships' with that hospital. And, in turn, the Stark statute prohibits that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such patients."

*United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, --- F. App'x ----, 2014 WL 5471925, at *3 (11th Cir. Oct. 30, 2014).

The Stark Statute does not, however, prohibit referrals from physicians whose compensation "is (1) equal to the 'fair market value for services and items actually provided'; (2) 'not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician' for the hospital; and (3) 'commercially reasonable.'" *Drakeford*, 675 F.3d at 398 (footnote omitted) (quoting 42 C.F.R. § 411.357(p)). Defendants argue that Relator has failed to sufficiently allege that Defendants' alleged illegal financial relationship violated the Stark Statute's prohibition improper financial relationships. ECF No. 76 at 10. The Court disagrees, but only in part.

While the Eleventh Circuit has not spoken directly on this point, a growing contingent of district courts have found that, in order to allege a departure from fair market value, and thus a violation of the Stark Statute, "Relator[s] must allege a benchmark of fair market value against which Defendants' [compensation arrangements with] physician[s] can be tested." *See, e.g., United States ex rel. Osheroff v. Tenet Healthcare Corp.* (*Tenet I*), 2012 WL 2871264, at *7 (S.D. Fla. July 12, 2012); *see also United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, 2013 WL 146048, at *13 (M.D. Tenn. Jan. 14, 2013); *United States ex rel. Schubert v. All Children's Health Sys., Inc.*, 2013 WL 6054803, at *11 (M.D. Fla. Nov. 15, 2013). *But see United States v. Millennium Radiology, Inc.*, 2014 WL 4908275, at *5 (S.D. Ohio Sept. 30, 2014) (declining to require a benchmark against which to test allegations of below-fair-market-value provision of services that plaintiff alleged were provided for free). Requiring such a benchmark for the Court to determine whether or not compensation exceeds fair

market value makes good sense, too, as "[t]he Stark Regulations define 'fair market value' as: '[T]he value in arm's length transactions, consistent with the general market value." *Drakeford*, 675 F.3d at 398 n.7 (second alteration in original) (quoting 42 C.F.R. § 411.351). Indeed, absent an allegation of a benchmark, "it is impossible for the Court to infer whether Defendants'" compensation arrangements departed from fair market value sufficiently "so as to constitute remuneration." *See Tenet I*, 2012 WL 2871264, at \*7. Therefore, because it is not obvious that the alleged illegal compensation arrangements exceed fair market value, the Court concludes that Relator must allege a benchmark from which the Court could conclude that the compensation arrangements exceeded fair market value.

Relator alleges that two separate compensation arrangements violated the Stark Statute—(1) the Bonus Pool and (2) the compensation plan for MHUP physicians. But Relator's Complaint fails to allege any benchmark from which the Court could infer that the Bonus Pool exceeded fair market value. Indeed, the extent of Relator's allegations regarding the Bonus Pool is that "[t]he Community-based physicians received approximately $3.0 million in bonuses" and that "[t]he cash collection data upon which many of the Community-based physicians' bonus payments were calculated was in fact erroneous," causing "the payment of inflated bonuses." *See* ECF No. 51 at 19. Though these allegations indicate that the bonuses were excessive in that they were the product of erroneous calculation, there is no

allegation in the Complaint as to why Relator believes those allegedly excessive payments exceeded *fair market value*. Without such allegations regarding the Fair Market Value of the bonus payments, the Court cannot infer that the bonuses in fact exceeded fair market value so as to constitute a violation of the Stark Statute.

On the other hand, Relator does allege benchmarks by which to assess his allegations that the MHUP physicians' compensation arrangements exceeded the fair market value in violation of the Stark Statute. Indeed, Relator alleges that, in 2009 and 2010, several MHUP "physicians received approximately $1.8 million each year in excess compensation when compared to the 75th percentile of total compensation as calculated by the [MGMA]." ECF No. 51 at 22, ¶ 94. Relator goes on to allege that, based on an analysis of "factors such as strategic importance, quality outcomes, clinical skills, professional accomplishments, business development skills or recruitment difficulties," he concluded that compensating those physicians at that level "was not consistent with [fair market value] guidelines." *Id.* at 22, ¶ 95. Additionally, Relator alleges "that every member of the Chatham Medical Group . . . received . . . total clinical compensation at or above the 90th percentile of MGMA" and that three senior partners at Memorial Medical Associates "received clinical compensation above the 90th percentile of MGMA." *Id.* at 23, ¶ 99. Thus, contrary to Defendants' contentions, Relator's Complaint does "highlight[] a number of particular facts from which one may reasonably infer that"

Defendants' compensation agreements with various MHUP physicians exceeded prevailing fair-market-value rates. *See United States ex rel. Osheroff v. Tenet Healthcare Corp. (Tenet II)*, 2013 WL 1289260, at *8 (S.D. Fla. Mar. 27, 2013).

To the extent that Defendants argue that Relator's alleged benchmarks fail as they do not allege whether Relator "compared like regions, specialties, subspecialties, or years of practice in picking a comparator or whether the comparison is of base or total compensation, or at a private practice, hospital system, or teaching hospital," ECF No. 76 at 12, "it may very well be that [Defendants'] attack on Relator's methodology of arriving at a benchmark of fair market value is entirely appropriate. But at this stage in the litigation, it is not the Court's role to weigh the merits of Relator's and [Defendants'] respective positions." *Tenet II*, 2013 WL 1289260, at *8. Rather, at the motion to dismiss stage the task for the Court is to consider only whether Relator has plausibly alleged that Defendant was compensating the various MHUP physicians at above-fair-market-Value rates. *See id.* The Court finds that Relator has done just that. Whether Relator's alleged benchmarks "in fact, represent[] fair market value," is a question to be taken up at a later date. *See id.*

### 3. Sufficiency of Allegations of AKS Violations

Defendants attack the sufficiency of Relator's allegations regarding AKS violations on two grounds. First, Defendants reassert the purported deficiencies in Relator's allegations of Stark Statute violations—i.e., a failure to adequately allege that Defendants compensated physicians at above-fair-market-value levels. ECF No. 76 at 13. Second, Defendants attack Relator's "fail[ure] to adequately allege inducement." *Id.* at 14. Specifically, Defendants take issue with Relator's failure to "provide any support for his bare allegations that physicians *were actually induced* to alter their referral decisions on account of their improper financial relationship with Memorial." *Id.* (emphasis added).

The AKS prohibits knowing and willful offers or payments of "any remuneration . . . directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A). As with alleged violations of the Stark Statute, "courts use 'fair market value' as the gauge of value when assessing the remuneration element of the [AKS]." *United States ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683, 699 (N.D. Miss. 2012). For the same reasons set forth with regard to Defendants' attack on the sufficiency of Relator's allegations regarding Stark Statute violations, the Court finds that Relator has failed to allege a sufficient fair-market-value benchmark as to the allegedly unlawful bonus payments, but has alleged a sufficient fair-market-value benchmark as to the allegedly unlawful compensation arrangements with MHUP physicians. Therefore, the Court finds that Relator has adequately alleged remuneration

for purposes of the AKS with regard to the compensation arrangements with MHUP.

That leaves Defendants' contention that Relator has not sufficiently alleged inducement for purposes of the AKS. Defendants' argument regarding inducement, however, simply misconceives what is necessary to plead an alleged violation of the AKS. Defendants' misconception is due, perhaps, to the distinction between FCA violations and AKS violations.[3] Plainly, "the AKS does not require *actual* inducement." *See United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 664 (S.D. Tex. 2013). Indeed, the Eleventh Circuit recently has concluded that a violation of the AKS "occurs when the defendant (1) knowingly and willfully, (2) pays money, directly or indirectly, to doctors, (3) *to induce the doctors to refer individuals* to the defendants for the furnishing of medical services, (4) paid for by Medicare." *United States ex rel. Mastej*, 2014 WL 5471925, at *4 (citing *United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013). Thus, "[c]ase law . . . consistently treats the AKS's inducement element as an *intent* requirement." *Parikh*, 977 F. Supp. 2d at 665 (emphasis added) (citing cases). Accordingly, the Court finds that so long as Relator's Complaint pleads with particularity that Defendants "made kickbacks with the intent of inducing referrals," and Defendants knowingly paid

remuneration in exchange for referrals, Relator has sufficiently pleaded a violation of the AKS. *See id.*

With regard to Defendants' alleged unlawful compensation arrangements with MHUP physicians, Relator's Complaint is replete with allegations that Defendants structured the compensation arrangements to induce referrals. For instance, Relator alleges that, despite knowledge of a need to address fair-market-value issues, Defendants were reluctant to alter the compensation arrangements for fear of losing patient referrals. ECF No. 51 at 23, ¶ 101. Additionally, Relator alleges that Board considered downstream income and patient referrals in negotiation of compensation models. *Id.* at 26, ¶¶ 112-15. Specifically, according to Relator, the Board considered what effect loss of referrals would have on revenues should certain physicians choose to leave in response to a renegotiation of their compensation arrangements. *Id.* at 26, ¶ 114.

Viewed as a whole, the story Relator's Complaint tells is that Memorial was suffering significant financial losses due to what Relator believed were excessive compensation arrangements, but refused to renegotiate those arrangements for fear of losing referrals. The Court finds little difficulty in concluding that Relator's Complaint provides sufficient indicia of reliability that Defendants intended that the compensation arrangements induce referrals from certain physicians in a volume sufficient to offset the financial losses sustained as a result of the compensation arrangements.

---

[3] Case law suggests that, while FCA liability grounded on AKS violations requires the actual presentment of tainted claims, there is no requirement that the alleged kickback actually induced the referral that generated the tainted claim. *See United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 664-66 (S.D. Tex. 2013) (discussing the "interplay between the FCA and the AKS").

### 4. Sufficiency of Relator's FCA Violation Allegations

Having established that Relator has sufficiently alleged that Defendants' compensation arrangements with certain MHUP physicians violated both the Stark Statute and the AKS, the Court's inquiry still is not at an end. This is because, "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies." *United States ex rel. Clausen v. Lab. Corp.*, 290 F.3d 1301, 1311 (11th Cir. 2002). Rather, what is required for FCA liability is that "the provider knowingly ask[] the Government to pay amounts it does not owe." *Id.* Thus, the Eleventh Circuit has stated that "[t]he submission of a claim is . . . the *sine qua non* of a False Claims Act violation." *Id.*

Defendants argue that Relator's Complaint fails on this ground. Specifically, Defendants argue that Relator's Complaint "provides no detail regarding referrals of Medicare-eligible patients as a result of the allegedly improper relationships between certain unnamed physicians and Memorial" and this "lack of any detail regarding the referrals and corresponding submission of a false claim for payment by the government for services rendered to improperly referred patients requires dismissal" of Relator's Complaint. ECF No. 76 at 16. In doing so, Defendants focus on Relator's failure to identify examples of prohibited referrals, representative claims, or cost reports submitted to the Government falsely certifying compliance with the AKS and the Stark Statute. *See generally id.* at 17-20.

In essence, Defendants have seized on *Clausen*'s application of Federal Rule of Civil Procedure 9(b) to FCA claims to demand that Relator provide the precise who, what, when, where, and how of the alleged unlawful claim for payment. As the Court noted in a previous order, such a request is unsurprising. *See United States ex rel. Schaengold v. Mem'l Health, Inc.*, 2014 WL 6908856, at *18 (Dec. 8, 2014). However, providing such specifics is but one way to survive the strictures of Rule 9(b) in FCA cases.

What *Clausen* demands is that "some indicia of reliability . . . be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311. Indeed, the Eleventh Circuit in *Clausen* specifically notes that identifying amounts, dates, billing policies, or copies of bills or payments merely were examples of "some of the types of information that might have helped [the relator] state an essential element of his claim with particularity." *Id.* at 1312 & n.21. It did "not *mandate* all of th[at] information for any of the alleged claims." *Id.* at 1312 n.21 (emphasis added).

Pursuant to *Clausen*'s directive that "'some indicia of reliability . . . to support the allegation of an actual false claim for payment being made to the Government,'" but conscious of *Clausen*'s admonition that Rule 9(b) does not require that relators establish that reliability in a particular manner, the Eleventh Circuit has "evaluate[d] whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *See United States ex rel. Atkins*

v. *McInteer*, 470 F.3d 1350, 1357-58 (11th Cir. 2006). Indeed, in its most recent case considering Rule 9(b)'s application to FCA actions, the Eleventh Circuit noted that "[p]roviding exact billing data . . . or attaching a representative sample claim is *one way* a complaint can establish the necessary indicia of reliability that a false claim was actually submitted." *Mastej*, 2014 WL 5471925, at *9. Thus, there are no bright-line rules for establishing sufficient indicia of reliability under Rule 9(b) in FCA actions. *Id.* Accordingly, the Eleventh Circuit consistently has found reliable indicia of reliability where relators have had firsthand information or personal knowledge about a defendant's billing practices and about actual submission of tainted claims. *E.g.*, *Mastej*, 2014 WL 5471925, at *11-12; *United States ex rel. Walker v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005); *Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, at *4-5 (11th Cir. Aug. 15, 2003); *see cf. Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009) ("Here, unlike in *Walker*, the relators do not allege personal knowledge of the billing practices of any person or entity. The complaint does little more than hazard a guess that unknown third parties submitted false claims for Medicaid reimbursement.").

With these principles in mind the Court now turns to analyzing whether Relator's Complaint provides sufficient indicia of reliability to survive Defendants' motion to dismiss. Relator's FCA claims are predicated on falsely certifying compliance with the Stark Statute and the AKS in order to secure reimbursement from the government. Thus, to plead a claim under the FCA, Relator must provide allegations to lend sufficient indicia of reliability that false claims were actually submitted to the Government.

Relator's Complaint sets forth in significant detail how Defendants obtain payment from the Government for provision of Medicare services. *See generally* ECF No. 51 at 9-14. Specifically, Relator alleges that both hospitals and physician practices were required to certify compliance with the Stark Statute and the AKS in order to finalize payments from Medicare. *Id.* at 10-12. He also alleges that for every year relevant to his claims, 2008 to 2011, Defendants submitted those certifications. *See id.* at 12-14. As Defendants note, Relator does not attach or identify a single claim form or cost report. *See* ECF No. 76 at 17. However, as already established, such a failure is not fatal to Relator's claims. Rather, Relator can provide sufficient indicia of reliability if he alleges personal knowledge regarding the submission of claims. He has done so here.

As President and CEO, Relator was tasked with addressing Defendants' significant financial pressures. ECF No. 51 at 51. Pursuant to this task, Relator had access to Defendants' financial information, including billing information as well as collection information. *See id.* at 19. It was during this review of financial data, dating back to at least 2008, that Relator discovered fair-market-value concerns that led to his concern regarding billing Medicare for what he believed were prohibited referrals. *See id.* at 19-20, 20-22, 24-25.

Defendants argue that Relator should not be given the benefit of allowing personal knowledge to provide indicia of reliability for claims arising prior to the start of his employment. *See* ECF No. 95 at 5.[4] But Relator, as CEO, had access to financial records that predated his employment and alleges that he reviewed them in detail while attempting to address Defendants' financial problems. The Court therefore finds that Relator was sufficiently familiar with Defendants' past billing and claim submission practices to provide sufficient indicia of reliability that Defendants actually submitted claims to the Government during 2008, 2009, 2010, and 2011.

However, those claims which Relator adequately alleges Defendants actually submitted trigger FCA liability *only if* the claims were false. The claims Defendants submitted to the Government were false *only if* the claims falsely certified entitlement to payment from the Government. As already noted, the certifications that Relator alleges were false were those certifying compliance with the Stark Statute and the AKS. Relator has sufficiently alleged that the compensation arrangements of certain physicians violated both the Stark Statute and the AKS. But Relator's Complaint provides the Court with no factual allegations that Defendants' made any claim or certification to the Government that was

in fact tainted by referrals made pursuant to those allegedly unlawful compensation arrangements. Without such factual allegations, the Court has no basis from which to infer that Defendants violated the FCA. *See Clausen*, 290 F.3d at 1311 (concluding that disregard of government regulations does not result in FCA liability "unless . . . the provider asks the Government to pay amounts it does not owe").

Accordingly, because Relator's Complaint has failed to allege with sufficient particularity that the Government made any payment pursuant to referrals that arose out of Defendants' allegedly unlawful compensation arrangements, the Court finds that Relator has not sufficiently pleaded a cause of action under the FCA.

## 5. Relator's Request to Amend Counts II and III

In response to Defendants' motion to dismiss, Relator has requested that the Court allow leave to amend his Complaint should the Court find pleading deficiencies. ECF No. 89 at 15. Having found pleading deficiencies, the Court turns now to whether such leave should be granted.

Pursuant to Federal Rule of Civil Procedure 15(a)(2) "a party may amend its pleading . . . with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). District courts generally should honor requests for leave to amend except for where a "substantial ground" exists for denial. *See Reese v. Herbert*, 527 F.3d 1253, 1263 (11th Cir. 2008). Predicting Relator's request for leave to amend, Defendants argue that leave should

---

[4] Defendants argue this point in their reply to Relator's response. This brief is not properly before the Court, because Defendants failed to immediately notify the Court of their intent to file a reply to Relator's response, *see* ECF No. 92 (noticing Defendants' intent to reply to Relator's response ten days after Relator filed his response), as the local rules require. LR 7.6, SDGa. The Court notes the argument simply for purposes of illustration.

be denied on the grounds that allowing leave would cause undue delay and, apparently, that allowing leave would be futile. *See* ECF No. 76 at 21.

The Court disagrees. Along with his response to Defendants' motion to dismiss, Relator filed an affidavit under seal, ECF No. 87. That affidavit not only identifies the specific physicians that Relator believes were receiving above-fair-market-value compensation, ECF No. 87 at 7, ¶¶ 16-7, it also identifies the charges to Medicare and Medicaid that Relator believes those physicians generated. *Id.* at 7-8, ¶¶ 18-19. The Court believes that such allegations would have pushed Relator's Complaint over the goal line in terms of the requisite indicia of reliability necessary for the FCA counts in his Complaint to weather Defendants' motion to dismiss. With leave to amend his Complaint to include these allegations, the Court thus believes that Relator's FCA allegations can proceed to a determination on the merits.

Defendants seek to avoid this result, arguing in their untimely-noticed reply to Relator's response that Relator has not properly moved the Court to allow him leave to amend his Complaint. ECF No. 95 at 4. It is true that plaintiffs seeking to amend their complaint *should* file a motion with the Court requesting to do so. *See Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999). However, the Court is not persuaded that Relator's failure to observe formalities by asking the Court for leave in his response rather than by motion is a "substantial ground" warranting denial of his request. *See Herbert*, 527 F.3d at 1263. Moreover, Relator's Complaint shows that "'the

underlying facts [and] circumstances relied upon by [Relator] may be a proper subject of relief,'" *see In re Engle Cases*, 767 F.3d 1082, 1108 (11th Cir. 2014) (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962)), and Relator's affidavit evinces a present ability to cure the pleading deficiencies the Court has identified. The Court will not allow Defendants' sudden insistence on formalities to bar the Court from hearing Relator's claims on the merits. *See id.* at 1108 ("The thrust of Rule 15(a) is to allow parties to have their claims heard on the merits . . . .").

Therefore, the Court will allow Relator twenty days to amend his Complaint to cure the deficiencies the Court has found—i.e., failure to adequately allege charges to Medicare pursuant to unlawful compensation arrangements and failure to allege a benchmark from which the Court can infer that the bonuses paid exceeded fair market value.

## B. Count IV: Breach of the CCA

Defendants argue that Relator's claims arising out of Defendants' alleged violations of the terms of the CCA should be dismissed because Relator lacks standing to bring those claims. ECF No. 76 at 21-22. Although the Court agrees with Defendants' argument, it need not decide the issue as Relator has not contested it. Rather, Relator has asked for leave to amend his Complaint to allege that Defendants violated the reverse false claims provision of the FCA, 31 U.S.C. § 3729(a)(1)(G), by concealing obligations to refund money owed to the Government under the terms of the CCA. *See* ECF No. 89 at 16-17. Defendants have

opposed this request on two separate grounds. *See* ECF No. 95 at 11-14.

Tellingly, Defendants cite no precedent purporting to preclude the Court's authority to allow Relator's requested amendment. The tenor of Defendants' argument is that the Court *should not* allow Relator to amend his Complaint, but they point the Court to nothing showing that it *may not* allow Relator's requested amendment. Defendants' seemingly most compelling argument is that allowing amendment now would circumvent the FCA's filing requirements, ECF No. 95 at 13-14, but Defendants cite no authority to support the proposition that Relator's proposed amendment to his complaint *actually is* subject to the FCA's filing requirements. For the following reasons, the Court does not find Defendants' admonitions against allowing amendment compelling.

1.   **Relator's Requested Amendment Need Not Comply With 31 U.S.C. § 3730(b)(2)'s Filing Requirement**

Section 3730(b)(2) provides that *qui tam* complaints in FCA actions "must be filed '*in camera*, [and] shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders.'" *Foster v. Savannah Commc'n*, 140 F. App'x 905, 908 (11th Cir. 2005) (alteration in original) (quoting 31 U.S.C. § 3730(b)(2)). "[T]he primary purpose of the under-seal requirement is to permit the Government sufficient time in which it may ascertain the status quo and come to a decision as to whether it will intervene in the case filed by

the relator." *United States ex rel. Summers v. LHC Grp., Inc.*, 623 F.3d 287, 292 (6th Cir. 2010). "Relatedly, the requirement serve[s] to 'prevent alleged wrongdoers from being tipped off that they were under investigation.'" *Id.* (quoting *Erickson ex rel. United States v. Am. Inst. of Biological Scis.*, 716 F. Supp. 908, 912 (E.D. Va. 1989)). Secondary purposes of the under-seal requirement are "to prevent defendants from having to answer complaints without knowing whether the government or relators would pursue the litigation," to protect a "defendant's reputation . . . when a meritless *qui tam* action is filed," and to encourage "a speedy and valuable settlement with the government in order to avoid the unsealing." *See United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 999 (2d Cir. 1995).

District courts, however, have reached differing results with regard to whether Section 3730(b)(2)'s filing requirements apply to amendment of complaints. *See generally United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 972 F. Supp. 2d 1317, 1324-27 (N.D. Ga. 2013) (discussing division among district courts regarding the application of Section 3730(b)(2) to amended complaints). The Court finds it unnecessary to take a side in this debate because it finds that, even under the reasoning of courts that have held that Section 3730(b)(2) applies to amended complaints, Relator's proffered amendment does not require compliance with Section 3730(b)(2).

The United States District Court for the Eastern District of Virginia considered this issue in *United States ex rel. Davis v.*

*Prince*, 766 F. Supp. 2d 679 (E.D. Va. 2011). There, the court found that "the term 'complaint' in § 3730(b)(2) encompasses amended complaints." *Davis*, 766 F. Supp. 2d at 684. Nonetheless, the court concluded that, "[b]ecause the [amended complaint was] substantially similar to the original complaint, the policy arguments supporting dismissal for failure to comply with the sealing requirement d[id] not apply." *Id.* at 685. That is, where a new FCA allegation in an amended complaint is "closely linked" with FCA allegations advanced in an original complaint that complied with Section 3730(b)(2)'s under-seal requirement, there is no reason to require that the amended complaint be filed under seal. *See id.* at 684-85.

Here, Relator's proffered new FCA claim is premised on concealment of alleged overpayments that Defendants were obligated to refund under the terms of the CCA. The Government disbursed the alleged overpayments as a result of the same fraudulent conduct—i.e., false certification of compliance with the Stark Statute and the AKS in claims for Medicare payments—that was disclosed in Relator's original complaint, which complied with Section 3730(b)(2). The conduct that allegedly concealed the obligation to refund overpayments under the CCA is conduct that Relator's original complaint discloses as well—i.e., false certification of compliance with the Stark Statute and the AKS in cost reports.

It is evident that Relator's original complaint disclosed to the Government the conduct that Relator now seeks to pursue in his proffered amended complaint. Thus, the unsealed filing of Relator's proffered amended count will "not deprive the government of the opportunity to investigate [R]elator['s] allegations and to decide whether to intervene . . . ." *Id.* at 685. Unsealed filing here also will not "'tip off' [D]efendants to the existence of an investigation" as Defendants clearly are aware of the investigation of the alleged fraud that forms the basis of Relator's proposed amended count. *Id.* Defendants also know which party—Relator or the Government—is pursuing claims related to which alleged fraud.

Further, despite having filed motions to dismiss both Relator's Amended Complaint and the Government's Complaint in Intervention, allowing Relator to add his proposed reverse false claims count will not prejudice Defendants as it arises out of the same fraud Defendants have already been formulating a defense for. And, finally, the Court has no reason to believe that requiring Relator to file his proposed amended count under seal will encourage a speedy and valuable settlement.

Accordingly, finding that the purposes underlying Section 3730(b)(2) inapplicable to Relator's proposed amended count, the Court will not require Relator to file his proposed amended count under seal.

## 2. Amended Complaints May Advance New Causes of Action

In addition to arguing that Relator's proposed amended count is subject to Section 3730(b)(2)'s under-seal requirement, Defendants argue that leave to amend should not be granted because Relator's request really is "a request to add a

new cause of action." ECF No. 95 at 11. But Defendants do not explain why classifying Relator's request as one adding a new cause of action warrants denial of leave to amend.

To be sure, Federal Rule of Civil Procedure 15(a)(2) allows leave for amendment to add new causes of action. *See Sperberg v. Firestone Tire & Rubber Co.*, 61 F.R.D. 78, 79 (N.D. Ohio 1973) ("Requested amendments are liberally granted even when the amendment seeks to add an entirely new cause of action."); *see also* 3 Moore's Federal Practice § 15.02[1] (3d ed. 2011) ("Amendments may relate to either parties or claims and may serve such purposes as to add claims or defenses . . . ."). Therefore, merely asserting a new cause of action is not grounds for denying a request for leave to amend a complaint.

Rather, if the Court is to deny Relator's request for leave to amend his Complaint, it needs a "substantial ground" for doing so. *See Herbert*, 527 F.3d at 1263. Such grounds exist "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). The Court finds that no such grounds exist here.

First of all, there simply is no evidence of undue delay, bad faith, or dilatory motive. Also, Relator has not repeatedly failed to cure deficiencies in his pleadings. Rather, Relator requests his current amendment as a result of what appears to be a mere oversight

in pleading. The Court will not allow a minor oversight that is evidently easily fixed prevent it from reaching the merits of claims where the facts and circumstances show Relator may be entitled to relief. *See In re Engle Cases*, 767 F.3d at 1108.

Second, Defendants have not shown that allowing Relator to add his proposed cause of action will cause them undue prejudice. Indeed, this litigation—though suffering from a significant delay in getting started due to the Government's investigation—is still very young. The only pretrial proceedings after the case was unsealed have been related to privilege disputes and Defendants' two motions to dismiss. Indeed, this is not even a case where Relator's proposed amendment "substantially change[s] the theory of the case" and requires Defendants "to marshal [their] defenses against allegations of fraud . . . that were never hinted at in the original Complaint." *See Barros v. Beck*, --- F. Supp. 2d ----, 2014 WL 1047732, at *5 (D.D.C. March 19, 2014) (allowing amendment despite defendant's argument regarding undue prejudice arising from plaintiff's purported substantial change in theory). Instead, Relator's proposed amendment relies on the same facts and circumstances of the fraud that form the foundation of his and the Government's other FCA causes of action and merely advances a different theory for recovery. Thus, the Court simply cannot find that introducing a new cause of action at this early stage will cause Defendants any undue prejudice and will not deny Relator's request on that ground. To find otherwise would not be a proper exercise of the Court's

discretion, but would be an "abuse of that discretion and inconsistent with the spirit of the Federal Rules." *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

Finally, the Court finds nothing in the record indicating that allowing Relator's requested amendment will be futile. Amendment to add a cause of action is futile when, among other things, the applicable statute of limitations bars the proffered cause of action. *See Moore v. Baker*, 989 F.2d 1129, 1131 (11th Cir. 1993). The statute of limitations for FCA actions "is no 'more than 6 years after the date on which the violation of section 3729 is committed.'" *Foster*, 140 F. App'x at 907 (quoting 31 U.S.C. § 3731(b)(1)). For purposes of Relator's proposed reverse false claims cause of action, the statute of limitation period began when Defendants first made an alleged false statement to the Government aimed at concealing their obligation to refund money to the Government. *Cf. United States v. Entin*, 750 F. Supp. 512, 517 (S.D. Fla. 1990) (considering 31 U.S.C. § 3731(b)(1)'s application to an affirmative false claims action and concluding that "the statute of limitations began to run once a claim for payment was submitted to the United States" (citing *Smith v. United States*, 287 F.2d 299, 304 (5th Cir. 1961))).

Defendants have not raised the statute of limitations issue in their opposition to Relator's request to amend his complaint and the record does not indicate that the statute of limitations period has run with regard to Relator's proffered reverse false claims cause of action. Further, the record shows substantial allegations of Defendants' fraudulent billing practices. The Court,

therefore, finds that if Relator can allege the making of a false statement aimed at concealing Defendants' obligation under the CCA to refund overpayments, granting leave to amend will not be futile.

Because the Court finds no substantial grounds on which to deny Relator's request for leave to amend his complaint in order to add a reverse false claims cause of action, the Court will allow Relator twenty days to amend his complaint as requested.

### C. Count V: Retaliatory Discharge

Defendants move to dismiss Relator's retaliatory discharge count under Federal Rule of Civil Procedure 12(b)(1), arguing that "Relator is precluded from pursuing his retaliatory discharge claim in this Court because of the provision in his written Employment Agreement that 'any controversy or claim arising out of or relating to this Agreement or any alleged breach thereof shall be settled by arbitration in Savannah, Georgia.'" ECF No. 76 at 22 (quoting Relator's Employment Agreement, at § 7.13). Because this aspect of Defendants' motion implicates a different standard of review, the Court will discuss the standard of review under Rule 12(b)(1) before turning to the merits of Defendants' challenge to the Court's jurisdiction.

#### 1. Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) motions "can be based upon either a facial or factual challenge to the complaint." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citing *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981)). "Facial challenges to

subject matter jurisdiction are based solely on the allegations in the complaint" and the usual safeguards of Federal Rule of Civil Procedure 12(b)(6) apply. *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). Therefore, the Court limits its review to "'the allegations in the complaint'" and must accept them as true. *Id.* (quoting *Williamson*, 645 F.2d at 412). However, where the attack is factual,

> the trial court may proceed as it never could under [Fed. R. Civ. P.] 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims.

*Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (per curiam) (quoting *Williamson*, 645 F.2d at 412-13) (internal quotation omitted).

Thus, when assessing a Rule 12(b)(1) motion, the Court may dismiss the complaint on any of three distinct bases: "'(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *McElmurray*, 501 F.3d at 1251 (quoting *Williamson*, 413 F.2d at 413).

## 2.    Classification of Defendants' Motion to Dismiss

As an initial matter, it is important to more specifically characterize Defendants' motion as it relates to Relator's retaliation cause of action. Defendants characterize the motion primarily as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and, in the alternative, as a motion to stay proceedings as to Relator's retaliation claim and to compel arbitration. *See* ECF No. 76 at 22. A review of Defendants' briefing and of case law bearing on the characterization of motions to dismiss based on arbitration clauses convinces the Court that the motion properly is classified solely as a motion to compel arbitration.

"The courts are divided as to whether a request to dismiss a case based on an arbitration clause should be treated as a request for an order compelling arbitration." *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 5 (1st Cir. 2004). This lack of consensus likely is because "[c]ircumstances vary and one rule may not suit all cases." *See id.* at 6. Such fact-dependency also explains the varying results reached in the courts of appeal that have considered the issue for purposes of determining appellate jurisdiction under Section 16 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16. *Compare Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1386 (10th Cir. 2009) (declining to construe denial of a Rule 12 motion as a denial of a

motion to compel arbitration), *Wabtec Corp. v. Faveley Transp. Malmo AB*, 525 F.3d 135, 140-41 (2d Cir. 2008) (same), *and Bombardier Corp. v. Nat'l R.R. Passenger Corp.*, 333 F.3d 250, 253 (D.C. Cir. 2003) (same), *with Fit Tech, Inc.*, 374 F.3d at 6 (construing a motion to dismiss as a motion to compel arbitration where the movant "clearly argued to the district court" that the alternative dispute forum "had sole authority to resolve *all* issues).

The Tenth Circuit has synthesized the cases considering this issue and has drawn from them a two-step process to employ in determining whether a motion to dismiss is properly considered a motion to compel arbitration. Under this two-step inquiry, courts first look to the caption of the motion and then, if the motion "is not explicitly styled as a motion under the FAA, . . . the court must look beyond the caption to the essential attributes of the motion itself." *See Conrad*, 585 F.3d at 1385; *see also Wheeling Hosp., Inc. v. Health Plan of the Upper Ohio Valley, Inc.*, 683 F.3d 577, 585-86 (4th Cir. 2012) (endorsing the Tenth Circuit's approach in *Conrad* and holding that courts "must determine whether [the movant] made it clear within the four corners of its motion to dismiss that it was seeking enforcement of the arbitration agreement").

With these principles in mind, the Court's task in properly classifying Defendants' motion is a relatively simple exercise. Though Defendants styled their motion as a motion to dismiss, their briefing tells a different story. Like the movant in *Fit Tech, Inc.*, Defendants clearly are invoking the Employment Agreement's

alternative dispute resolution remedy. *See Fit Tech, Inc.*, 374 F.3d at 6. Indeed, unlike the movants in *Wabtec Corp.*, Defendants frame their motion "in terms of mandatory arbitration," rather than merely "in terms of judicial preclusion." *See Wabtec Corp.*, 525 F.3d at 140 (emphasis omitted). Further, whereas the movants in *Bombardier Corp.* did not rely "on the FAA's requirement that arbitration agreements be strictly enforced," *see Bombardier Corp.*, 333 F.3d at 254, Defendants' motion invokes the FAA's "strong federal policy in favor of arbitration," *see* ECF No. 76 at 23 (citing *Picard v. Credit Solutions, Inc.*, 564 F.3d 1249, 1253 (11th Cir. 2009)). Indeed, Defendants' brief in support of their motion to dismiss relies on the standard applied to motions to compel arbitration in arguing that the Court should dismiss Relator's retaliation claim. *See* ECF No. 76 at 23-25.

Accordingly, the Court finds that Defendants' motion to dismiss Relator's retaliation claim based on the arbitration provision of his Employment Agreement is properly construed as a motion to compel arbitration, and the Court will analyze it as such.

### 3. Defendants' Motion Presents a Factual Attack on the Court's Subject-Matter Jurisdiction

"Motions to compel arbitration generally raise factual attacks" on a district court's jurisdiction. *Wash v. Mac Acquisition of Del., LLC*, 2014 WL 5173504, at *1 (M.D. Fla. Oct. 14, 2014). This is because such motions "assert[] that a provision of an extrinsic document, an arbitration clause

contained within the body of a contract, deprives the court of its power to adjudicate the [disputed] claims." *See Norfolk S. Ry. Co. v. Fla. E. Coast Ry., LLC*, 2014 WL 757942, at *1 n.2 (M.D. Fla. Feb. 26, 2014) (second alteration in original) (quotation omitted). There is some indication, however, that where a complaint references an employment agreement, a motion to compel arbitration may be considered a facial attack as the arbitration clause on which the motion relies would be considered part of the pleadings. *See, e.g., Perera v. H&R Block E. Enters., Inc.*, 914 F. Supp. 2d 1284, 1289 (S.D. Fla. 2012) (indicating that if the employment agreement and arbitration agreement were referenced in the complaint, they would not be matters outside the complaint); *Moore v. Ferrellgas, Inc.*, 533 F. Supp. 2d 740, 745 (W.D. Mich. 2008) ("The Court finds that Defendant is making a factual attack because Defendant relies on matters outside the pleadings, namely, the Employment Agreement. Plaintiff neither *referenced* the Employment Agreement in the Complaint nor attached it to the Complaint." (emphasis added)). Presumably as a result of such decisions, the parties' hot dispute regarding the Court's jurisdiction centers on whether Defendants' challenge properly is classified as a facial or factual attack.

Defendants argue, in sum, that because Relator referenced the Employment Agreement in his Complaint, the Employment Agreement is part of the Complaint and, therefore, their challenge to the Court's subject-matter jurisdiction over the retaliatory discharge count is a facial challenge. *See* ECF Nos. 76 at 22 & n.12;

95 at 25 & n.10. Relator, though not directly responding to Defendants' argument, contends that resolution of Defendants' Rule 12(b)(1) challenge turns on matters outside the pleadings, *see* ECF No. 89 at 18 n.3, and therefore apparently views Defendants' challenge as a factual attack.

The parties' long-drawn briefing has done little in the way of assisting the Court in classifying the jurisdictional challenge. Defendants' incomplete discussion of the classification issue, however, provides a useful starting point for the Court's own discussion.

In arguing that their challenge to the Court's subject-matter jurisdiction is facial, Defendants' reasoning boils down to: (1) the Eleventh Circuit considers as part of the complaint documents incorporated by reference; (2) Relator's Complaint references the Employment Agreement; therefore, (3) a challenge to subject-matter jurisdiction based on the contents of the Employment Agreement is a challenge based solely on the contents of the Complaint—i.e., a facial challenge. *See* ECF Nos. 76 at 22 n.12; 95 at 15 & n.10.

But the mere fact of a reference to a document in a complaint does not suffice to make that document part of the pleadings. Under Federal Rule of Civil Procedure 12(b)(6), whose safeguards apply to facial challenges under Rule 12(b)(1), courts generally "do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th

Cir. 2007) (per curiam). The Eleventh Circuit, however, "recognizes an exception" to this general rule "in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Id.*

Thus, in order for Defendants' argument to get from Step One (Recognition of the Doctrine of Incorporation by Reference), to Step Three (Establishing That Their Challenge is a Facial Challenge to the Court's Jurisdiction), Defendants must complete Step Two (Establishing That Relator's Complaint Incorporated the Employment Agreement by Reference). But Defendants simply fail to address this step, opting instead to restate their conclusion that their "argument is based on only the [Complaint's] allegations and the Employment Agreement that Relator specifically incorporates by reference." ECF No. 95 at 15 n.10. This simply is insufficient.

Eleventh Circuit precedent makes clear that reference to a document, though necessary, is not sufficient to deem that document incorporated into the complaint by reference. Rather, of crucial importance, is that the document, among other things, be central to the plaintiff's claim. *See, e.g., Lockwood v. Beasley*, 211 F. App'x 873, 876-77 (11th Cir. 2006) (concluding that "the district court failed to follow the proper procedure in ruling on the defendants' motion to dismiss" when it "considered [a] copy of [a] . . . check and . . . affidavit explaining the release language, which were attached to the defendants' motion to

dismiss" where the "check and its release language" were not "central to the plaintiff's case"). In determining "whether a document is central to the plaintiff's case, . . . [the Eleventh Circuit] consider[s] whether the plaintiff would have to offer the document to prove his case." *Id.* at 277.

Here, Relator brings his retaliation claim not pursuant to any terms of his Employment Agreement, but rather pursuant to 31 U.S.C. § 3730(h), *see* ECF No. 51 at 34, which provides for relief from retaliatory actions for *qui tam* plaintiffs in false claims actions. *See* 31 U.S.C. § 3730(h). "The FCA retaliation claim is not a claim for violation of the Employment Agreement; it is completely separate from the contract and asserts an independent claim that would exist even without the contract." *See United States ex rel. Paige v. BAE Sys. Tech. Solutions & Servs., Inc.*, 566 F. App'x 500, 504 (6th Cir. 2014). Indeed, the scope of the FCA "is not limited to instances where employers breach an Employment Agreement addressing the 'terms and conditions' of employment." *Id.* Rather, a prima facie case of retaliation under 31 U.S.C. § 3730(h) requires only that the plaintiff suffer some "adverse action" as a result of engaging in protected activity. *See, e.g., Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1317 (M.D. Ala. 1999) (citing *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 934 (11th Cir. 1995) (interpreting the whistleblower-protection provision of the Energy Reorganization Act)).

Courts interpreting "adverse action" under the FCA have concluded that it is synonymous with adverse employment

actions under Title VII; therefore, "an action may be cognizable as discrimination under the False Claims Act . . . if it is reasonably likely to deter employees from engaging in activity protected under [the FCA]." *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 848 (9th Cir. 2002); *see also United States ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 1021 (S.D. Ohio 2014) (same); *Turner v. DynMcDermott Petroleum Operations Co.*, 2010 WL 4363403, at *2 (E.D. La. Oct. 21, 2010) (same). *But see Haka v. Lincoln Cnty.*, 533 F. Supp. 2d 895, 917 (W.D. Wis. 2008) (concluding that 31 U.S.C. § 3730(h)'s protections are narrower than Title VII's in that "§ 3730(h) applies only to retaliatory actions 'in the terms and conditions of employment,'" but finding that "a reasonable interpretation of the phrase would include a decision to hire"). Quite clearly, whether § 3730(h) is construed as broadly as Title VII or more narrowly, allegations of a retaliatory discharge fall squarely within its scope. 31 U.S.C. § 3730(h)(1) ("Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is *discharged* . . . because of lawful acts done by the employee . . . in furtherance of an action under [the FCA]." (emphasis added))

Thus, the Employment Agreement is not a *necessary* element of Relator's case for retaliation under the FCA. Though Relator's Complaint shows that the contents of the Employment Agreement may provide some evidence of the alleged retaliation—e.g., withholding of severance pay provided for in the Employment Agreement—Relator need not offer the Employment Agreement to prove his retaliatory discharge case under § 3730(h). *See Beasley*, 211 F. App'x at 877.

Accordingly, because Defendants' jurisdictional challenge relies entirely on a clause in the Employment Agreement, a document extrinsic to the pleadings, the Court finds that the challenge presents a factual attack on subject-matter jurisdiction. The Court will, thus, consider matters outside of the pleadings in determining whether Relator's retaliation claim is properly before the Court. *See Carmichael*, 572 F.3d at 1279.

### 4.    Arbitability of Relator's Claims

"The determination of the propriety of a motion to compel arbitration pursuant to Section 4 of the Federal Arbitration Act . . . is a two-step inquiry." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004). The Court must first consider "whether the parties agreed to arbitrate the dispute," and then consider "whether 'legal constraints external to the parties' agreement foreclosed arbitration.'" *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). In conducting this inquiry, it is important to remember that "questions of arbitability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Thus, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitable issues should be resolved in favor of arbitration . . . ." *Id.* at 24-25.

Here, the arbitration clause in Relator's Employment Agreement reads:

> Except as hereinafter provided, any controversy or claim arising out of or relating to this Agreement or any alleged breach thereof shall be settled by arbitration in Savannah, Georgia in accordance with the rules then obtaining of the American Arbitration Association ("AAA") and any judgment upon any award, which may include an award of damages, may be entered in the highest state or federal court having jurisdiction. . . .

ECF No. 76-1 at 14, § 7.13.

The Court's first task is to determine whether the parties agreed to arbitrate Relator's claim. The fact that Relator brings his retaliation claim under 31 U.S.C. § 3730(h) does not render it beyond the purview of the arbitration clause in the Employment Agreement. The Supreme Court consistently has "recognized that federal statutory claims can be appropriately resolved through arbitration, and [has] enforced agreements to arbitrate that involve such claims." *See Green Tree Fin. Corp.- Ala. v. Randolph*, 531 U.S. 79, 89 (2000) (citing cases). This principle pertains even as to "claims arising under a statute designed to further important social policies . . . ." *Id.* at 90. Indeed, other courts considering similarly broad language in arbitration clauses have found that those clauses cover retaliation claims under 31 U.S.C. § 3730(h).[5] This application of

arbitration clauses employing "arising out of or relating to" language to retaliation claims brought under § 3730(h) comports with the Eleventh Circuit's interpretation of the scope of similar language. *See generally Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1217-19 (11th Cir. 2011) (discussing an arbitration provision covering disputes "related to" a plaintiff's employment and finding that the provision was "broad, but not limitless" in that "'related to' mark[ed] a boundary by indicating some direct relationship" between the dispute and the plaintiff's employment was required). Accordingly, as to the first step of its inquiry, the Court finds that the parties agreed to arbitrate Relator's § 3730(h) retaliation claim.

As for the second step of the Court's inquiry, the Court must consider whether

---

[5] *Compare United States ex rel. McBride v. Halliburton Co.*, 2007 WL 1954441, at *5 (D.D.C. July 5, 2007) (concluding that an "agreement cover[ing] 'any matters with respect to' [Relator's] employment . . . , including the termination of her employment, as well as 'any other matter related to or concerning the relationship between the Employee and the Company'" covered retaliation claims under § 3730(h)); *Orcutt v. Kettering Radiologists, Inc.*, 199 F. Supp. 2d 746, 753 (S.D. Ohio 2002) (holding § 3730(h) retaliation claim was within the scope of an arbitration agreement covering "'[a]ny controversy or claim arising out of or relating to this Agreement or breach thereof'" (alteration in original)); *Mikes v. Strauss*, 889 F. Supp. 746, 755 (S.D.N.Y. 1995) ("Since the parties have agreed to arbitrate all 'disagreements, claims, questions or controversies which may arise out of *or relate to* [the] Agreement,' unless otherwise prohibited, under the general federal policy favoring arbitration we must interpret the clause as covering plaintiff's retaliatory discharge claim [under § 3730(h)]." (alteration in original)), *with Paige*, 566 F. App'x at 504-05 (concluding that a § 3730(h) retaliation claim was beyond the scope of an arbitration clause that "explicitly limit[ed] the scope of the clause to the disputes arising 'under the terms of this agreement' and d[id] not include claims 'related' to the agreement or that arise out of the relationship between the parties").

extrinsic legal constraints preclude arbitration. "In determining whether statutory claims may be arbitrated, . . . [the Court] ask[s] whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Green Tree Fin. Corp.*, 531 U.S. at 90. Thus, "so long as the agreement does not require the claimant to forgo substantive rights," an agreement to arbitrate statutory claims is enforceable. *Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77, 79 (D.C. Cir. 2005).

Defendants argue that "[n]o such . . . Congressional intention foreclose[s] arbitration here." ECF No. 76 at 24. Relator does not dispute this conclusion and other courts to consider the issue have concluded that "no congressional intent to preclude arbitration of FCA retaliation claims appears in the statute or its legislative history" and that § 3730(h) claims can "adequately be vindicated in . . . arbital forum[s]." *See McBride*, 2007 WL 1954441, at *4-5 (discussing the issue of whether § 3730(h) evinces an intent to preclude waiver of judicial remedies). Thus, the Court finds that no legal constraints exist to preclude arbitration of Relator's § 3730(h) retaliation claim and that it is therefore subject to the arbitration clause under his Employment Agreement.

## 5. Defendants' Waiver of Arbitration

A finding that Relator's § 3730(h) retaliation claim is subject to the arbitration provision of the Employment Agreement does not, however, end the Court's inquiry. "'[D]espite the strong policy in favor of arbitration, a party may, by its conduct,

waive its right to arbitration.'" *Garcia v. Wachovia Corp.*, 699 F.3d 1273, 1277 (11th Cir. 2012) (alteration in original) (quoting *S & H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990) (citation omitted)). In his response to Defendants' motion to dismiss, Relator argues that Defendants have done just that. *See* ECF No. 89 at 17.

Determination of whether a waiver of the right to arbitration has occurred requires the Court to engage in yet another two-step legal dance. "A party has waived its right to arbitrate if, 'under the totality of the circumstances, the . . . party has acted inconsistently with the arbitration right' and, in so acting, has in some way prejudiced the other party." *S & H Contractors*, 906 F.2d at 1514 (citations omitted) (quoting *Nat'l Found. for Cancer Research v. A.G. Edwards & Sons*, 821 F.2d 772, 774 (D.C. Cir. 1987)). However, in light of the strong federal policy in favor of arbitration, a waiver of a right to arbitration is not easily found. "[T]he party who argues waiver 'bears a heavy burden of proof' under this two-part test." *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1200 n.17 (11th Cir. 2011) (quoting *Stone v. E.F. Hutton & Co.*, 898 F.2d 1542, 1543 (11th Cir. 1990) (per curiam)).

In support of his waiver argument, Relator attached to his response to Defendants' motion to dismiss the records of an arbitration proceeding regarding his discharge. *See* ECF Nos. 89-1; 89-2; 89-3; 89-4. This record reveals why Defendants objected so adamantly to the Court's consideration of *extrinsic* evidence.

Relator's Demand for Arbitration advanced a claim for retaliatory discharge, alleging that he "engaged in protected activities under Georgia and federal law," that Defendants were "aware of [his] protected activities," that Defendants "terminated [his] employment in retaliation for his protected activities," and that Defendants' "termination . . . violate[d] public policy and multiple statutes of the State of Georgia and the United States." ECF No. 89-1 at 11, ¶¶ 34-36. The report from the preliminary arbitration management conference reveals, however, that Defendants did "not agree that the arbitrator has jurisdiction or authority over [Relator's] Second Claim for Retaliatory Discharge . . . ." ECF No. 89-2 at 3, ¶ 5.

In response, Relator moved to voluntarily dismiss his retaliatory discharge claim without prejudice. ECF No. 89-3 at 2. His stated reason for doing so was Defendants' argument that the arbitrator lacked jurisdiction over the claim and that "therefore the claim [was] not arbitrable under the language of the Employment Agreement." Id. Accordingly, Relator sought to withdraw the claim "without prejudice to asserting [it] in a forum of appropriate jurisdiction." Id. Defendants "had no objection" to Relator's voluntary dismissal and the arbitrator accepted it and noted that Defendants' "exception to the arbitrator's jurisdiction or authority over [Relator's] Second Claim for Retaliatory Discharge . . . [was] no longer at issue . . . ." ECF No. 89-4 at 2. Thus, Relator's waiver argument goes as follows: (1) by objecting to the submission of the retaliation claim to the arbitrator in the first instance,

Defendants have acted inconsistently with the arbitration right; and that (2) as a result, Relator incurred significant expenses in the first arbitration proceeding without addressing the retaliation claims and forcing him to return to arbitration would force him to incur duplicative expenses. See ECF No. 89 at 21.

Turning to the merits of Relator's waiver argument, it is clear, first of all, that Defendants took a position in the prior arbitration proceedings that was inconsistent with the right to arbitrate. Indeed, Defendants objected to the submission of the claim that they now argue is exclusively within the jurisdiction of the arbitrator on the basis that the arbitrator in the previous proceeding lacked jurisdiction over the claim.

Defendants seek to avoid this finding of inconsistency by arguing that "it was not clear that Relator's arbitration demand included an FCA-based retaliatory discharge claim." ECF No. 95 at 18. This argument "taxes the credulity of the credulous." See Maryland v. King, 133 S. Ct. 1958, 1980 (2013) (Scalia, J., dissenting). As an initial matter, Relator's demand for arbitration did specify that Relator's "termination was in fact in direct retaliation for [his] exercise of lawful rights under the laws of . . . the United States," ECF No. 89-1 at 5, ¶ 11; see also id. at 11, ¶¶ 34-36, and notes that at the center of the parties' dispute was Defendants' insistence on Relator's release of claims under "the federal False Claims Act, the Stark Law, the Anti-Kickback law, and the Georgia False Claims Act." Id. at 8, ¶ 20. Relator was not required to specify the exact statutes on which he relied for his

retaliation claim. *See Kurt Orban Co. v. Angeles Metal Sys.*, 573 F.2d 739, 740 (2d Cir. 1978) ("The language of arbitration demands should not be subjected to the same strict standards of construction that would be applied in formal court proceedings."). Even where an arbitration demand does not comply with notice-pleading requirements, it is the arbitrator's duty to ensure that the statement adequately sets forth the nature of the parties' dispute. *See* John H. Henn, *Where Should You Litigate Your Business Dispute? In an Arbitration? Or Through the Courts*, Disp. Resol. J., Aug.-Oct. 2004, at 34, 36 n.6.

The arbitration record makes clear that the parties discussed Relator's arbitration demand, the nature of the claims advanced, and the arbitrator's jurisdiction. Indeed, based on the history between Relator and Defendants, the factual background set forth in Relator's arbitration demand, the discussion of the arbitrator's jurisdiction over the retaliation claim, and the eventual dismissal without prejudice of that claim based on the parties' agreement regarding the arbitrator's jurisdiction, *see* ECF Nos. 89-2 at 3; 89-4 at 2, there can be little doubt that Defendants were aware that Relator pursued FCA-based retaliation claims in his arbitration proceeding and that Defendants objected to the arbitrator's jurisdiction over that claim. To find otherwise simply would defy logic. Therefore, the Court finds that Defendants were aware that Relator's retaliation claim in his Arbitration Demand included FCA-based claims and that their prior objection to the arbitrator's jurisdiction over Relator's retaliation claim was

inconsistent with the right to arbitrate that claim.

Moving to the second prong of the waiver analysis, there can be similarly little doubt that Defendants' inconsistent actions have prejudiced Relator. Defendants' argument against a finding of prejudice here focuses on the progress of, and Defendants' participation in, the instant litigation. *See* ECF No. 95 at 19 ("Relator has not incurred any significant expenses by pursuing his claim in court . . . Further, because discovery has not yet begun, [Defendants] ha[ve] not taken advantage of any of the procedural differences between arbitration and litigation that a finding [a sic] waiver is designed to prevent.").

But "participating in litigation is not the only way to waive the right to arbitration." *See Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1318 (11th Cir. 2002). Rather, the Court asks whether, "under the totality of the circumstances," the Defendants' inconsistent actions have "in some way prejudiced [Relator]." *S & H Contractors*, 906 F.2d at 1514 (quotation omitted). This inquiry considers "the length of delay in demanding arbitration," as well as "the expense [Relator] incurred . . . from participating in the litigation process." *Id.* Guiding the Court's determination of the waiver issue is the "'prime objective of an agreement to arbitrate[, which] is to achieve streamlined proceedings and expeditious results.'" *In re Checking Account Overdraft Litig.*, 754 F.3d 1290, 1295 (11th Cir. 2014) (quoting *Preston v. Ferrer*, 552 U.S. 346, 357 (2008) (internal quotation marks omitted)).

With these principles in mind, the Court concludes that, through their inconsistent position taken during Relator's arbitration, Defendants have waived their right to compel arbitration. Relator included his retaliation claim in his arbitration demand, submitted on April 1, 2011. ECF No. 89-1. Defendants objected to the arbitrator's jurisdiction over Relator's retaliation claim on August 17, 2011, ECF No. 89-2 at 3, and the arbitrator accepted the withdrawal of that claim based on Defendants' objection to jurisdiction on September 19, 2011. ECF No. 89-4 at 2. The arbitration proceedings continued until May 30, 2012, when the arbitrator issued a final award, without Defendants addressing the arbitability of the retaliation claim further. *See* ECF No. 51 at 31. Indeed, it was not until October 7, 2014, more than three years after the close of arbitration, that Defendants pressed the arbitrability of Relator's retaliation claim in this motion to dismiss. ECF No. 76 at 22.

In addition to Defendants' over-three-year delay in asserting their purported right to arbitration of Relator's retaliation claim, Relator has expended a significant sum of money in reliance on Defendants' objection to the arbitrator's jurisdiction over his retaliation claim. To be sure, Relator alleges that he incurred over $100,000 in expenses during the course of the arbitration from which he withdrew his retaliation claim in reliance on Defendants' objection to jurisdiction. *See* ECF No. 89 at 21. Had it not been for Defendants' objection to jurisdiction, Relator could have resolved his retaliation claim, along with all other claims arising out of his Employment Agreement, in one, streamlined process. To allow

Defendants to change course now would cause Relator to incur duplicative arbitration expenses while also incurring the cost and burden of pursuing parallel claims in separate forums, not to mention expending the resources of both the Court and the arbitration forum.

If Defendants wanted to arbitrate Relator's retaliation claim, they should have allowed that claim to proceed through arbitration in the first instance to achieve an expeditious resolution of all the parties' disputes. But because Defendants objected to the arbitrator's jurisdiction then, they cannot now tell the Court it lacks jurisdiction because the claim is subject to the arbitration clause. *See Smith v. Petrou*, 705 F. Supp. 183, 185 (S.D.N.Y. 1989) (finding an express waiver of a party's right to arbitration when the party seeking arbitration "previously prevented the case from going to arbitration" and concluding that "a party may not freely take inconsistent positions in a law suit and simply ignore the effect of a prior filed document" (quotation omitted)); *See cf. Rock-Tenn Co. v. United Paperworkers Int'l Union AFL-CIO*, 184 F.3d 330, 334-35 (4th Cir. 1999) ("Thus, even when a party could have refused arbitration in the first instance, . . . if that party 'voluntarily and undeservedly submits an issue to arbitration, he cannot later argue that the arbitrator had no authority to resolve it.'" (quoting *Jones Dairy Farm v. Local No. P-1236, United Food & Commercial Workers Int'l Union, AFL-CIO*, 760 F.2d 173, 175 (7th Cir. 1985)). Both the arbitrator and Relator accepted Defendants' argument regarding the retaliation claim's arbitability. The Court will not allow

Defendants to materially change their position "according to the exigencies of the moment"—i.e., in order to avoid a determination of the retaliation claim by the arbitrator in the first instance and to avoid litigating the retaliation claim before the Court in the second instance. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Allowing this "chameleonic" gamesmanship, *see Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992), would make a mockery of justice. *See Tampa Bay Water v. HDR Eng'g*, 731 F.3d 1171, 1182 (11th Cir. 2013).

Accordingly, in light of Defendants' prior inconsistent position with regard to the arbitability of Relator's retaliation claim and the prejudice Relator has suffered as a result, the Court finds that Defendants have waived their right to compel arbitration of that claim. Count V is therefore not subject to dismissal under Federal Rule of Civil Procedure 12(b)(1).

## V. CONCLUSION

This Order has covered a significant amount of ground. By way of summary, the Court has found that Count II of Relator's Complaint was inadequately pleaded, because the Complaint failed to sufficiently allege that the Government actually made payments to Defendants based on services provided pursuant to prohibited referrals. Relator, however, requested leave to amend his Complaint to add the requisite specificity. In doing so, he attached an affidavit to his response to Defendants' motion to dismiss detailing the factual allegations he plans to add. The Court concluded that this affidavit evinced a present ability to cure the deficiencies it found and therefore granted Relator's request for leave to file an amended complaint.

Next, the Court found that Count III of Relator's Complaint was inadequately pleaded, because the Complaint failed to allege a benchmark from which the Court could infer that the bonuses that Relator alleges were excessive were, in fact, above fair market value levels. However, Relator will have the opportunity to provide such a benchmark in his amended complaint.

The Court then considered Relator's request to amend Count IV of his complaint to add a reverse false claims cause of action in lieu of the original breach of contract cause of action. Finding no substantial grounds on which to deny leave to amend, the Court granted Relator's request.

Finally, the Court considered Defendants' jurisdictional challenge to Count V of Relator's complaint, the FCA retaliation claim. Having found that Defendants' previous, inconsistent position with regard to their right to arbitrate Relator's retaliation claims has prejudiced Relator, the Court determined that Defendants waived their right to arbitrate Relator's retaliation claim. Therefore, Relator's retaliation claim is not subject to dismissal under Rule 12(b)(1).

Accordingly, the Court *GRANTS* Defendants' Motion to Dismiss as to Counts II, III, and IV of Relator's First Amended Complaint, ECF No. 75. As to Count V of Relator's First Amended Complaint, Defendants' Motion to Dismiss, ECF No. 75, is *DENIED*.

However, having found no substantial grounds on which to deny Relator's request for leave to file an amended complaint, ECF No. 89 at 15, 16, the Court *GRANTS* Relator's request and will allow him twenty days to file an amended complaint as to Counts II, III, and IV.

In closing, the Court notes the vitriol contained in the parties' briefs. Specifically, Defendants' characterized Relator's term as President and CEO as a "near-sighted reign of error" and alleged that Relator's Complaint sought to blame others "for his failures as a leader" and "as CEO." ECF No. 76 at 1, 2. Apparently not one to let insults go unanswered, Relator opened his response by discounting Defendants' motion to dismiss "as a self-aggrandizing press release in parts, an inaccurate op-ed about the state of Medicare reimbursement in other parts, and a personal attack on Mr. Schaengold in other parts." ECF No. 89 at 1. Such personal attacks and petty ancillary disputes distract from the merits of the case.

The parties' mutual acrimony is of no moment to the Court. Going forward, the parties are advised to show a grace in their quarrel, 2 The Letters of John Keats, 1819-1821, at 80 (Hyder Edward Rollins ed., 2011), and to bring only law into the courtroom.

This /8 day of December 2014.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA